The Bank of Augusta, Plaintiffs in error, *vs.* Joseph B. Earle, Defendant in error.

The Bank of the United States, Plaintiffs in error, *vs.* William D. Primrose, Defendant in error.

The New Orleans and Carrollton Railroad Company, Plaintiffs in error, *vs.* Joseph B. Earle, Defendant in error.

An action was instituted in the Circuit Court of the United States for the District of Alabama, by the Bank of Augusta, Georgia, against the defendant, a citizen of Alabama, on bills of exchange drawn at Mobile, Alabama, on New York, which had been protested for non-payment, and returned to Mobile. The bill was made and endorsed for the purpose of being discounted by the agent of the bank, who had funds in his hands belonging to the plaintiffs for the purpose of purchasing bills of exchange, which funds were derived from bills and notes discounted by the bank in Georgia. The bills were discounted by the agent of the bank, in Mobile, for the benefit of the bank, with their funds, to remit the said funds to the bank. The defendant defended the suit on the facts that the bank of Augusta is a corporation incorporated by an act of the legislature of Georgia, and have power such as is usually conferred on banking institutions, such as to purchase bills of exchange, &c. The Circuit Court held that the plaintiffs could not recover on the bills of exchange; and that the purchase of the bills by the agent of the plaintiffs were prohibited by the laws of Alabama, and gave judgment for the defendant. In the case of the Bank of the United States of Pennsylvania *vs.* Primrose, a corporation created by virtue of a law of the state of Pennsylvania, authorized by its charter to sue and be sued in the name of the corporation, and to deal in bills of exchange, and composed of citizens of Pennsylvania, and of states of the United States, other than the state of Alabama, the agent of the bank resident in Mobile, and in possession of funds belonging to the bank, and intrusted with them for the sole purpose of purchasing bills of exchange; purchased a bill of exchange, and paid for the same in notes of the branch of the bank of Alabama, at Mobile. The bill was protested for non-payment, and a suit was instituted in the Circuit Court against the payee, the endorser of the bill. The question for the opinion of the Circuit Court was, whether the purchase of the bill of exchange by the bank of the United States was a valid contract, under the laws of Alabama. The Circuit Court decided that the contract was void, and gave judgment for the defendant. The case of the New Orleans and Carrollton Railroad Company *vs.* Joseph B. Earle, was similar to that of the Bank of Augusta *vs.* Joseph B. E rle. The Supreme Court reversed the judgment of the Circuit Court in the three cases; and held the contracts for the purchase of the bills valid; and that the plaintiffs acquired a legal title to the bills by the purchase.

In the case of the Bank of the United States *vs.* Deveaux, the Supreme Court decided, that in a question of jurisdiction they might look to the character of the persons composing a corporation; and if it appeared that they were citizens of another state, and the fact was set forth by proper averments, the corporation might sue in its corporate name in the Courts of the United States. But in that case the Court confined its decision, in express terms, to a question of jurisdiction; to a right to sue; and evidently went, even so far, with some hesitation. The propriety of that decision is fully assented to, and it has ever since been recognised as authority in this Court. But the principle has never been extended any farther than it was carried in that case; and has never been supposed to extend to contracts made by a corporation. especially in another sovereignty.

The nature and character of a corporation create, d by statute, and the extent of the powers which it may lawfully exercise, have upon several occasions been under consideration in this Court. The cases of Head and Amory *vs.* The Providence Insurance Company, 2 Cranch, 167; and the Dartmouth College *vs.* Woodward, 4 Wheaton, 636, cited.

Whenever a corporation makes a contract, it is the contract of the legal entity; of the artificial being created by the charter, and not the contract of the individual members. The only rights it can claim are the rights which are given to it in that character, and not the rights which belong to its members as citizens of a state.

It may be safely assumed, that a corporation can make no contracts, and do no acts, either within or without the state which creates it, except such as are authorized by its charter; and those acts must also be done by such officers or agents, and in such manner as the charter authorizes." And, if the law creating a corporation does not, by the true construction of the words used in the charter, give it the right to exercise its powers beyond the limits of the state, all contracts made by it in other states would be void.

It is very true that a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law, and by force of the law; and where that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty. But although it must live and have its being in that state only, yet it does not by any means follow that its existence there will not be recognised in other places; and its residence in one state creates no insuperable objection to its power of contracting in another. It is indeed a mere artificial being, invisible and intangible; yet it is a person for certain purposes, in contemplation of law; and has been recognised as such by the decisions of this Court. It is sufficient that its existence as an artificial person, in the state of its creation, is acknowledged and recognised by the law of the nation where the dealing takes place; and that it is permitted by the laws of that place, to exercise there the powers with which it is endowed.

Courts of justice have always expounded and executed contracts made in a foreign country according to the laws of the place in which they were made; provided that law was not repugnant to the laws or policy of their own country. The comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered; and is inadmissible when contrary to its policy, or prejudicial to its interests. But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong; that Courts of justice have continually acted upon it, as a part of the voluntary law of nations.

The Court can perceive no sufficient reason for excluding from the protection of the law the contracts of foreign corporations; when they are not contrary to the known policy of the state, or injurious to its interests. It is nothing more than the admission of the existence of an artificial person created by the law of another state; and clothed with the power of making certain contracts. It is but the usual comity of recognising the law of another state.

The states of the Union are sovereign states; and the history of the past and the events which are daily occurring, furnish the strongest evidence that they have adopted towards each other the laws of comity in their fullest extent.

In the legislation of Congress, where the states and the people of the *several* states are all represented, we shall find proof of the general understanding in the United States that by the law of comity among the states, the corporations chartered by one, were permitted to make contracts in the others.

It is well settled, that by the law of comity among nations, a corporation created by one sovereignty is permitted to make contracts in another, and to sue in its Courts; and that the same law of comity prevails among the several sovereignties of this Union. The public, and well known and long continued usages of trade, the general acquiescence of the states; the particular legislation of some of them, as well as the legislation of Congress; all concur in proving the truth of this proposition.

Franchises are special privileges conferred by government upon individuals, and which do not belong to the citizens of the country generally of common right. It is essential to the character of a franchise, that it should be a grant from the sovereign authority; and in this country, no franchise can be held which is not derived from a law of the state.

The comity of suit brings with it the comity of contract; and where the one is expressly adopted by the Courts, the other must also be presumed, according to the usages of nations, unless the contrary can be shown.

The state of Alabama has not merely acquiesced by silence, but her judicial tribunals have declared the adoption of the law of international comity in the case of a suit.

The state of Alabama never intended, by its constitution, to interfere with the right of selling or purchasing bills of exchange.

When the policy of a state is manifest, the Courts of the United States would be bound to notice it, as a part of its code of laws; and to declare all contracts in the state, repugnant to it, to be illegal and void.

IN error to the Circuit Court of the United States for the southern district of Alabama.

These cases were brought from the Circuit Court of the southern district of Alabama, by the plaintiffs in each case, by writs of error. The cases of the Bank of Augusta vs. Joseph B. Earle, and of the Bank of the United States vs. William D. Primrose, were argued by counsel. The case of the New Orleans and Carrollton Railroad Company was submitted by Mr. Ogden, on the argument in the other causes.

In the case of the Bank of Augusta vs. Joseph B. Earle, the facts were the following :—

The Bank of Augusta, incorporated by the legislature of the state of Georgia, instituted in the Circuit Court for the southern district of Alabama, in March, 1837, an action against Joseph B. Earle, a citizen of the state of Alabama, on a bill of exchange, dated at Mobile, November 3, 1836, drawn at sixty days sight, by Fuller, Gardner, and Co., on C. B. Burland and Co., of New York, in favour of Joseph B. Earle, and by him endorsed, for six thousand dollars. The bill was accepted by the drawees, but was afterwards protested for non-payment; and was returned with protest to the plaintiffs.

The following facts were agreed upon by the counsel for the plaintiffs and the defendant; and were submitted to the Circuit Court :—

" The defendant defends this action upon the following facts that are admitted by the plaintiffs; that plaintiffs are a corporation, incorporated by an act of the legislature of the state of Georgia, and have power usually conferred upon banking institutions, such as to purchase bills of exchange, &c. That the bill sued on was made and endorsed for the purpose of being discounted, by Thomas McGran, the agent of said bank, who had funds of the plaintiffs in his hands, for the purpose of purchasing bills, which funds were derived from bills and notes, discounted in Georgia by said plaintiffs, and payable in Mobile, and the said McGran, agent as aforesaid, did so discount and purchase the said bill sued on, in the city of Mobile, state aforesaid, for the benefit of said bank, and with their funds; and to remit said funds to the said plaintiffs.

" If the Court shall say that the facts constitute a defence to this action, judgment will be given for the defendant, otherwise for plaintiffs, for the amount of the bill, damages, interest and costs; either party to have the right of appeal or writ of error to the Supreme Court, upon the statement of facts, and the judgment thereon."

The Circuit Court gave judgment for the defendant.

The Bank of the United States, incorporated by the legislature of the State of Pennsylvania, as the holders of a bill of exchange protested for non-payment, for five thousand three hundred and fifty dollars, drawn by Charles Gascoine, at Mobile, on the 14th January, 1837, at four months, on J. and C. Gascoine, of New York, in favour of W. D. Primrose, and by him endorsed, instituted in October, 1837, an action against the endorser of the bill, in the Circuit Court for

[Bank of Augusta vs. Earle.]

the southern district of Alabama. The agreed facts of the case, which were submitted to the Circuit Court, were as follow:

"The plaintiffs are a body corporate, existing under and by virtue of a law of the state of Pennsylvania, authorized by its charter to sue and be sued by the name of the President, Directors, and Company of the Bank of the United States, and to deal in bills of exchange, and is composed of citizens of Pennsylvania, and of states of the United States other than the state of Alabama. The defendant is a citizen of the state of Alabama. George Poe, Jr., was the agent of the plaintiffs, resident in Mobile, and in the possession of funds belonging to the plaintiffs, intrusted to him for the sold purpose of purchasing bills of exchange. The said George Poe, Jr., as such agent, on the 14th day of January, A. D. 1837, purchased at Mobile the bill declared upon, and paid for the same in notes of the branch of the Bank of the State of Alabama, at Mobile. The defendant is the payee of the bill, and endorsed it to plaintiffs, the present holders. The bill was presented at maturity to the acceptors, and duly protested for non-payment; and due and legal notice given to the defendant.

The question for the opinion of the Court on the foregoing statement of facts is, whether the purchase of the said bill of exchange by the plaintiffs, as aforesaid, was a valid contract under the laws of Alabama. If the Court be of opinion that the said contract was valid, and that the said plaintiffs, as holders of the said bill, acquired the legal title thereto by the said purchase, then judgment to be rendered for the plaintiffs for the sum of 5,350 dollars, with interest at eight per cent. since 30th May, 1837, and ten per cent. damages on it. But if the Court be of opinion that the said purchase was prohibited by the laws of Alabama, and the contract was therefore invalid and void, judgment to be rendered for the defendant."

The Circuit Court gave judgment for the defendant.

The action of the New Orleans and Carrollton Railroad Company, incorporated by an act of the legislature of Louisiana, was upon a bill of exchange, drawn by Fuller, Gardner, and Co., of Mobile, in favour of Joseph B. Earle, upon Fuller and Yost, of New Orleans, for five thousand two hundred and ten dollars, protested for non-payment. The action was against the endorser of the bill, which had been purchased at Mobile by an agent of the plaintiffs, who had funds in his hands belonging to the plaintiffs, for the purpose of purchasing bills exchange, as a means of remittance to New Orleans.

The Circuit Court gave judgment for the defendant.

The case of the Bank of Augusta was argued by Mr. D. B. Ogden, for the plaintiffs, and by Mr. C. J. Ingersoll, for the defendant. Mr. Ogden also submitted the case of the New Orleans and Carrollton Railroad Company to the Court, on the argument in the case of the Bank of Augusta, &c. The case of the Bank of the United States vs. Primrose, was argued by Mr. Sergeant and Mr. Webster,

for the plaintiff in error, and by Mr. C. J. Ingersoll, and Mr. Vande Gruff, for Joseph B. Earle. A printed argument for W. D. Primrose, was also submitted by Mr. Crawford.

Mr. Ogden; for the Bank of Augusta, contended that the bank had a right to become the purchaser of the bill of exchange on which the suit was brought; and they had a legal right to recover its amount against the defendant, as the endorser of the bill.

The plaintiffs were the owners of a bill or bills of exchange, which they had purchased at Augusta, in Georgia, drawn on persons in Mobile, which were remitted by them to Mobile, and were there paid. The funds thus obtained, were invested in the bill of exchange which is the subject of this suit, for the purpose of a remittance. The question for the determination of this Court is, whether the plaintiff's had authority to make the purchase. The Circuit Court of Alabama decided this to be contrary to the laws of Alabama.

If the decision of the Circuit Court shall be sustained by this Court, a deeper wound will be inflicted on the commercial business of the United States than it has ever sustained. The principal means by which the commercial dealing between the states of the United States and Alabama is conducted, will be at an end; and there will be no longer the facilities of intercourse for the purposes of traffic, by which alone it is prosperous and beneficial. Nor will the effect of such a decision be confined to the State of Alabama. The principles of law which forbid the dealing in exchange by a corporation established under the laws of another state, and by the terms of its charter expressly authorised to purchase bills of exchange, will prevail to the full extent of inhibiting the same purchases in other states; and thus exclude the principal operations of commerce between the states of the Union. In the state of Alabama, such a condition of things will operate most injuriously. The purchases of bills of exchange in that state, are extensively made by the agents of corporations of other states; and thus, by the competition which is produced; the rates of exchange are kept in a due proportion to those of other states. The large productions of cotton in that state, are thus enabled to realize to the planter a proper, and an equal price to that obtained by the planters in the neighbouring states. Should the banks of Alabama and the capitalists of that state have the exclusive right to deal in exchange, the effect of such a monopoly will be felt extensively.

Such operations in exchange as those out of which this controversy has arisen, have been transacted in every state of the Union. Until now, their legality has never been doubted; and in no Court of the United States, or in any state Court, has their validity been before questioned or denied. The Union has existed for more than half a century, the transactions between the states composing it, of the same character with that which is now before the Court, have, for a large portion of that period, been extensive and constant; and they have been universally found to be beneficial. No state, what-

ever the power of its legislature may be to act upon the matter; a power which it is not intended to admit or deny in this argument; has attempted to interpose a prohibition and forbid such dealing.

The proposition in the Circuit Court, and on which its decision is founded, is that a corporation of one state can do no commercial business, can make no contract, and can do nothing in any other state of the Union, but in that in which, by the law of the state, it has been created.

This proposition is the more injurious, as in the United States associated capital is essentially necessary to the operations of commerce, and the creation and improvement of the facilities of intercourse, which can only be accomplished by large means. Associated capital here, supplies the place of the large individual accumulations which are found in Europe.

The question is not on the powers of a corporation, but as to whom and to what objects those powers can be exerted. A corporation is the creature of the law, and it is clothed with all the powers of a person. The position on the other side is, that when it leaves the state which gave it existence by granting its charter, it loses its personal existence, and has no existence whatever. This is a harsh doctrine, and seems at war with the principles of those who assert and maintain state rights. It is certainly true that a corporation in one state, is not a corporation in another state, as to the full exercise of corporate powers. In Georgia, if it was brought into being by a law of that state, it may carry on any business authorized by its charter; but in Alabama it can do nothing but what the laws of Alabama authorize it to do, as a corporation, or which these laws do not forbid. It may institute suits in Alabama. If a debt is contracted in Augusta, in Georgia, and the debtor removes to Mobile, can no suit be instituted to recover the debt in Mobile? It can be sued at Alabama, as it may sue.

Congress in 1825 passed an act authorizing steamboat companies to own ships and vessels, and to take out a register on the oath of the president of the company. Suppose a steamboat owned and registered in New York shall put into Mobile, and shall there be unlawfully taken possession of; could no action be brought by the company for such a trespass? Could not the company make an agreement to have the boat repaired in Mobile? Is it possible that such a construction can be given to the law?

Nothing is better settled than that a corporation may institute suits in the Courts of other states and countries than those under whose laws they may have been established. 1 Roll's Abridg. 531. 2 Bulstrode, 32. Hobart, 113. 9 Vesey, 347. The Nabob of Carnatic vs. The East India Company, 1 Vesey, Jr., 371. 2 Lord Raymond, 152. 1 Strange, 612. 10 Mass. Rep., 91. 5 Cowan, 550. The King of Spain vs. Oliver, Peters' Cir. Court Rep. 276. The Society for Propagating the Gospel in foreign Parts vs. Wheeler, Gallison's Rep. 2 Randolph's Rep. 465.

It is admitted by those who maintain the decision of the Circuit

Court of Alabama to be correct, that by the laws of nations, corporations of other countries may institute suits out of the states or countries in which they were created: but it is said this principle and established practice does not apply to suits which are claimed to be instituted by a corporation of one state of the United States, in the Courts of another state; that the states are not nations towards each other, and that the rules and principles of international law do not apply to them; that all the states compose one nation, and each is absorbed in the nation of the United States.

This is a strange doctrine as to the states of the Union. The same governments, having similar laws, are said to owe to each other less comity than is admitted to be due to foreign nations. The contrary to this position would seem just and proper. Between the states comity is doubly due; and is an obligation of the highest influence.

The states between each other are sovereign and independent. They are distinct and separate sovereignties, except so far as they have parted with some of the attributes of sovereignty by the Constitution. They continue to be nations, with all their rights, and under all their national obligations, and with all the rights of nations in every particular; except in the surrender by each to the common purposes and objects of the Union, under the Constitution. The rights of each state, when not so yielded up, remain absolute.

Congress have never provided for the proof of the laws of the states when they are brought forward in the Courts of the United States, or in the Courts of the states; and they are proved as foreign laws are proved. There must be special legislation of every state as to the mode of proof of the laws of other states. New York has legislated on this subject, and a provision has been made which is applicable to it.

Every principle of law which allows foreign states to sue in the Courts of other countries, applies to corporations. The laws respecting mortgages are necessarily local in their character and provisions; and yet it has been held that a corporation of one state may become a mortgagee of lands in another state. This was decided by Chancellor Kent, in the case of The Silver Lake Bank, 4 Johns. Ch. Rep. 370. In this case the Chancellor held that corporations created by the legislature of Pennsylvania had a right to enforce a mortgage on real property in New York, by a proceeding in the Court of Chancery of New York.

It is said that a right to sue and a right to contract are different; that a corporation may sue because it is a person recognised by the laws of Alabama, and may take a stand as a person in the Courts of Alabama. Thus a corporation of Georgia is considered a person in Alabama. It can give a warrant of attorney; for no suit can be sustained without such a warrant. Why is such a right allowed? It is because a corporation is recognised as having a personal existence. How can they sue to enforce a contract, and not have a right to make a contract? In principle there can be no difference.

Does not a right to sue give a right to make a compromise of the matter in controversy in the suit? This is a right to make a contract, for a compromise is a contract. He who institutes a suit may discontinue it. This is a contract. The declaration in a suit in a Court of Alabama, must aver that the contract was made in Alabama; but this is not traversable.

A chose in action is assignable only to a limited extent; but it has been held that the assignees appointed under the bankrupt laws of England may sue in the Courts of the United States. This is giving an extra-territorial existence to the laws of England. This is on the principles of the comity of nations; and such principles are essential to sustain the intercourse between nations. But if no express contract can be made in another state by a corporation, it cannot be a party to an implied contract. The law will not suffer a contract to be implied, where no express contract can be made. Look at what this would lead to. The Bank of Augusta may buy a bill on Mobile, and the bill may be sent by the bank to Mobile for collection. It may be paid in Mobile to the agent of the bank; but if a corporation cannot make a contract, no implied promise of the agent to remit the money collected to the Bank of Augusta can be raised; and he may keep the whole amount. Suppose a note given by him to the bank for the money, it would be void. The doctrine is monstrous.

The Constitution of the United States was formed to establish a national government, and this Court is a most important part of the government thus formed. The great object of the Constitution was to erect a government for commercial purposes, for mutual intercourse, and mutual dealing. The prosperity of every state could alone be promoted and secured by establishing these on principles of reciprocity; and on the security and protection of the citizens of each state, in all the states united by the government. This Court will hesitate a long time before it will make a decision which will either break down or cripple the whole of the commercial intercourse between the states, and shake the foundations of all our internal commerce.

One of the most important objects and interests for the preservation of the Union is the establishment of railroads. Cannot the railroad corporations of New York, Pennsylvania, or Maryland, make a contract out of the state for materials for the construction of a railroad? Cannot these companies procure machinery to use on their railroads, in another state. They cannot get on without this right. These railroads often run into other states, with the permission of those states; and it never has been doubted that every contract for construction made by the corporations to which the railroads belong, although out of the state in which they were originally created, is valid.

Manufacturing corporations established in one state by the law of the state cannot sue in another state for debts due for articles made by such corporation, if the decision of the Circuit Court of

Alabama is sustained by this Court. Policies of insurance made in another state than that in which the property insured was, at the time of the insurance, will be void.

The legislature of New York have by a special law prohibited insurances against fire being made in New York by foreign corporations. This shows that the legislature thought that without such a law foreign corporations had a right to make such insurances, and to sue upon contracts made in New York, or contracts flowing out of policies of insurance. Revised Laws of New York, 52. Act of March 18th, 1814.

It is admitted that a corporation may not carry on the business for which it was created, out of the state whose laws gave it existence. But this does not interfere with the right claimed by the plaintiffs in this case. The Bank of Augusta cannot carry on the business of banking in Alabama, for by the laws of Alabama this is forbidden. But if not forbidden by the law of that state, it could transact the business of banking there. At common law every man has a right to become a banker, and to carry on the business of banking. The acts of Parliament in England impose restrictions on this common law right. 15 Johns. Rep. 379.

The plaintiffs in this case are citizens of the state of Georgia. They are so called in the writ by which the suit was commenced; and by the Constitution of the United States they have a right to transact any business which any persons, citizens of the state of Alabama, may carry on; and which is not prohibited by the laws of the state. The laws of New York authorize special partnerships. Have not these partnerships a right to deal in Georgia and Alabama to the same extent and in the same manner as in New York? This shows that an association under the name of one person, can do any and all acts which citizens of New York or of any other state can do.

Large collections have been made by the Bank of England in the United States, on bills of exchange drawn in the United States, and returned protested for non-payment. There has not been a suggestion that the Bank of England, a foreign corporation, could not pursue such claims in the Courts of the states and of the United States, in the same manner as individuals. All those bills have been collected but a very small amount; and this after many of them had been put in suit. Large and numerous sales of the stocks of states of the United States, and of corporations established by states, have been made in other states, and in England. These would be void on the same principle as that claimed on the part of the defendant in this case. Alabama has herself issued stock as the basis of her banking capital; and this stock has been sold out of the state of Alabama. Yet she will not be bound to pay the amount of this stock, or even to pay the interest on it, if as a corporation she cannot contract out of her territories.

Mr. Ogden went into an examination of the cases which had been referred to by the Circuit Court of Alabama, and which were

considered by that Court, as sustaining the principle that the plaintiffs in error could not maintain this suit. He examined particularly the case of Head and Amory *vs*. the Providence Insurance Company, 2 Cranch, 127. The Dartmouth College case, 4 Wheat. 519. Goslen *vs*. the Corporation of Georgetown, 6 Wheat. 593. The Bank of the United States *vs*. Donelly, 8 Peters, 361.

There is another class of cases and authorities cited in the opinion of the Circuit Court of Alabama, which go to show that a corporation has no power which is not given to it by the law which created it, and from which all its functions are derived. It is not necessary to examine these authorities, because the principle laid down by the Circuit Court is fully admitted; and because in this case, it is not a question as to the powers of the corporation, but as to the place where those powers may be executed.

There is another view upon this branch of the argument, which appears worthy of the serious consideration of this Court. This is an action commenced in the Circuit Court of the United States. How does the Court acquire jurisdiction of the cause? Certainly not under the state law of Georgia, constituting the plaintiffs a corporation. A state legislature has no power to give to or take away jurisdiction from the Courts of the United States.

Again, as it regards the United States, and the Courts of the United States, a corporation created by one of the states is as much a foreign corporation as a corporation created by Georgia is a foreign corporation in Alabama, created by a different government, with different powers and different local jurisdiction.

How does the Court of the United States acquire its jurisdiction in this case? From the Constitution, and the laws of Congress passed under the Constitution. Now the Constitution gives the Courts of the United States no jurisdiction where a corporation created by a state is a party, and a citizen of another state is the other party; but it does give the Courts of the United States jurisdiction in all cases between citizens of different states.

In the case of The Hope Insurance Company *vs*. Boardman, this Court many years ago decided that the Courts of the United States had no jurisdiction in cases where a state corporation was a party; but the plaintiff must aver, in order to give the Court jurisdiction, that the stockholders and persons interested in and composing the corporation were citizens of one state, and the defendant a citizen of another state. And the practice has been uniform ever since, to make such an averment in order to bring the case within the jurisdiction of the Courts of the United States.

This averment is material, and its truth must be proved if put in issue by a plea in abatement. It is manifest then that the Circuit Court had jurisdiction in this case; because it appeared on the record that the plaintiffs, or the persons interested as plaintiffs, were citizens of Georgia, and the defendant was a citizen of Alabama.

And when the Courts of the United States sustain an action in the name of a state corporation, it is only because citizens of the

state have associated together under the name and in the form of a corporation. Still it is those citizens only who are the parties before the Court, and not the corporation, quasi corporation. Upon no other hypothesis can the Courts of the United States have any jurisdiction in the cause, none other being justified or authorized by the Constitution.

Now it is asked of this Court, if citizens of the state of Georgia have a right to sue in the Courts of the United States in the state of Alabama, under the name of an association called the Bank of Augusta; does not this amount to a recognition on the part of the Courts of the United States of their rights to act under that associated name? And if they may act under that name in one thing, why not in all things? If you recognise their right of acting in bringing a suit to enforce a contract, why not in making the contract itself, which is the foundation of the suit? In principle there is seen no difference. Twenty merchants in Augusta, in Georgia, may be concerned as partners in carrying on business, in the name of one of them, or they may assume any other name. Can it be contended for a moment that under that assumed name they would not have a right to make contracts, purchase cotton, bills of exchange, or do any other business not forbidden by the laws of Alabama? If this is not so, what becomes of the provision in the Constitution of the United States, which declares that a citizen of one state shall be entitled to all the rights of a citizen of the other states?

It is no answer to this to say, that in an action in such a case you must bring the suit in the names of all the partners. This is a question as to the remedy; but it can in no wise affect the power of contracting, or of suing. One is a matter of form, the other is matter of substance.

There remains another point in the case to which the attention of the Court is respectfully called. By the constitution of Alabama it is declared that there shall be established a bank, to be called " The Bank of the State of Alabama ;" and that the legislature may from time to time establish as many branches of that bank, to be located in different parts of the state, as they may think proper.

This constitutional provision has been construed as a prohibition on the legislature, which precludes them from establishing any other bank in the state; and upon the argument of this cause, it is presumed that it must be taken for granted that the construction given to the constitution in this particular, is the true construction.

A large portion of the stock of the bank and of its branches is reserved for the state; intending, no doubt, thereby to acquire a revenue for the state by means of their interest in the bank. Now it is supposed, that to permit a bank of Georgia, or of any other state, to transact its business in Alabama, would interfere with the profits of the Bank of Alabama; and would therefore be in direct opposition to the settled policy of the state, as declared and established by the constitution.

Let us examine this argument. It is readily admitted, for the

purposes of this case, that the state of Alabama has a right to pass a law declaring that no bank shall exist and do its business in that state, unless it be chartered by the legislature of the state. This is an admission as broad as can be called for: but it by no means follows that the transaction which is the subject of the present controversy is an illegal one.

What is legitimate banking business? It consists of three things. First, discounting notes Second, receiving money on deposit. Third, issuing notes or bills to be circulated as money. It seems to be clear and certain that all these operations must be combined to constitute banking, as understood among us, and in the commercial world.

The mere discounting notes is not of itself a banking operation. It is indeed doing one thing which banks are authorized to do, but it is not therefore banking. May not a merchant discount his own notes, without being considered a banker? The mere receiving money on deposit, to be paid out again whenever called for, is not banking. Surely a man may deposit his funds in safe keeping in the hands of a friend, without making that friend what is known in our law and in the commercial law, as a banker. Issuing a note to be put into circulation as money may, perhaps, be evidence of itself of an act of banking; and this may be the most important power which a bank possesses.

Now there is no pretence that the Bank of Augusta received deposits in Alabama. It is not pretended that the Bank of Augusta ever put into circulation in Alabama one of its notes or bills to be circulated as money in that state: and it is contended, that if they had discounted a promissory note in Alabama, it would not of itself have been such a banking operation as would render the transaction illegal, if there were a law in Alabama absolutely prohibiting any bank but the bank of the state from carrying on the banking business in the state. An individual might discount a note without violating the law, and so might the plaintiffs in error.

It is admitted that under a charter given by the state of Georgia, the plaintiffs could not establish a bank in the state of Alabama. No such right is claimed by the plaintiffs. But it is contended that becoming lawfully possessed of funds in the state of Alabama, common sense, common justice, and common law require that the plaintiffs should have the ordinary means of withdrawing those funds from the state of Alabama. The purchase of a bill of exchange is among the ordinary means of transmitting funds from one place to another.

Again. The act complained of is the purchase of bills of exchange. Now dealing in the purchase and sale of bills of exchange is not banking. It is true the power of dealing in bills of exchange is often expressly given to banking corporations: and the fact that it is expressly given, is evidence of the general understanding that without it is so given, a bank would not have the right or power of dealing in exchange, and that is, strictly speaking, no part of the

ordinary business of a bank. Some banks have the power of making a canal; and yet it is hardly to be contended that making canals is a part of banking business. If therefore there be an express prohibition in the law and constitution of Alabama, prohibiting the business of banking in that state by any other than their own incorporated banks, it would in no wise prohibit the plaintiffs from purchasing a bill of exchange in Alabama.

There remains yet another view of this question which it is thought the duty of counsel to submit to the consideration of this Court. It has heretofore been contended that the dealing in bills of exchange, being no part of the business of banking, does not come within the prohibitions of the constitution of Alabama against banking.

But let us now suppose that the legislature of Alabama had passed a law prohibiting any body but one of their own incorporated banks, from dealing in bills of exchange. This would present a more important question. In the present state of the commercial world, bills of exchange are one of the great means of carrying on the commerce of the world.

Our commerce with the East Indies is principally carried on by means of bills of exchange. These are now sent instead of specie to China, to Batavia, and to Calcutta. By means of bills of exchange our northern merchants are enabled to obtain funds in the south for the purchase of the cotton and tobacco, the rich productions of that portion of our country. By means of bills of exchange, the merchants of the south are enabled to purchase goods in the north. By means of bills of exchange the manufacturers of the north are enabled to receive remittances from the south, for the carriages, shoes, cabinet furniture, and numerous other articles shipped and sold there.

It will not be said that no commerce can be carried on without the use and facilities of bills of exchange; but it is said, with emphasis, that without their use it would be a cramped, and crippled, and an unproductive commerce. Our ships would be almost useless, and the trade and intercourse between the states would be prostrate. Now by the Constitution of the United States, power is given to Congress to regulate commerce with foreign nations, and among the states.

This power to regulate commerce necessarily includes in it the power to regulate the means by which commerce is to be carried on. Hence the laws relative to ships or vessels. No express power is given over them by the Constitution, but they are the great means by which commerce is carried on, and therefore Congress, having the power to regulate commerce, has exercised the power of regulating them.

It is submitted that the legislature of Alabama has as much right to declare that no ship or vessel shall come into the ports of that state, which does not belong to one of her own citizens, and is not registered in some office established by a law of Alabama, as she has to prohibit any but her own citizens from dealing in exchange

within her territories   She may as well say a merchant shall not sell or buy a bale of g᠆ s, as that he shall not buy or sell a bill of exchange.

ergeant for the United States Bank.

The case stated admits the right of the plaintiffs to sue in Alabama, and in the Circuit Court for that district.  It admits the right to recover a judgment in such suit. It admits the right of the plaintiffs, therefore, to be, to appear, and to act as a corporation under its charter in Alabama.   This concession, approved and sanctioned as it is by the judgment of the Court, would seem to make it unnecessary to consider the question whether a foreign corporation can sue in Alabama; unless it be deemed doubtful in this Court, where it is perhaps open upon the record, notwithstanding the concession.   If thought necessary, it will accordingly be considered.

But, first in order, it is proposed to consider the question directly presented, being the one decided by the Circuit Court, which is thus stated in the record: "Whether the purchase of the said bill of exchange by the plaintiffs as aforesaid, was a valid contract under the laws of Alabama."

Before proceeding to the general question here presented, it is right to give some attention to the nature and state of the transaction as embraced in the words "as aforesaid;" in order to exhibit one view of the case of itself sufficient for its decision.

It is necessary only to premise, for this purpose, that the bank was authorized by its charter to purchase and to hold bills of exchange, without restriction of time or place; that the defendant had a right by law to sell the bill of exchange; and that the contract of sale was executed and at an end. It was no longer executory. The suit is not upon the contract of sale, nor to enforce that contract. It is upon the bill sold, against the defendant as endorser, and upon his contract as endorser.

How does that contract arise? It consists of two parts, the endorsement, and the delivery of the bill endorsed. Neither alone would create a liability, and neither alone makes a contract as endorser. The endorsement by itself makes no contract with anybody, either to pass the bill or to create the liability. It is the delivery which effects both these ends. The ordinary form of the declaration proves this. The settled law of bills and notes establishes it. The parties on the bill make a new contract with every successive holder by the delivery. This is the law as to bills and notes payable to bearer. It is equally so as to endorsed bills. The delivery makes the contract. The time and place of endorsement, material for some purposes, are wholly immaterial for this. Whenever and wherever the name may have been written, the delivery gives it effect, whether it be to pass the bill merely, or to pass it with a liability on the part of the endorsee.

The question then is, where was the delivery made? This is a

question of legal construction, and not a mere matter of fact. Suppose the transaction to have been carried on by means of correspondence, where would the delivery be considered in law to have been made? The bill being endorsed by the one party, and the full consideration paid by the other, it must surely be construed to have been made where the party is capable of receiving it. Nothing less than this would be giving the stipulated equivalent. It is indispensable to the justice of the case, and according to the intention of the parties. Upon any construction but this, the one party would get the money of the other without a consideration. An interpretation leading to such a conclusion would be a disgrace to the law. Both parties must be supposed to intend what is fair and in good faith.

Does it make any difference that the transaction is conducted by means of an agent, and not by written correspondence? There is no reason why it should. Persons who are distant from each other can only treat through intermediaries; and it is of no consequence what they are. The agent acts under instructions, which are his contract, and the essence of that contract is to obtain a lawful and valid delivery.

But it is superfluous to argue in favour of a position already established by the highest judicial authority in the land. Cox and Dick vs. United States, 6 Peters, 172. 202. Duncan vs. United States, 7 Peters, 435. 449.

The delivery then in contemplation of law was at the bank. That delivery passed the bill to the bank, with all the rights accruing by it against the parties.

But it may be alleged that admitting all this to be so, the contract created by delivery of the bill is affected by the illegality of the original contract of purchase, so as to render the endorsement also illegal. To this there are several answers. In the first pla e the original contract was executed and at an end by delivery of the thing bargained for. Can what was so delivered be recovered back? The full consideration has been paid. There is no offer to refund it: and there is nothing immoral in the transaction.

Again: the very reverse of the allegation is the truth. This construction makes the original contract good and valid, by making its end and object lawful. In legal intendment it transfers the whole contract to Philadelphia, as the place of performance. If the delivery was to be made there, the contract arising from that delivery was also there. For this purpose it is not material where the money was paid; it is not material where the endorser's name was written on the bill. The place of endorsement may fix the measure of liability in case of dishonour of the bill. The delivery makes the contract with the particular holder. This must especially be the case where an agent is employed. His authority is to make a lawful and valid purchase. He must do it in a lawful mode; and in favour of justice he will be intended to have done so.

2 y 2

Still further: it cannot be admitted that even the alleged illegality is of such a character as to defeat the claim upon the bill. To produce that result there must be a clear prohibition by statute, or by the common law; or a penalty which implies a prohibition. See the cases collected in Wheeler vs. Russell, 17 Mass. 258. In the case now under consideration there is no such prohibition. There is at most an infirmity in the contract of sale, from the want of capacity to make the purchase. Admit, for the purpose of this argument, that the contract of sale could not have been enforced at law by the buyer; it does not follow that the execution of the contract is illegal, still less that it is criminal. The bill was good before the contract. It is good after the contract. If it had been made expressly to be negotiated to a bank out of the state, that would not affect its validity; even though the policy of the state were against foreign banks carrying on business within its limits. Reese vs. Conococheague Bank, 5 Rand. 326.

If this be so, the more general question does not arise. At all events, it will however receive some light from the view which has been taken. I will now proceed to consider it.

That question is, whether the Bank of the United States can lawfully become the holder of a bill of exchange by purchase in Alabama.

The general ground taken against the bank is, that no corporation can make such purchase, or enter into any contract out of the state in which it is chartered. A vastly important position this must be admitted to be. Its bearing is very extensive. For, observe some of its effects.

1. It will follow as an unavoidable consequence, that no corporation can buy a bill of exchange at all; unless, which rarely happens, it be strictly a domestic bill, that is, wholly within a state. There must be different parties on the bill at different places. Each makes a new contract with the holder, and each contract has its own locality. If a corporation be incapable of contracting out of the state where it is chartered, it cannot be the holder of such a bill. Nor is this all. No title can be derived through a corporation.

2. This doctrine once introduced into the law, as a principle, no one can foresee the extent of its operation. It must apply to all contracts whatever, express or implied, primary or secondary, avoiding them all. It must apply to them according to some legal determined method of fixing the locality. What that is, is a construction of law upon the facts. Is this construction to continue as heretofore, or will a new set of principles become necessary? If they continue, the contract, otherwise moral and just, may be made void by construction of law.

3. It would operate suddenly and without notice to condemn a long established usage and practice, universally understood, adopted, and approved. It operates upon the past and the present, as well as the future, so as to avoid all existing contracts to an extent which can neither be limited nor defined. The method of proceeding by

legislation is very different. It acts prospectively. It acts with precision, and with due limitation and exception. Its action is restricted to the sphere of legislative power, leaving each state free to pursue its own policy within the limits of its constitutional power; and leaving in rightful force all that is not prohibited. But a principle like that contended for, judicially established, sweeps over all the states, and embraces all cases whatsoever, even such as the true policy of the state may require should be supported.

Partial legislation, forbidding certain acts of foreign corporations, has been adopted in many of the states; for example, in Pennsylvania, New York, and Virginia. Whether such acts be within the constitutional competency of the state legislatures or not, yet it is most clear that they all assume as their basis the general power of corporations to contract where there is no statutory prohibition, the continuance of that power except in the prohibited cases, and its unlimited existence where it has not been curtailed or restricted. There cannot possibly be higher or stronger proof of the law, the universal law, than this is. It is the most authoritative and conclusive evidence. To such acts, when duly passed, the common law lends its aid to give them effect. What they prohibit, the law will in no manner aid to support, but the contrary.

Having stated these preliminary objections, we now come to the very question—Does the law of Alabama prohibit a corporation chartered in another state from buying a bill of exchange in Alabama? Does it, in other words, prohibit such a corporation from making a contract? The broad ground is here taken.

What, then, let us inquire, is the law of Alabama? Of what does it consist? It is made up of the common law, the constitution and statutes of the state, and the Constitution and statutes of the United States where they are applicable.

The common law is regularly derived to it, and is coeval with its existence. In Prince's Dig. Laws of Georgia, 551, is a declaration of the boundaries of the state of Georgia, the same as admitted for the United States by the treaty of peace with England: sec. 23, 119. In page 552 is the authority to sell to the United States a part, comprehending the present states of Alabama and Mississippi: sec. 23. This part was accordingly ceded, and the consideration received: 526. Thus ceded it retained its former laws till altered. What was that law? The common law had been adopted by the state of Georgia, by express statutory enactment, on the 25th February, 1784. Prince, 310, sec. 1. This is sufficient. But, further, the fifth section of the articles of cession, Prince, 527, refers to the ordinance of 13th January, 1787, for the government of the western territory of the United States, which provides for the common law. 1 Laws U. S., 475. 479, art. 2. And, finally, the common law is saved by the present constitution of Alabama. Sched, sec. 5. Aik, Dig. 45. There can be no doubt therefore that the common law is in force in Alabama.

The common law is said to be "common right." The expression

seems a quaint one, but it is true to the sense. Right is antecedent to all law. The object of law is to secure right; not so much to define as to enforce it, and to prevent wrong. When we speak of what is malum in se, we have an accurate and explicable meaning. We say at once that it is against law, referring to a standard to which all laws must be supposed to conform. So of the obligation of promises, and the like, derived from a source above the law. It is this common law, which in every state and nation protects and secures the great body of our rights, and enforces obligations founded in morality. In all civilized nations, this law is substantially the same. Even in nations not admitted to be within that description, there is a strong resemblance: for example, in the laws of the Hindoos. The reason is obvious. Whether expounded in codes, or disclosed by judicial investigation and decision, the great principles of justice are identical; and it is the aim of all law to cultivate, extend, and enforce them. Statutes are but few in comparison. They are exceptions; the common law is the great body. The legislator acts chiefly upon matters which are indifferent.

Constitutions of states are frames of government. They give no civil rights. The utmost they aim at, in this respect, is to secure some of the most important of them, (as existing things,) by a solemn assertion of them, by excepting them from the encroachments of power, or by placing around them strong and permanent guards. This is the proper office of a bill of rights. In all forms of government, these rights are the same; however they may be trodden down in arbitrary ones, where there is no independent judiciary to protect them. The common law acknowledges and aids them.

Of this common law, the law of nations is a part, and the law merchant is a part, as binding and obligatory upon Courts of justice, and upon individuals, as any other part of the common law. Surely, it cannot be necessary to quote authority for this. It is self-evident. It must be so, for the rights and interests of individuals are concerned in the law of nations; they depend upon it. No body of municipal law would be complete without it; unless the whole transactions of a community were confined within its limits, and the people never went abroad. It furnishes the only rule of decision in a vast variety of cases; there would be no rule without it. It is the common law of nations, that is, of all the inhabitants of the civilized world. It is said, with great propriety, to be the law of nature applied to nations; the unwritten law, founded upon rights. Take, for example, one of the most simple of its elements: the owner of property going abroad with it, is the owner still. If taken from him by force or by fraud, he is robbed of it. When the wrong is done by individuals, under the law of nations, he is entitled to redress. When by a state or nation, his own nation compels reparation to be made. This law is thus the rule of decision for individuals, and, between individuals, the only rule. What a sovereign may do, is another question. He is responsible as a sovereign, if he do wrong. But between individuals, it is the only rule of decision.

" The principle of international law on the subject of co-existing commissions on the estate of a bankrupt, in concurrent operation in different countries, is a rule of decision, not a question of jurisdiction, and does not affect the right of territorial sovereignty." Holmes *vs.* Remsen, 4 Johns. C. C. 466. S. C. 20 Ibid. 229. Where this rule is properly applicable, it is, for all judicial purposes, a part of the law of the land—it is the law of the land. Every judge is bound to administer it as the law of the case. He can no more disregard or disobey it, than any other part of the law. It is " common right," the right of every suitor.

May not this rule, it will be asked, be controlled by the sovereign lawgiving power? Admit that it may—that if a statute be so made as to prohibit what the law of nations permits, the statute must be obeyed. The common law cannot do this: there is an evident contradiction, for the common law cannot repeal or overrule itself. The judge cannot do it, for he is to administer the law, and this is the law. No general notions of policy or impolicy can effect such an end; and for this plain reason, that there are considerations to be entertained by the sovereign power. To that power, the responsibility belongs. The state or nation is answerable. Upon this ground our claims on foreign nations have rested, that they have disregarded the law of nations. Upon this ground they have been acknowledged and paid.

To the generality of the proposition, namely, that the law of nations is a part of the common law, or law of the land, there is no exception. Every chapter and section of the law of nations is embraced by it; it is true of the whole, and it is true of every part, no matter what its foundation. If there be a title of comity, as there certainly is, still it is a title of the law of nations; and therefore a title of the common law, as binding in the administration of justice as any other part. The name, whatever it may seem to the ear to import, does not detract from its obligatory force. The lawmaking power may have authority over it, as it has over the common law. But, in the absence of a statute plainly to the contrary, if a case arise, within the law of nations, that is the law to be applied to it in judgment.

No nation has ever more implicitly acknowledged this truth than the United States. The constitution of our Courts is such as to secure an inflexible administration of justice to foreigners as well as to our own citizens. No bending to the winds of occasional doctrine. Steady, erect, and independent, they have no guide and no teacher but the law. Even our Courts of admiralty—a description of Courts elsewhere too subject to extraneous influence—have here been furnished with no direction but the law.'

No nation has had more occasion to insist upon the vigorous application of the law of nations. We have felt, as every nation similarly circumstanced must feel, that a large portion of the justice due to our fellow-citizens is to be obtained only by means of the law of

nations; and we acknowledge it, not only for its justice, but that we may have the benefit of its provisions. It is a feeble exhibition of its virtue to speak only of its regulating the intercourse of nations. Its operation is upon individuals, and upon individual rights.

The position that the law of nations is part and parcel of the common law, is supported by the highest and most venerable authority. Indeed, it has never been questioned, and more especially the law merchant. 1 Black. Com. 273. 4 Ibid. 67. Magna Charta, ch. 30, contains an express provision in favour of merchant strangers; which occasioned the striking remark of Montesquieu, l. 20, ch. 14, that the English have made the protection of foreign merchants, one of the articles of their own liberty. In Triquet vs. Bath, 3 Burr. 1480,1481. Lord Mansfield quotes Lord Talbot as declaring a clear opinion, "That the law of nations, in its full extent, was part of the law of England."—"That the law of nations was to be collected from the practice of different nations, and the authority of writers." He quotes Lord Hardwicke to the same effect, and Lord Holt. Four names being thus associated, either of them alone sufficient to establish a point; and, collectively, making a weight of authority, only surpassed by the splendour of such an assemblage of luminaries. In Respublica vs. Longchamps, 1 Dall. 111, a criminal case, the indictment was upon the law of nations. M'Kean, Chief Justice, a very learned lawyer, and a very eminent man, says, "The laws of nations form a a part of the municipal laws of Pennsylvania."—"This law, in its full extent, is part of the law of this state, and is to be collected from the practice of different nations, and the authority of writers."

But why accumulate authorities upon a point which is every day adopted, acted upon, and confessed? The occasions for its application are of daily occurrence, and its application is daily made— sometimes unconsciously, I admit—by every tribunal in the land, from the highest to the lowest. Why take up time in insisting upon what is so manifest, so universally conceded? Manifest and conceded though it be, yet there is not always a full sense of its force and authority. This makes it necessary to say, as the truth really is, that the authority of the law of nations is exactly the same as that of the common law—it is as binding in matters of judicature— it is imperative and of absolute power. Its principles being known, can no more be set aside, evaded, or disregarded, than a settled principle of the common law. Call it comity: still it is law, and part of the rights of individuals, who are wronged if it be denied to them.

This law is a part of the law of Alabama towards foreign nations. Its authority towards the states of this Union is even greater. They are united by an association at once national and federal. To their national character belongs the faculty of regulating all their commerce, of cultivating its growth, and improving and strengthening the commercial intercourse between the different parts of the nation. The spirit of such an association, which aims at an inti-

mate, and easy, and equal intercourse, demands that whatever there is of comity between nations, or by the practice of nations, should be enlarged among the associates. More especially is this true, as the care of commerce is intrusted to the government of the whole; as a common concern, affecting the general welfare. If by the practice of these states, under the influence of this spirit of the Constitution of the United States, there were to be an enlarged comity; it would become among them an enlargement of that branch of the law of nations, of full authority. That practice is inquirable into, (for no formal convention is necessary,) and, if ascertained, has the effect of law. This does not at all detract from the sovereignty of the states. On the contrary, it is the work of sovereign power attesting its existence. If it has been the universal practice to acknowledge each others' charters of incorporation, in contracts, that would make the law; even though (which is by no means the case) it were not so among independent nations. Of such a practice, some of the evidences will hereafter be adverted to, not as necessary, but because they may be useful. Certainly there can be no good reason for frowning upon, or seeking to destroy a practice, which is in harmony with the spirit of the Constitution; tends to the growth of commerce; and has a kindly influence upon the intercourse of brethren of one family.

Is this in any manner derogatory, or can it be prejudicial to the sovereignty or to the policy of the states? We have heard it argued that laws have no extra-territorial force, and many authorities cited to maintain the position. Properly understood, it is as true as it is familiar. The meaning is, that, proprio vigore, they have no such power: that is, they have none by virtue of any authority in the lawgiver. He cannot make a law to govern in another territory. It is because this is so, that a law of nations is necessary; founded in mutual convenience and in common consent, to ascertain a rule in individual cases. The comity of nations has furnished the rule. It is not on this account the less a rule of binding force. Huberus says, " Every nation, from comity, admits that the laws of each nation in force within its own territorial limits, ought to be in force in all other nations, without injury to their respective powers and rights." De Confl. Leg. l. 1, tit. 3, § 2, p. 538. The proudest nations have adopted this maxim. How, then, can its adoption be derogatory to states closely confederated? But if at any time such a practice, however long continued, should be found derogatory, impolitic, or inconvenient, is the evil without a remedy? The lawmaking power is to apply the corrective.

And here we naturally recur to the other branch of the law of Alabama; the statutory law, the exercise of the power of the lawmaking authority. Within the limits of the Constitution, this is admitted to be plenary; there is no other restriction. The legislature is competent to decide upon both points: the evil and the remedy. Of the duty of the Courts to respect the decision, when clearly made, there is no doubt. But that it belongs to the judiciary origi-

nally to deal with either, cannot be assented to. The Courts are to expound the laws, not to make them. They have no faculties for such an inquiry. There is still another objection. The will of the legislature, however pronounced, is binding upon the judiciary. Their enactment is a positive exercise of legislative power. Their refusal to enact, where they have power, is equally significant of their opinion. Either is the will of the community, which is paramount. The legislature, too, can precisely adapt the remedy to the evil. Courts of justice cannot. They have no power to change the law from what it has been. Here, then, is the saving of what Huberus calls "their respective powers and rights." It is in the sovereign lawmaking power, and not in the administration of the law, that the saving authority is lodged.

Having thus established that the law of nations is part of the law of Alabama, we come to these the only remaining inquiries:—

1. What is the law of the case, according to the laws of nations; as they exist among independent nations, and by the practice of these states?

2. Is there any statute of Alabama which alters the law?

1. But here we are met by an objection which, if well founded, puts the law of nations and the comity of nations entirely out of the case. It is said they do not apply, because the states of this Union are confederated and not independent states. (Opinion of the judge of the Circuit Court.)

These states are at once confederated and independent states. They are, to all intents and purposes, independent and sovereign, except so far as they have given up their powers to the Union. "For all national purposes embraced by the federal Constitution, the states and their citizens are one, united under one sovereign authority. In all other respects the states are necessarily foreign and independent of each other." Bucknor vs. Finley, 2 Peters, 586. 590. Have Congress then the power, and have they exercised it, to supply the rule in all cases, where between independent sovereignties it is furnished by the law of nations; and where, from some source, it is indispensably requisite that it should be supplied? Do the laws of the United States define the rights of the domicil in cases of intestacy and succession? Do they decide what law shall govern the construction of contracts? Do they tell us where a contract shall be deemed to have been made? Do they determine how the capacity of parties shall be ascertained? Do they provide how the ages of majority, for different purposes, shall be determined? Do they settle, or afford the means of settling, any one of the innumerable questions arising from the conflict of laws? The Constitution makes provision for the cases of fugitives from justice and fugitives from labour, and that is all.

But, speaking historically, there was a time when these states (then provinces) were entirely independent of each other. There was a time, afterwards, when they were united by a very loose and inadequate confederation. What law governed at those respective

periods? When and how has it been altered? There has been no alteration. There is scarcely a volume of reports in this Union, the reports of the decisions of this Court included, which has not the title Foreign Laws, and Foreign States; and does not embrace under them these states and their laws. There is not a digest, with any pretensions to the character of completeness, but has such a title. There is not a case discussed, in which a question arises, where the law of nations is not appealed to. The learned and most useful work of Judge Story, upon the conflict of laws, applies it to the states throughout. And this Court has decided, sanctioning the judgment of the Circuit Court for the district of Pennsylvania, Lonsdale *vs.* Brown, 4 Wash. C. C. R. 81, that a bill drawn in one state upon another state, is a foreign bill. If this be an error, there certainly never was another instance of one so pervading and deeply rooted, and which so long escaped detection. We submit, however, respectfully, but confidently, that it is not an error. A law among these states, deciding those questions of continual occurrence which fall under the title of comity of nations, is of indispensable necessity much more important among themselves, than between any one of them, and nations foreign to our Union. In proportion as inter-communication becomes more rapid and easy, or, in other words, as the great ends and objects of the Union are attained, it becomes more and more important. Precisely because these states are at once confederated and independent, because there is a union and yet these are sovereign states, we cannot dispense with a law, which is in the spirit of union, but is essential to independent sovereignties. Comity is a sovereign attribute. It would, indeed, be very singular, if it were true, that a British corporation was entitled to be acknowledged in our Courts, but a corporation of one of our own states was not.

Assuming that the law of nations does apply between the states of the Union; what is the rule of that law as applied to the present question?

The rights of a corporation, that is, its corporate rights, are all conferred by its charter; are all of equal authority, and from the same source of power. What are they? To have a corporate name and style. To have a common seal. To have succession. To sue and be sued by its corporate name. To be, by that name, a person in law, capable of contracting. To make by-laws. The power to transact business is not, properly speaking, granted by the charter, but the rights of the associators, which they would have individually or collectively, are restricted by it. The grant is limited to the particular kind of business, whatever it may be, or other kinds are expressly prohibited. In either case the body cannot transcend these limits. Thus incorporated, the body becomes a person in law; and is embraced by statutes which speak of persons, as well in criminal as in civil proceedings. United States *vs.* Amedy, 11 Wheat. 392. The United States *vs.* State Bank of North Carolina, 6 Peters, 29. Farmers Bank of Delaware *vs.* Elkton Bank of

Maryland, 12 Peters, 134, 135. Such a recognition of state corporations by the laws of the United States, as persons, having a lawful existence, is of course a recognition of them, by the same laws, as persons possessing all the faculties and attributes conferred upon them by their charters. To acknowledge them to be persons, when they are so by creation of law, is to acknowledge all that by law constitutes the persons so created. There can be no distinction. All the corporate privileges are of equal authority, as before remarked; and are from the same source.

This person, thus constituted, is not so entirely artificial as to conceal or destroy the substantial character of the individuals associated under its name; nor to take away their rights, or release them from their obligations as citizens. Thus a corporation composed of citizens of one state, with proper averments on the record, may sue a citizen of another state in the Courts of the United States. Bank United States *vs.* Devaux, 5 Cranch, 61. Where a corporation is sued in the Circuit Court, it is prima facie evidence to support the averment of citizenship, that it is incorporated by a law of the state where it is sued. Catlet *vs.* Pacific Insurance Company, Paine's C. C. R. 594. It is only prima facie evidence. A bill in equity was filed by A, a citizen of New Jersey, against B and the Lehigh Coal and Navigation Company, an incorporated body in Pennsylvania. A plea to the jurisdiction set forth that four of the corporators, naming them, were citizens of New Jersey. The plea was sustained; the corporators being the real defendants, by their corporate name, and represented by their officers. Kirkpatrick *vs.* White, 4 Wash. C. C. R. 595. A foreign corporation, for the purpose of jurisdiction, is an alien. Society for Propagation of Gospel *vs.* Wheeler, 2 Gall. 105. 8 Wheaton, 464. The very case before the Court admits the jurisdiction, and of course admits the ground upon which the jurisdiction must rest.

Here then is an association of individuals, clothed by law with certain faculties, which as individuals they would not have to transact business, which as individuals they might lawfully transact. The former are their franchises or privileges. They are united, and one and all conferred by territorial legislation. The substance of the matter is, that it is an exercise of individual rights under a form authorized by law. It cannot be distinguished in principle from the case of special partnerships under the laws of Pennsylvania and New York; where one person becomes the representative of all, just as the corporate name represents the individual corporators. They all make up the one person in law.

It must be very obvious (and this is the conclusion sought) that the acknowledgment of this person, for any one of its legal attributes, is as full a recognition of the law which created it, as an acknowledgment of the whole. Such a recognition is equally giving effect to extra-territorial legislation. In truth, it is an acknowledgment of the whole, for it admits the person created by law. As a person, having a lawful existence, all the faculties which constitute

the person are admitted, unless there pe some of them that are prohibited. This seems an unavoidable though a tedious deduction.

Of the privileges conferred by the charter, one is to sue and be sued by the corporate name. Can such a corporation, being a foreign corporation, sue and be sued by its corporate name? If it can, the law which created it is acknowledged as operating, and of course the person is acknowledged as the law has made it; and that law, it cannot be denied, does give the power to contract in the corporate name.

The right of foreign states and corporations to sue can be traced in the books of the law for more than two centuries. The earliest case is that in B. A. 531, (E. 3, tit. Court de Admiraltie,) King of Spain's case in Admiraltie. Prohibition was granted, and trover directed at common law in the name of the King of Spain. 2 Bulstr. 322. (12 Jac. 1.) 1 Roll. 133. In Hob. 113, (Jac. 1, between 1614 and 1625,) the bill was dismissed, because it was in the name of the ambassador, and not of the King of Spain. Then follows the case of the Dutch West India Company *vs.* Henriquez, L. Ray, 1532, 1 Str. 612. (2 Geo. 2. A. D. 1729.) The company, a foreign corporation, sued by its name of reputation. The suit was sustained; and though the case was much litigated, and carried to the House of Lords; the right to sue was never denied. This case has always been considered as having finally settled the question. The cases which have since occurred have already been brought into view in the cause last argued, (by Mr. Ogden,) excepting King of Spain *vs.* Mullett, 2 Bligh. 31. There is still another case, of some note, in which we were all interested, where a great political corporation was allowed to sue, without dispute, and to recover in the Courts of England. United States *vs.* Smithson's Executors, for the Smithsonian legacy.

The authorities in the United States are equally uniform. There are decisions in Massachusetts, Connecticut, New York, Pennsylvania, Virginia, Louisiana, and probably in other states. The point is so thoroughly established, as to be assumed in argument. In Bustal *vs.* Commonwealth Insurance Company of Boston, 15 Serg. and Rawle, 173, the question was whether a foreign corporation was liable to the process of foreign attachment, Judge Rogers, delivering the opinion of the Supreme Court of Pennsylvania, says, "The power of corporations to sue in personal actions is not restricted to corporations created by the laws of this commonwealth. If they can sue within a foreign jurisdiction, why should they not also be liable to suit in the same manner and under the same regulations as domestic corporations?" See also Williamson *vs.* Smoot, 7 Mart. Louisiana R. 31. Nor is the authority of this high Court wanting. In the Society for Propagating the Gospel *vs.* New Haven, 8 Wheat. 464, the right of a foreign corporation to sue is admitted. In the same *vs.* Town of Pawlet, 4 Peters, 480, the right is sustained; and the Court further decided that the corporate capacity is

admitted by pleading the general issue. If contested, it must be by a special plea in abatement, or in bar.

Innumerable cases have occurred in which the question might have been raised. Instead of this, there are rules of pleading and rules of evidence, which assume the right to sue, as unquestionable. If the charter be put in issue, the foreign law must be produced. In no one of the decided cases was the suit maintained by virtue of any special law or right. They were all upon the ground of the common law. In no one of them (unless it be in Pindall vs. Marietta Bank) was the power to contract drawn in question, denied, or doubted. In 2 Bligh, 21, Lord Eldon puts a case of contract. "Suppose the king were to send his jewels to be set by Rundell and Bridge, and the jewellers were not to deliver them up to the king, do you think the Courts of the country would not interfere?" Lord Redesdale says, "I conceive there can be no doubt that a sovereign may sue. If he cannot, there is a right without a remedy." —"As to the proposition that a sovereign prince cannot sue, it would be against all ideas of justice." No learning is necessary to understand such arguments as these. The highest legal attainments are never more fully exhibited than in direct appeals to good sense and justice.

This doctrine, as has been seen, of the right of the corporations of one state to sue in the other, is thoroughly incorporated into our system of jurisprudence. How then can it be said there is no comity between the states? It is established, that the law of the charter is recognised though granted by another state. The corporation is clothed everywhere with the character given by the charter. The whole question is thus settled as to all corporations. Can it be necessary further to examine the principle upon which this rests? In giving corporate powers, the foreign law operates rightfully within its own territory, as it does in giving validity or construction to a contract between individuals. It is the exercise of a strictly territorial power in the one act, as it is in the other. There is nothing extra-territorial in either. The question is, what respect is yielded to it in another state? And the answer is found in the fact, that it is capable of suing as a domestic corporation may, which is evidence of unbounded respect. Story's Conflict of Laws, 64, sec. 65—67.

We have been told that foreign executors, administrators, and guardians are not acknowledged. If this were so, it would prove nothing but that for good reasons these cases are excepted from the general operation of comity. But they are acknowledged. They cannot sue. This is the whole extent of the exception. A voluntary payment to them is good and valid. Besides, the executorship or administration of the domicil is regarded as the principal, and any other is only ancillary to it. So that for most, perhaps for all purposes except enforcing payment by suit, they are regarded.

But as to contracts the ground of the matter is that the extra-territorial effect is by comity, adopting voluntarily the law of an-

other state, as a rule of decision where it is the proper and natural rule. This adoption is presumed unless the contrary be made apparent. Such is the doctrine of the common law of the states of this Union.

And what would be the consequences of a contrary doctrine?

1. The inconvenience, mischief, and injustice that would result from establishing that a corporation can make no valid contract beyond the limits of the state creating it. Consider the immorality of urging and aiding the breach of contracts fairly made; especially if on one side executed. Public policy may sometimes require from the tribunals to withhold their aid from parties; but they do it from necessity, and always under a sense of the individual injustice and wrong that are done. It is a casual advantage to dishonesty, which ought not to be often presented, nor unless there be a clear prohibition. What possible inducement is there here?

Consider also the great injury to commerce and trade. Sales for incorporated manufacturing companies, to the amount of millions of dollars annually, are made by their agents. What possible reason can be given for declaring all such transactions illegal and void? Insurances are made by incorporated companies against fire, and against marine risks. Are the policies to be declared void? To what good end?

Again: it must embrace all contracts, implied as well as express; for if it be unlawful to make an express promise, surely the law will not imply one. No two corporations, in different states, can make any contract with each other. For one of them must unavoidably contract out of the state where it is chartered. Obligations and notes of corporations, even bank notes, passed in another state, must become void, because there is a new contract with the holder.

There would be no end to the enumeration of the mischiefs which would flow from such a decision.

2. The capacity of corporations to make contracts beyond their states, and the exertion of that capacity, are supported by uniform, universal, and long-continued practice. How many of our corporations have made contracts in England, by their agents? How many have made contracts in other states? How many such contracts are now pending, where the consideration on one side has been fully paid? It surpasses all power to estimate them. What disorder and gross wrong would be caused by introducing a principle that would declare them illegal and void! And for what good purpose? To abolish a common law found convenient and just, and adopted as it were by the whole people.

But of this adoption there is more authentic evidence than this; more tangible, more cognizable in a Court of justice. There is every kind of evidence.

1. Judicial. Unless it be in a single case, to be adverted to presently; which really is not an exception, there is not an instance of such an objection ever being made. This silence is not without significance, for cases have been of daily occurrence.

2 z 2    69

There is affirmative evidence too.  Society for Propagating the Gospel *vs.* Wheeler, 8 Wheat. 464, is to the point.  Pindall *vs.* The Marietta Bank, 2 Rand., 465, admits that what are there termed "secondary contracts," may be made.  If it seem to go further, and question the validity of primary contracts, it is proper to remark that the action was sustained; and therefore the saying would be merely obiter, and of little weight, notwithstanding the high authority of the Court.  But what is said has express reference to banking operations, and the restraints upon them by the laws of Virginia.  Judge Cabell says, "It is our policy to restrain all banking operations by corporations not established by our laws.  It would not therefore be permitted to a bank in Ohio to establish an agency in this state for discounting notes, or carrying on other banking operations; nor could they sustain an action upon notes thus acquired by them."  The policy here referred to is apparent from the statutes of Virginia.  Tait's Dig., 41, &c.  Let the Court of Appeals however be its own expositor.  In Reese *vs.* Conococheague Bank, 5 Rand., 326, Green, Justice, says, "It was decided, 2 Rand., 465, that a foreign corporation may sue in our Courts, upon a contract with them, valid according to the laws of the country in which it was made; unless it was contrary to the policy of our laws: and the making a note in Virginia to be discounted at a foreign bank is not so."  Thus explained the case admits the power to make contracts by all corporations, excepting primary ones by banks for carrying on banking operations, and by banks for all others.  We might therefore lawfully buy a bill of exchange in Virginia; and so the case is really an authority in our favour.

2. Legislative.  The Chesapeake and Ohio Canal Company, an incorporated company, sent an agent to Europe to borrow a million of dollars, to be secured by mortgage upon the three local corporations within this district; and the United States, under an act of Congress, guarantied the payment of the interest.  Was this a void contract, being made abroad?  The contracts made by the treasury with the state banks, about the deposit of the public moneys, were made in law, as we have seen, and probably in fact too, in the city of Washington.  Were they void?  The same question might be put as to the contracts the deposit banks were to make with each other; which as to one of them could not fail to be beyond the limits of its charter.  Contracts of the postoffice department with railroad companies, are they all void?  These are all instances of contracts with or by corporations beyond their territorial limits, and yet they are recognised by acts of Congress as good.

The methods of proceeding by state legislatures are to the same effect.  In New York there is a law against banking, and a law against foreign insurance companies, (companies out of the United States,) and their agents.  In Pennsylvania there are similar laws.  Purd. Dig., 68. 368.  In Virginia.  Tate's Dig. 41.  In Alabama there was a law in 1827, since repealed.  And so of other states.

How far such prohibitory laws may be carried by state legislation, without violating the rights of other states and their citizens under the Constitution of the United States, is not now the question. They are adduced only as evidence of the concurrence of the state legislation with the legislation of the United States, that corporations could lawfully contract out of their territorial limits unless they were prohibited. Else why should there be prohibition? The New York law prohibited foreign insurance companies, properly so called, from insuring in New York. If there was any sense in the act, it must follow that insurance companies of other states may still insure in New York. This is high and authentic evidence of the law from the highest sources. Have the people, the legislatures, the judiciary, and the executive, all been hitherto in error from the time when the United States, in their need, made their loan in Holland up to the present time?

The answer is plain. What is not prohibited is lawful, and is under the protection of the law. A corporation has a twofold claim. It has a claim to respect for the law of its creation, and it has a claim to respect for the rights and privileges of the individuals who compose it. The former is sufficient for the present purpose. The latter need not be asserted unless there should be a prohibition, which under colour of inhibiting the exercise of corporate powers, should really assail the constitutional rights of the citizen.

It remains only to consider whether there is any law of the state of Alabama, which forbids the purchase of a bill of exchange within her limits by a corporation of another state. Mobile, it appears, is a market where bills are to be bought, and where it must be for the interest of sellers that buyers should freely come. One does not easily perceive what policy there can be to the contrary, unless it be to enable the state bank of Alabama in some measure to command the market, by excluding competition as far as possible. But whatever was thus gained by the buyer would be lost by the seller. The more buyers the better for the seller; the better for Mobile; the better for Alabama. Nor is it objectionable because the buyer is a bank. Such a purchase, though it be the operation of a bank, is not a banking operation. What is meant by banking is well understood and defined. It consists of lending or discounting, receiving on deposit, and issuing paper. Maine Bank *vs.* Butts, 9 Mass., 54. People *vs.* The Utica Insurance Company, 15 Johns. 390. New York Firemen Insurance Company *vs.* Ely, 5 Conn., 560. Accordingly the prohibitory laws of the states point their prohibitions and penalties against one or all of these. A banking charter would not, by giving banking privileges, authorize the dealing in bills of exchange. When such a power is deemed requisite, it is expressly given, as something superadded. A prohibition of banking would not prohibit the buying exchange by corporations or by individuals. The policy of such prohibitory statutes would not be contravened by buying bills of exchange. A company incor-

porated for buying bills of exchange would not be a bank either in a popular or in a legal sense.

Such would have been the clear law to be applied to the case, if there had been any legislative act against banking in Alabama at the time of this transaction. Neither the prohibition nor the policy of the act would have been encountered by the purchase of a bill of exchange. But there was none. The second section of the act of 1827 was a general law. 1 Stewart's Reports, 301, 302. In 1833 Aikin's Digest was established, and all laws of "a general and public nature" not included in it, were repealed from and after the 1st of January then next. Dig. 301, sec. 5. This law is not included in the Digest, and therefore it is repealed. It was under this law, while it was in force, that Stebbins and others were indicted. Stewart's Rep. 300. The charge was for issuing bank notes. The case is not unlike the case of The Utica Insurance Company, in 15 Johns., though the mode of proceeding was different. The defendants were indicted as individuals, and attempted to justify themselves under a very loose and extraordinary charter; which did not define their powers, and was therefore contended to be without restriction or limitation. Towards the close of the opinion, the learned judge speaks of the issuing of bank notes, as being a franchise under the constitution of Alabama. The charter is a franchise, but it is not perceived that the acts which might be done by an individual, if not prohibited by law, can with propriety be so called, according to the legal import of the term. 10 Petersdoff, 53, (77,) note. 4 Com. Dig. 450. But be that as it may, as regards the issuing of bank notes, it cannot be pretended that the buying or holding a bill of exchange is a franchise. If it be, it would follow, according to the decision in Stebbins' case, that under the act of 1827, an individual might be indicted for buying a bill of exchange. This proves too much.

The Constitution has no bearing upon the question. It provides in detail for the establishment of a state bank and branches, and limits the number of banks the legislature may establish. Aik. Dig. 55, 56. The state bank is specially authorized to purchase bills of exchange, conceding that it would not otherwise possess the power; but there is nothing to prohibit individuals or other corporations from buying them, nor from which any such prohibition can be implied. It would indeed be derogatory to the character of the state of Alabama, to suppose that she would be so wanting to her own true policy, and to the duties she owes to the citizens of her own state and of other states, as to deprive them of the use of the ordinary means of transferring their funds, for the sake of conferring an odious and unjust, and probably fruitless monopoly upon her own bank. The only effect would be, to impose upon her citizens the vexation and expense of going abroad in quest of purchasers, instead of having purchasers to come to them.

It is submitted that the judgment below is erroneous; that it ought

to be reversed; and judgment on the case stated be entered for the plaintiffs.

Mr. Webster, also of counsel with Mr. Sergeant for the United States Bank.

The United States Bank is a corporation created by a law of the state of Pennsylvania. By that act the bank, among other functions, possesses that of dealing in bills of exchange. In the month of January, 1837, having funds in Mobile, this bank, through the instrumentality of its agent, Mr. Poe, purchased a bill of exchange to remit to New York. This bill, drawn at Mobile upon New York, and endorsed by William D. Primrose, the defendant in this case, not having been paid either at New York or by the drawer, the Bank of the United States instituted this suit in the Circuit Court of Alabama to recover the money due on the bill.

In the Court below it was decided that the contract by Poe in behalf of the bank was void, on two grounds. 1. Because it was a contract made by the United States Bank, in the state of Alabama; whereas a bank incorporated by the state of Pennsylvania can do no act out of the limits of Pennsylvania. 2. Because Alabama has a bank of her own, the capital of which is owned by the state herself, which is authorized to buy and sell exchange, and from the profits of which she derives her revenue; and the purchase of bills of exchange being a banking operation, the purchase of such bills by others, at least by any corporation, although there is no express law forbidding it, is against the policy of the state of Alabama; as it may be inferred from the provisions of the constitution of that state, and the law made in conformity thereto.

It is admitted that the parties are rightfully in Court. It is admitted also that the defendant is a citizen of Alabama, and that all the citizens who compose the corporation of the United States Bank are citizens of the state of Pennsylvania, or of some other state besides Alabama. The question is, can they as a corporation do any act within the state of Alabama? In other words, is there any thing in the constitution or laws of the state of Alabama which prohibits, or rightfully can prohibit, citizens of other states, or corporations created by other states, from buying and selling bills of exchange in the state of Alabama?

In his argument for the defendant in this case, my learned friend, Mr. Vande Gruff, asked certain questions, which I propose to answer.

Can this bank, said he, transfer itself into the state of Alabama? Certainly not.

Can it establish a branch in the state of Alabama, there to perform the same duties and transact the same business in all respects as in the state of Pennsylvania? Certainly not.

Can it exercise in the state of Alabama any of its corporate functions? Certainly it can. For my learned friend admits its right to sue in that state, which is a right that it possesses solely by the

authority of the Pennsylvania law by which the bank is incorporated.

We thus clear the case of some difficulty by arriving at this point, the admission on both sides that there are certain powers which the bank can exercise within the state of Alabama, and certain others which it cannot exercise.

The question is, then, whether the bank can exercise within the state of Alabama this very power of buying a bill of exchange?

Our proposition is, that she can buy a bill of exchange within the state of Alabama: because there are no corporate functions necessary to the act of buying of a bill of exchange: because buying and selling exchange is a thing open to all the world, in Alabama as well as everywhere else: because, although the power to buy and sell bills of exchange be conferred upon this bank by its charter, and it could not buy or sell a bill of exchange without that provision in its charter, yet this power was conferred upon it, as were other powers conferred by its charter, to place the bank upon the same footing as an individual; to give it not a monopoly, not an exclusive privilege in this respect, but simply the same power which the members of the corporation as individuals have an unquestionable right to exercise. The banker, the broker, the merchant, the manufacturer, all buy bills of exchange as individuals. The individuals who compose a corporation may do it; and we say that they may do it, though they do it in the name of, and for the corporation. We say, undoubtedly, that they cannot acquire power under the Pennsylvania charter to do acts in Alabama which they cannot do as individuals; but we say that the corporation may do in their corporate character in Alabama, all such acts authorized by their charter as the members thereof would have a right to perform as individuals.

The learned counsel on the other side was certainly not disposed to concede gratuitously any thing in this case. Yet he did admit that there might be a case in which the acts of a corporation, created by one state, if done in another state, would be valid. He supposed the case of a railroad company in one state sending an agent into another state to buy iron for the construction of the road. Without conceding expressly the point of law in that case, he admitted that it would be a case very different from the present; and he gave as a reason for this admission, that it would be a single special act, necessary to enable the corporation to execute its functions within the state to which it belonged; and in this respect differing from the case now under consideration. In what circumstance, it may well be asked, do the cases differ? One act only of the corporation of the United States Bank is set forth in this record, and that act stands singly and by itself. There is no proof before the Court that the corporation ever bought another bill of exchange than that which is the subject of this suit. Transactions of this nature must necessarily come one by one before this Court when they come at all, and must stand or fall on their individual merits, and not upon

the supposition of any policy which would recognise the legality of a single act, and deny the validity of the dealings or transactions generally of which that act is a part.

Then, as to the other reason stated by my learned friend in support of the idea that such a purchase of iron might be supported, he says it is because that, in that case, the purchase being made abroad solely to enable the corporation to perform its functions at home, might be considered legal under the law of comity from one state to another.

Now, said Mr. Webster, that supposed case is precisely the case before the Court. Here is the case of a corporation established in Philadelphia, one of whose lawful functions is to deal in exchange. A Philadelphia merchant, having complied with the order of his correspondent in Alabama, draws a bill upon him for the amount due in consequence, goes to the United States Bank, and sells the bill. The funds thus realized by the bank from the purchase of bills of exchange accumulate in Alabama. How are those funds to be brought back by the Philadelphia corporation within its control? The bank has unquestioned power to deal in bills of exchange. Can there be such a thing as dealing in exchange, with a power to act only on one end of the line? Certainly not. How then is the bank in Philadelphia to get its funds back from Alabama? Suppose that it were to send an agent there, and buy specie. Can the bank ship the specie? Can it sign an agreement for the freight, insurance, and charges of bringing it round? To do that would be an act of commerce, of navigation, not of exchange. A power conferred upon a bank to deal in exchange would be perfectly nugatory, unless accompanied by a power also to direct its funds to be remitted. The practical result of a contrary construction would be, that this Pennsylvania bank may carry on exchange between Philadelphia and I. ading, or Philadelphia and Lancaster, but not by possibility with Mobile, or any other city or place in the south, or even with New York, Trenton, or Baltimore. Out of Pennsylvania it could only buy and remit. It could get no return. An exchange that runs but one way! What sort of an exchange is that?

Having cleared the case of some of these generalities, Mr. Webster proceeded to the exposition of what he considered a constitutional, American view of the question.

The record of this case finds that these plaintiffs, the members of the corporation of the United States Bank, are citizens of other states, and that the defendant is a citizen of Alabama. Now, in the first place, to begin with the beginning of this part of the question, what are the relations which the individual citizens of one state bear to the individual citizens of any other state of this Union?

How did the matter stand before the Revolution? When these states were colonies, what was the relation between the inhabitants of the different colonies? Certainly it was not that of aliens. They were not indeed all citizens of the same colony; but certainly they were fellow-subjects, and owed a common allegiance; and it was

not competent for the legislative power to say that the citizens of any one of the colonies should be alien to the other. This was the state of the case until the 4th of July, 1776, when this common allegiance was thrown off. After a short interval of two years, after the renunciation of that allegiance, the articles of confederation were adopted; and now let us see what was the relation between the citizens of the different states by the articles of confederation. The government had become a confederation. But it was something more—much more. It was not merely an alliance between distinct governments for the common defence and general welfare, but it recognised and confirmed a community of interest, of character, and of privileges, between the citizens of the several states. " The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this Union," said the fourth of the articles of confederation, " the free inhabitants of each of these states shall be entitled to all the privileges and immunities of free citizens in the several states; and the people of each state shall have free ingress and egress to and from any other state, and shall enjoy therein all the privileges of trade and commerce," &c. This placed the inhabitants of each state on equal ground as to the rights and privileges which they might exercise in every other state. So things stood at the adoption of the Constitution of the United States. The article of the present Constitution, in fewer words and more general and comprehensive terms, confirms this community of rights and privileges in the following form : " The citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." However obvious and general this provision may be, it will be found to have some particular application to the case now before the Court; the article in the confederation serving as the expounder of this article in the Constitution.

That this article in the Constitution does not confer on the citizens of each state political rights in every other state, is admitted. A citizen of Pennsylvania cannot go into Virginia and vote at an election in that state; though, when he has acquired a residence in Virginia, and is otherwise qualified as required by h :: constitution, he becomes, without formal adoption as a citizen of Virginia, a citizen of that state politically. But for the purposes of trade, commerce, buying, and selling, it is evidently not in the power of any state to impose any hinderance or embarrassment, or lay any excise, toll, duty, or exclusion, upon citizens of other states, to place them, coming ther upon a different footing from her own citizens.

There is one provision then in the Constitution, by which citizens of one state may trade in another without hinderance or embarrassment.

There is another provision of the Constitution by which citizens of one state are, entitled to sue citizens of any other state in the Courts of the United States.

This is a very plain and clear right under the Constitution; but it is not more clear than the preceding.

Here then are two distinct constitutional provisions conferring power upon citizens of Pennsylvania and every other state, as to what they may do in Alabama or any other state: citizens of other states may trade in Alabama in whatsoever is lawful to citizens of Alabama; and if, in the course of their dealings, they have claims on citizens of Alabama, they may sue in Alabama in the Courts of the United States. This is American, constitutional law, independent of all comity whatever.

By the decisions of this Court it has been settled that this right to sue is a right which may be exercised in the name of a corporation. Here is one of their rights then which may be exercised in Alabama by citizens of another state in the name of a corporation. If citizens of Pennsylvania can exercise in Alabama the right to sue in the name of a corporation, what hinders them from exercising in the same manner this other constitutional right, the right to trade? If it be the established right of persons in Pennsylvania to sue in Alabama in the name of a corporation, why may they not do any other lawful act in the name of a corporation? If no reason to the contrary can be given, then the law in the one case is the law also in the other case.

My learned friend says, indeed, that suing and making a contract are different things. True; but this argument, so far as it has any force, makes against his cause; for it is a much more distinct exercise of corporate power to bring a suit, than by an agent to make a purchase. What does the law take to be true, when it says that a corporation of one state may sue in another? Why, that the corporation is there, in Court, ready to submit to the Court's decree, a party on its record. But in the case of the purchase of the bill of exchange, such as is the subject of this suit, what is assumed? No more than that George Poe bought a bill of exchange, and paid the value for it, on account of his employers in Philadelphia. So far from its being a more natural right for a corporation to be allowed to sue, it is a more natural right to be allowed to trade in a state in which the corporation does not exist. What is the distinction? Buying a bill of exchange is said to be an act, and therefore the corporation could not do it in Alabama. Is not a suit an act? Is it not doing? Does it not, in truth, involve many acts?

The truth is, that this argument against the power of a corporation to do acts beyond the territorial jurisdiction of the authority by which it is created, is refuted by all history as well as by plain reason.

What have all the great corporations in England been doing for centuries back? The English East India Company, as far back as the reign of Elizabeth, has been trading all over the eastern world. That company traded in Asia before Great Britain had established any territorial government there, and in other parts of the world, where England never pretended to any territorial authority. The Bank of England, established in 1694, has been always trading and dealing in exchanges and bullion with Hamburg, Amsterdam, and other marts of Europe. Numerous other corporations have been

created in England, for the purpose of exercising power over matters and things in territories wherein the power of England has never been exerted. The whole commercial world is full of such corporations, exercising similar powers, beyond the territorial jurisdiction within which they have legal existence.

I say, then, that the right, secured to the people of Pennsylvania, to sue in any other state in the name of a corporation, is no more clear than this other right of such a corporation to trade in any other state; nor even so clear: it is a farther fetched legal presumption, or a much greater extent of national courtesy or comity, to suppose a foreign corporation actually in Court, in its legal existence, with its legal attributes, and acting in its own name, than it is to allow an ordinary act of trade, done by its agent, on its own account, to be a valid transaction.

Mr. Webster here referred to an opinion of this Court directly bearing on this question. It was the case of the Bank of the United States vs. Deveaux, decided in 1809. The bank here mentioned was the first Bank of the United States, which had not, like the last, express authority given in its charter, to sue in the Courts of the United States. It sued, therefore, as this plaintiff sues, in its name as a corporation; but with an averment, as here, that its members were citizens of Pennsylvania, the action being brought against a citizen of Georgia. The only question was, whether the plaintiffs might not exercise their constitutional right to sue in the Courts of the United States, although they appeared in the name of their Pennsylvania corporation; and the Court decided that they might. " Substantially and essentially," said Chief Justice Marshall, " the parties in such a case, where the members of the corporation are aliens, or citizens of a different state from the opposite party, come within the spirit and terms of the jurisdiction conferred by the Constitution on the national tribunals." " That corporations composed of citizens, are considered by the legislature as citizens, under certain circumstances, is to be strongly inferred from the registering acts. It never could be intended that an American registered, vessel, abandoned to an insurance company composed of citizens, should lose her character as an American vessel; and yet this would be the consequence of declaring that the members of the corporation were, to every intent and purpose, out of view, and merged in the corporation."

The argument here is, that citizens may exercise their rights of suing, as such citizens, in the name of their corporation; because, in such a name, the law recognises them as competent to engage in transactions, hold property, and enjoy rights proper for them as citizens.

If the Court agree in this language of its own opinion as far back as the year 1809, it must be admitted that the rights of the people of Pennsylvania, as citizens of the United States, are not merged in the act of incorporation by which they are associated, and under which they are parties to this suit. If there ever was a human

being that did not argue to the obscure from the more obscure, it was certainly the late Chief Justice of the United States. And what was his argument to prove that the citizens of one state may sue in another by a corporate name? It is, as I have said, that they may sue by a corporate name, because they can do acts out of Court by a corporate name; whilst, directly reversing this conclusion, it has been held in this case, in the Court below, that, whilst a corporation of one state may rightfully sue in another state, it cannot do any other act therein.

In this view of the case, said Mr. Webster, I see no occasion to invoke the law of comity or international courtesy to our aid. Here our case stands, independently of that law, on American ground, as an American question.

Now, as to the reason of the case. What possible difference can it make, if these citizens of Pennsylvania can trade, or buy and sell bills, in Alabama, whether the trading, or buying and selling, be under one agency or another? That Poe (the agent of the United States Bank at Mobile) could, under a power of attorney from a citizen of Philadelphia, buy and sell bills of exchange in Alabama, will not be denied. If, without an act of incorporation, several citizens of Philadelphia should form an association to buy and sell bills of exchange, with five directors or managers of its concerns, those five directors may send as many agents as they please into other states to buy bills of exchange, &c. Having thus formed themselves into this associated company, and appointed agents for the purpose of, transacting their business, if they should go one step further, and obtain a charter from Pennsylvania, that their meetings and proceedings may be more regular, and the acts of the association more methodical, what would be the difference, in the eye of reason, between the acts of the members of such a corporation, and the acts of the same individuals, associated for the same purposes, without incorporation, and acting by common agents, correspondents, or attorneys! The officers of a bank are but the agents of the proprietors; and their purchases and sales are founded upon their property, and directed by their will, in the same manner as the acts of agents of unincorporated associations or partnerships. The Girard Bank, we all know, was never incorporated until after Mr. Girard's death; yet its proprietor, during a considerable part of his life, and until his death, acted as a banker. Could he not, during his life, send an agent into Alabama, and there purchase bills of exchange? And if his neighbours over the way chose to ask for an act of incorporation from the state of Pennsylvania, are they thereby less entitled to the privileges common to all other citizens, than Stephen Girard was?

I agree, certainly, generally, that a state law cannot operate extra-territorially, as the phrase is. But it is a rule of law that a state authority may create an artificial being, giving it legal existence; and that that being, thus created, may legally sue in other states than that by which it is created. It follows, of course, as a conse-

quence of the right of suit in another state, that it may obtain judgment there. If it obtain judgment, it may accept satisfaction of that judgment. If a judgment be obtained in Alabama by the United States Bank, would not an acknowledgment of satisfaction by an agent of the bank be a satisfaction of the decree of the Court? How is the fruit of a suit to be gathered, if the bank, by its agent, cannot do this act? What benefit can it be to this bank to be allowed to sue in Alabama, if it cannot take the money sued for? But it is said by the Court below, that it cannot recover money in Alabama, because it cannot do an act there! According to this argument, although the power to appeal to law, and the power to recover judgment exist, yet the fructus legis is all dust and ashes.

On the commercial branch of this question (Mr. Webster continued) he would say but little. But this much he would say: The state of Alabama cannot make any commercial regulation for her own emolument or benefit, such as should create any difference between her own citizens and citizens of other states. He did not say that the state of Alabama may not make corporations, and give to them privileges which she does not give to her citizens. But he did say, that she cannot create a monopoly to the prejudice of citizens of other states, or to the disparagement or prejudice of any common commercial right. Suppose that a person having occasion to purchase bills of exchange should not like the credit of bills sold by the Bank of Alabama; or suppose (what is within the reach of possibility) that the Bank of Alabama should fail; may not a citizen buy bills elsewhere? Or is it supposed that the state of Alabama can give such a preference to any institution of her own in the buying and selling of exchange, that no exchange can be bought and sold within her limits, but by that institution? It would be, doubtless, doing the state great injustice to suppose that she could entertain any such purpose.

In conclusion of the argument upon this point, said Mr. Webster, I maintain that the plaintiffs in this case had a right to purchase this bill and to recover judgment upon it. For the same reason that they had a right to bring this suit, they had the right to do the act upon which the suit was brought.

But if the rights of the plaintiffs, under this constitutional view of the case, be doubted, then what has been called the comity of nations obliges the Court to sustain the plaintiffs in this cause.

The term "comity" is taken from the civil law. Vattel has no distinct chapter upon that head. But the doctrine is laid down by other authorities with sufficient distinctness, and in effect by him. It is, in general terms, that there are, between nations at peace with one another, rights, both natural and individual, resulting from the comity or courtesy due from one friendly nation to another. Among these, is the right to sue in their Courts respectively; the right to travel in each other's dominions; the right to pursue one's vocation in trade; the right to do all things, generally, which belong to the citizens proper of each country, and which they are not precluded

from doing by some positive law of the state. Among these rights, one of the clearest is the right of a citizen of one nation to take away his property from the territory of any other friendly nation, without molestation or objection. This is what we call the comity of nations. It is the usage of nations, and has become a positive obligation on all nations. I know, said Mr. Webster, that it is but a customary or voluntary law; that it is a law existing by the common understanding and consent of nations, and not established for the government of nations by any common superior. For this reason, every nation, to a certain extent, judges for itself of the extent of the obligation of this law, and puts its own construction upon it. Every other nation, however, has a right to do the same; and if, therefore, any two nations differ irreconcileably in their construction of this law, there is no resort for settling that difference but the ultima ratio regum.

The right of a foreigner to sue in the Courts of any country may be regulated by particular laws or ordinances of that country. He may be required to give security for the costs of suit in any case, or not to leave the country until the end of the controversy. He may possibly be required to give security that he will not carry his property out of the country till his debts are paid. But if, under pretence of such regulation, any nation shall impose unreasonable restrictions or penalties on the citizens of any other nation, the power of judging that matter for itself lies with that other nation. Suppose that the government of the United States, for example, should say that every foreigner should pay into the public treasury ten, twenty, or fifty per cent. of any amount which he might recover by suit in our Courts of law; would such a regulation be perfectly just and right? Or would not the practice of such extortion upon the citizens of other nations be a just ground of complaint, and, if unredressed, a ground of war, much more sufficient than most of the causes which put nations in arms against one another? What is, in fact, now the question, which has assumed so serious an aspect, between the governments of France and Mexico? One of the leading causes of difference between the two countries, so far as I understand it, is not that the Courts of Mexico are not open to the citizens or subjects of France, but that the Courts do not do justice between them and the citizens of Mexico; in other words, that French subjects are not treated in Mexico according to the comity of the law of nations. [Mr. Webster said he did not speak of the merits of this quarrel: into that he did not enter; he spoke only of things alleged between the parties.] Look, said Mr. Webster, into Vattel, and you will find that this very right to carry away property, the proceeds of trade from a foreign friendly country, by exchange, is a well understood and positive part of the law of nations. Suppose that there existed no treaties between the United States and France or England guarantying these rights to each other's citizens: those rights would yet exist by tacit consent and permission. Suppose this government, in the absence of treaties, were to shut its Courts

3 A 2

against the citizens of either nation, (to do so would be only a violation of the comity of nations,) and should grant them no redress upon complaint being made : it might unquestionably be ground of war against the United States by that nation.

There are in London several incorporated insurance companies. Suppose a ship insured by one of these companies should be wrecked in the Chesapeake bay. Being abandoned, she becomes the property of the corporation by which she was insured. I demand whether the insurers may not come and take this property, and bring an action for it, if necessary, in any Court in this country, state or federal? They may recover by an action of tort against the wrongdoer. They may replevy their property, if necessary, or sell it; or refit it; or send it back. Unquestionably, if any country were to debar the citizens of another country of the enjoyment of these common rights within its territorial jurisdiction, it would be cause of war. I do not mean that a single act of that sort would or should bring on a war; but it would be an act of that nature, so plain and manifest a violation of our duty under the law of nations, as to justify war. According to the judgment of the Court below in the present case, however, these insurance companies would be deprived of their rightful remedy. You let them sue, indeed; but that is all.

Mr. Webster here referred to a case tried some time ago in the Circuit Court of the Massachusetts district, in which he was counsel, in which a vessel insured in Boston was wrecked in Nova Scotia, and was abandoned to the insurers. The insurance office sent out an agent, who did that which the owner of the vessel said was an acceptance of the abandonment. On the question whether the agent of the Boston office accepted the abandonment, (said Mr. Webster,) the Court decided the case. If we had said that we sent him down, indeed, but that his agency ceased when he got to the boundary line of the state, and he could do no act when he got beyond it, and the Court had agreed with us, we might, perhaps, have gained our cause. But it never occurred to me, nor probably to the Court, that the agency of our agent terminated the moment that he passed the limits of the state.

The law of comity is a part of the law of nations; and it does authorize a corporation of any state to make contracts beyond the limits of that state.

How does a state contract? How many of the states of this Union have made contracts for loans in England? A state is sovereign, in a certain sense. But when a state sues, it sues as a corporation. When it enters into contracts with the citizens of foreign nations, it does so in its corporate character. I now say, that it is the adjudged and admitted law of the world, that corporations have the same right to contract and to sue in foreign countries, as individuals have. By the law of nations, individuals of other countries are allowed in this country to contract and sue; and we make no distinction, in the case of individuals, between the right to sue and

the right to contract. Nor can any such distinction be sustained in law in the case of corporations. Where, in history, in the books, is any law or dictum to be found (except the disputed case from Virginia) in which a distinction is drawn between the rights of individuals and of corporations to contract and sue in foreign countries in regard to things, generally, free and open to everybody? In the whole civilized world, at home and abroad, in England, Holland, and other countries of Europe, the equal rights of corporations and individuals, in this respect, have been undisputed until now, and in this case; and if a distinction is to be set up between them at this day, it lies with the counsel on the other side to produce some semblance of authority or show of reason for it.

But it is argued, that though this law of comity exists as between independent nations, it does not exist between the states of this Union. That argument appears to have been the foundation of the judgment in the Court below.

In respect to this law of comity, it is said, states are not nations; they have no national sovereignty; a sort of residuum of sovereignty is all that remains to them. The national sovereignty, it is said, is conferred on this government, and part of the municipal sovereignty. The rest of the municipal sovereignty belongs to the states. Notwithstanding the respect which I entertain for the learned judge who presided in that Court, I cannot follow in the train of his argument. I can make no diagram, such as this, of the partition of national character between the state and the general governments. I cannot map it out, and say so far is national, and so far municipal; and here is the exact line where the one begins and the other ends. We have n second Laplace, and we never shall have, with his Méchanique Politique, able to define and describe the orbit of each sphere in our political system with such exact mathematical precision. There is no such thing as arranging these governments of ours by the laws of gravitation, so that they will be sure to go on forever without impinging. These institutions are practical, admirable, glorious, blessed creations. Still they were, when created, experimental institutions; and if the convention which framed the constitution of the United States had set down in it certain general definitions of power, such as have been alleged in the argument of this case, and stopped there, I verily believe that in the course of the fifty years which have since elapsed, this government would have never gone into operation.

Suppose that this Constitution had said, in terms, after the language of the Court below—all national sovereignty shall belong to the United States; all municipal sovereignty to the several states. I will say, that however clear, however distinct, such a definition may appear to those who use it, the employment of it in the Constitution could only have led to utter confusion and uncertainty. I am not prepared to say that the states have no national sovereignty. The laws of some of the states—Maryland and Virginia, for instance—provide punishment for treason. The power thus exercised

is certainly not municipal.    Virginia has a law of alienage : that is, a power exercised against a foreign nation.    Does not the question necessarily arise, when a power is exercised concerning an alien enemy—enemy to whom ?    The law of escheat, which exists in all the states, is also the exercise of a great sovereign power.

The term " sovereignty" does not occur in the Constitution at all. The Constitution treats states as states, and the United States as the United States ; and by a careful enumeration declares all the powers that are granted to the United States, and all the rest are reserved to the states.    If we pursue, to the extreme point, the powers granted, and the powers reserved, the powers of the general and state governments will be found, it is to be feared, impinging, and in conflict.    Our hope is, that the prudence and patriotism of the states, and the wisdom of this government, will prevent that catastrophe.    For myself, I will pursue the advice of the Court in Deveaux's case ; I will avoid nice metaphysical subtilties, and all useless theories ; I will keep my feet out of the traps of general definition ; I will keep my feet out of all traps : I will keep to things as they are, and go no further to inquire what they might be, if they were not what they are.    The states of this Union, as states, are subject to all the voluntary and customary law of nations. [Mr. Webster here referred to, and quoted a passage from Vattel, (page 61,) which, he said, clearly showed that states connected together as are the states of this Union, must be considered as much component parts of the law of nations as any others.]

If, for the decision of any question, the proper rule is to be found in the law of nations, that law adheres to the subject.    It follows the subject through, no matter into what place, high or low.    You cannot escape the law of nations in a case where it is applicable. The air of every judicature is full of it.    It pervades the Courts of law of the highest character, and the Court of pie poudre ; ay, even the constable's Court.    It is part of the universal law.    It may share the glorious eulogy pronounced by Hooker upon law itself : that there is nothing so high as to be beyond the reach of its power, nothing so low as to be beneath its care.    If any question be within the influence of the law of nations, the law of nations is there.    If the law of comity does not exist between the states of this Union, how can it exist between a state and the subjects of any foreign sovereignty ?

Upon all the consideration that I have given to the case, the conclusion seems to me inevitable, that if the law of comity do not exist between the states of this Union, it cannot exist between the states individually and foreign powers.    It is true a state cannot make a treaty ; she cannot be a party to a new chapter on the law of nations : but the law which prevails among nations—the customary rule of judicature, recognised by all nations—binds her in all her Courts.

I have heard no answer to another argument.    If a contract be made in New York, with the expectation that it is to be there exe-

cuted, and suit is brought upon it in Alabama, it is to be decided by the law of the state in which the contract was made.    In a case now before this Court, there has been a decision by the Court of Alabama, in which that Court has undertaken to learn the law of the state of New York, and administer it in Alabama.    Why take notice in Alabama of the law of New York?    Because, simply, there are cases in which the Courts in Alabama feel it to be their duty to administer that law, and to enforce rights accordingly. That, said Mr. Webster, is the very point for which we contend, viz.: the Court in Alabama should have given effect to rights exercised in that state by the plaintiff in the present cause, under the authority of Pennsylvania, without prejudice to the state of Alabama.

After all that has been said in argument about corporations, they are but forms of special partnership, in some of which the partners are severally liable.    The whole end and aim of most of them, as with us, is to concentrate the means of small capitalists in a form in which they can be used to advantage.

In the eastern states, manufactures, too extensive for individual capital, are carried on in this way.    A large quantity of goods is manufactured and sold to the south, out of cotton bought in the south, to the amount of many millions in every year.    Upon the principle of the decision in the Court below, the manufacturers of the goods and the growers of the cotton would be equally precluded from recovering their dues.    What will our fellow-citizens of the south say to this?    If, after we have got their cotton, they cannot get their money for it, they will be in no great love, I think, with these new doctrines, about the comity of states and nations.

Again, look at the question as it regards the insurance offices. How are all marine insurances, fire insurances, and life insurances, effected in this country, but by the agency of companies incorporated by the several states?    And the insurances made by these companies beyond the limits of their particular states, are they all void? I suppose that the insurances against fire, effected for companies at Hartford, in Connecticut alone, by agents all over the northern states, may amount to an aggregate of some millions of dollars.    I remember a case occurring in New Hampshire, of a suit against one of those companies for the amount of an insurance, in which a recovery was had against the company; and nothing was said, nor probably thought, of such a contract of insurance being illegal, on the ground that a corporation of Connecticut could not do an act or make a contract in New Hampshire.    Are those insurances all to be held void, upon the principle of the decision from Alabama?

And as to notes issued by banks: if one in Alabama hold the notes of a bank incorporated by Pennsylvania, are they void?    If one be robbed there of such notes, is it no theft?    If one counterfeits those notes there, is it no crime?    Are all such notes mere nullities, when out of the state where issued?

Reference has been made to the statute-books to show cases in

71

which the states have forbidden foreign insurance companies from making insurances within their limits. But no such prohibition has been shown against insurances by citizens of, or companies created in, the different states. Is not this an exact case for the application of the rule exceptio probat regulam? The fact of such prohibitory legislation shows that citizens of other states have, and that citizens of foreign powers had, before they were excluded by law, the right to make insurances in any and every one of the states.

Mr. Webster next called the attention of the Court to the deposite law passed by Congress on the 23d of June, 1836. It was, said he, one of the conditions upon which, under that act, any state bank should become a depository of the public money, that it should enter into obligations "to render to the government all the duties and services heretofore required by law to be performed by the late Bank of the United States, and its several branches or offices;" that is, to remit money to any part of the United States, transfer it from one state to another, &c. But that act required, also, something more: and it shows how little versed we in Congress were (and I take to myself my full share of the shame) in the legal obstacles to the doing of acts in one state by corporations of other states. The first section of that act provides, that "in those states, territories, or districts, in which there are no banks," &c., the Secretary of the Treasury "may make arrangement with a bank or banks in some other state, territory, or district, to establish an agency or agencies in the states, territories, or districts, so destitute of banks, as banks of deposite," &c. Here is an express recognition by Congress of the power of a state bank to create an agent for the purpose of dealing as a bank in another state or territory.

It has been said, that as there is no law of comity under the law of nations between the states, it remains for the legislatures of the several states to adopt, in their conduct towards each other, as much of the principle of comity as they please. Here, then, there is to be negotiation between the states, to determine how far they will observe this law of comity. They are thus required to do precisely what they cannot do. States cannot make treaties nor compacts. A state cannot negotiate. It cannot even hold an Indian talk! And now I would ask how it happens, at this time of the day, that this Court shall be called upon to make a decision contrary to the spirit of the Constitution, and against the whole course of decisions in this country and in Europe, and the undisputed practice under this government for fifty years, overturning the law of comity, and leaving it to the states, each to establish a comity for itself?

Mr. Webster here took leave of the question of the power of a corporation created by one of the states to make contracts in another.

I now proceed, said Mr. Webster, to consider whether there be any thing in the law or constitution of the state of Alabama, which prevents the agent of the United States Bank, in that state, from making such a contract as that which is the foundation of this suit.

It is said that the buying of a bill of exchange by such agent is contrary to the policy of the state of Alabama; and this is inferred from the law establishing the Bank of Alabama; that bank being authorized to deal in bills of exchange, and the constitution of the state authorizing the establishment of no other than one bank in the state.

This, said Mr. Webster, is a violent inference.

How does the buying or selling bills of exchange in Alabama, by another purchaser than the Bank of Alabama, infringe her policy? Because, it is said, it diminishes the profits which she derives from the dealings of the bank. Profit is her policy, it is argued; gain, her end. Is it against her policy for Mr. Biddle to buy bills, because his bank is incorporated; and not against her policy for Mr. Girard to buy bills, because his is not incorporated? Or, how far does she carry this policy imputed to her? Is no one to be allowed to buy or sell bills of exchange in Alabama but a bank of her own, which may or may not be in credit, and may or may not be solvent? It would be strange, indeed, were any state in this Union to adopt such a policy as this. But, if the argument founded on this inferred policy of Alabama amounts to any thing, it proves, not that incorporated citizens of other states cannot buy or sell bills there, but that it is the policy of Alabama to prevent other citizens from buying bills at all in Alabama.

I think, said Mr. Webster, that there is no just foundation for the inference of any such policy on the part of the state of Alabama. By referring to Aikins' Digest of the laws of that state, it will be found that she has carried her policy a little farther than merely the establishing of a bank. Her public officers are authorized to receive the notes of banks of other states in payment of dues to her; and she has enacted laws to punish the forgery of notes of other banks. Now, taking their acts together, considering them as a whole, the inference which has been drawn from her establishment of a State Bank under her constitution is certainly not sustained.

To consider this argument, however, more closely: it is assumed by it, first, that the state meant, by her legislation, to take to herself all the profits of banking within her territorial limits; and, secondly, that the act of buying and selling a bill of exchange belongs to banking.

The profits of banking are derived more from circulation than from exchange. If the state meant, through her bank policy, to take all the profits of banking, why has she not taken all the profits of circulation? Not only has she done no such thing, but she protects the circulation of notes of banks of other states.

Mr. Webster begged now to ask the particular attention of the Court to this question: What is banking?

Alabama, in reference to banking, has done nothing but established a bank, and given it the usual banking powers. And when the learned counsel on the other side speak of banking, what do they mean by it? A bank deals in exchanges; and it buys or builds

houses, also; so do individuals. If there be any thing peculiar in these acts by a bank, it must be not in the nature of the acts individually, but in the aggregate of the whole. What constitutes banking, must be something peculiar. There are various acts of legislation, by different states in this country, for granting or preventing the exercise of banking privileges. But has any law ever been passed to authorize or to prevent the buying by an individual of a bill of exchange? No one has ever heard of such a thing. The laws to restrain banking have all been directed to one end; that is, to repress the unauthorized circulation of paper money. There are various other functions performed by banks; but, in discharging all these, they only do what unincorporated individuals do.

What is that, then, without which any institution is not a bank, and with which it is a bank? It is a power to issue promissory notes with a view to their circulation as money.

Our ideas of banking have been derived principally from the act constituting the first Bank of the United States, and the idea of that bank was borrowed from the Bank of England. To ascertain the character and peculiar functions of the Bank of England, Mr. Webster had referred, and referred the Court, to various authorities: to M'Culloch's Commercial Dictionary; to Smollett's continuation of Hume's England; to Godfrey's History of the Bank of England, in Lord Somers' Tracts, 11th volume, 1st article; to Anderson's History of Commerce, &c.

The project of the Bank of England was conceived, Mr. Webster said, by Mr. Paterson, a Scotch gentleman, who had travelled much abroad, and had seen somewhere (he believed in Lombardy) a small bank which issued tickets or promises of payment of money. From this he took the idea of a bank of circulation. That was in 1694. At that time neither inland bills nor promissory notes were negotiable or transferable, so as to enable the holder to bring suit thereon in his own name. There was no negotiable paper except foreign bills of exchange. Mr. Paterson's conception was that the notes of the Bank of England should be negotiable toties quoties, or transferable from hand to hand, payable at the bank in specie, either on demand or at very short sight. This conception had complete success, because there was then no other inland paper, either bills or notes, which were negotiable. The whole field was occupied by Bank of England notes. In 1698 inland bills were made negotiable by act of Parliament; and in the fourth year of Queen Anne's reign promissory notes were made negotiable. Of course after this everybody might issue promissory notes, and where they had credit enough they might circulate as money. There is not much of novelty in the inventions of mankind. Under this state of things, that took place in England which we have seen so often take place among us, and which we have put to the account of modern contrivance. Large companies were formed, with heavy amounts of capital, for purposes not professedly banking; one, especially, to carry on the mining business on a large scale. These companies

issued promissory notes, payable on demand; and these notes readily got into circulation as cash, to the prejudice of the circulation of the Bank of England. But Parliament being at this time in great want of ready money for the expenditures of the war on the Continent, the bank proposed to double its capital, and to lend this new half of it to government if government would secure to the bank an exclusive circulation of its notes. The statute of the sixth of Anne, chapter 22, was accordingly passed; which recites that other persons and divers corporations have presumed to borrow money, and to deal as a bank, contrary to former acts; and thereupon it is enacted, that " no corporation, or more than six persons in partnership, shall borrow, owe, or take up any money on their bills and notes, payable at demand, or at less than six months from the borrowing." This provision has been often re-enacted, and constitutes the banking privilege of the Bank of England. Competition was not feared from the circulation of individual notes. Hence individuals or partnerships of not more than six persons have been at liberty to issue small notes, payable on demand; in other words, notes for circulation. And we know that in the country such notes have extensively circulated; but private bankers in London, in the neighbourhood of the bank, though it was lawful, have not found it useful to issue their own notes. So that the banking privilege of the Bank of England consisted simply in the privilege of issuing notes for circulation, while that privilege is forbidden, by law, to all other corporations, and all large partnerships and associations.

This privilege was restrained, in 1826, so as not to prohibit banking companies, except within the distance of sixty-five miles of London; and, at the same time, notes of the bank were made a tender in payment of all debts, except by the bank itself. This provision may be considered as a new privilege; but it does not belong to the original and essential idea of banking. Mr. M'Culloch remarks, and truly, that all that government has properly to do with banks is only so far as they are banks of issue. Upon the same principle the banks of other countries of Europe are incorporated, with the privilege to issue and circulate notes as their distinctive character. Here Mr. Webster explained the character of the banks of France, Belgium, &c.

Now, how is it in our own country? When our state legislatures have undertaken to restrain banking, the great end in view has been to prevent the circulation of notes. Mr. Webster here referred to the statute books of Massachusetts, Maine, Rhode Island, and New Hampshire, for restraining unauthorized companies from issuing notes of circulation. He then turned to the statute of Ohio, imposing a punishment for unauthorized banking. Her law defines, in the first place, what constitutes a bank, viz. the issuing of notes which pass by delivery, and intended for circulation as cash. That, said Mr. Webster, is the true definition of a bank, as we understand it, in this country. Mr. Webster referred also to the laws of other

Vol. XIII.—3 B

states, Maryland, New Jersey, Missouri, Pennsylvania, Delaware, North Carolina, South Carolina, Virginia, Georgia, all to the same effect.  The law of the state of Alabama herself, said he, is much more important, in this view of the case, than that of any other state.  The constitution of the state of Alabama was established in 1819; the law creating the bank of Alabama was passed in 1823.  The constitution and this law are all the authorities from which the inference has been drawn of the policy of the state of Alabama.  Did she suppose that by this law she was establishing such a monopoly of the purchase of bills of exchange as has been contended for in this case?  Certainly not.  For, by a law passed afterwards, she restrained the circulation of unauthorized bank notes; that is, notes not issued by some authorized banks.  But did she also restrain dealings in exchange?  She did no such thing.  Nor is there any thing, either in the constitution or the laws of the state of Alabama, which shows that by banking she ever meant more than the circulation of bills as currency.  There is nothing therefore in any law or any policy of Alabama, against the purchase of bills of exchange by others as well as by the Bank of Alabama.  She has prohibited by law other transactions which are clearly banking transactions; but she has not touched this.  If even her banking policy includes as well buying exchange as circulation, and she guards against competition in the one, and leaves the other open, who can say, in the face of such evidence, that it is her policy to guard against what she leaves free and unrestrained?

Is there any thing in the constitution, or any ground in the legislation of Alabama, to sustain the allegation which has been made of her policy?  If not, is the existence of such a policy to be established here by construction, and that construction far-fetched?

Mr. Webster here rested his argument on this case, which, he said, had been discussed by others so ably as not to justify his occupying the time of the Court by going further into it.

The learned counsel on the other side had, in the course of his argument of yesterday, alluded to the newspapers, which, he said, had treated the decision of the Court below scornfully.  Mr. Webster said he was sorry to hear it; for the learned judge had acted, in his decision, he had no doubt, under a high sense of duty.  I have been told, said Mr. Webster, but I have not seen it, that a press in this city, since this case has been under consideration in this Court, has undertaken to speak, in a tone something approaching to that of command, of the decision upon it to be expected from this Court.  Such conduct is certainly greatly discreditable to the character of the country, as well as disrespectful and injurious to the Court.

A learned gentleman on the other side said, the other day, that he thought he might regard himself, in this cause, as having the country for his client.  He only meant, doubtless, to express a strong opinion that the interest of the country required the case to be decided in his favour.  I agree with the learned gentleman, and I go indeed far beyond him, in my estimate of the importance of this case

to the country. He did not take pains to show the extent of the evil which would result from undoing the vast number of contracts which would be affected by the affirmation here of the judgment rendered in the Court below, because his object did not require that: his object was to diminish the prospect of mischief, not to enlarge it. For myself, I see neither limit nor end to the calamitous consequences of such a decision. I do not know where it would not reach, what interests it would not disturb, or how any part of the commercial system of the country would be free from its influences, direct or remote. And for what end is all this to be done? What practical evil calls for so harsh, not to say so rash a remedy? And why now, when existing systems and established opinions, when both the law and public sentiment have concurred in what has been found practically so safe and so useful; why now, and why here seek to introduce new and portentous doctrines? If I were called upon to say what has struck me as most remarkable and wonderful in this whole case, I would, instead of indulging in expletives, exaggerations, or exclamations, put it down as the most extraordinary circumstance, that now, within a short month of the expiration of the first half century of our existence under this Constitution, such a question should have been made; that now, for the first time, and here, for the last place on earth, such doctrines as have been heard in its support should be brought forward. With all the respect which I really entertain for the Court below, and for the arguments which have been delivered here on the same side, I must say that, in my judgment, the decision now under revision by this Court is, in its principle, anti-commercial and anti-social, new and unheard of in our system, and calculated to break up the harmony which has so long prevailed among the states and people of this Union.

It is not, however, for the learned gentleman, nor for myself, to say here that we speak for the country. We advance our sentiments and our arguments, but they are without authority. But it is for you, Mr. Chief Justice and judges, on this, as on other occasions of high importance, to speak and to decide for the country. The guardianship of her commercial interests; the preservation of the harmonious intercourse of all her citizens; the fulfilling, in this respect, of the great object of the Constitution, are in your hands; and I am not to doubt that the trust will be so performed as to sustain at once high national objects and the character of this tribunal.

Mr. Ingersoll, for the defendant, said that although distinct considerations of universal, of international, and of municipal law are involved in this case, he should not attempt to discriminate, but submit them altogether. The judgment of the Circuit Court is against the plaintiff's right of action. For that judgment two distinct reasons are given, viz.: 1. That the law of Alabama excludes banking in that state except as prescribed by its peculiar provisions; and, 2. That besides that local law, the universal law excludes corporations not authorized by the legislative power of such states as

did not charter them. The first reason is enough to support the judgment, without regard to the second, with which this Court is not bound to concern itself. The corporation question, therefore, is not necessarily in issue. It matters not what the rule of general jurisprudence may be as to corporations attempting extra-territorial transactions, if the law of Alabama be that banking is prohibited in that state, whether by corporations or individuals. The banking question rules the case by the banking interdict, without reference to the corporation question, on which the opposite argument has spent itself in political denunciation. Alabama has a sovereign right to make banking an affair of state; and an unbroken series of the uniform judgments of the Supreme Court of the United States affirms not only that state right, but the obligation of this Court to conform to it. Mr. Ingersoll then read the articles of the constitution of Alabama concerning banks, and an act of the assembly of that state in 1836, by which the profits of banks are declared to be the resource substituted for all other taxation of the state revenue; and several passages of the case of the state of Alabama *vs.* Stebbins et al., Stewart's Alabama Reports, vol. i. 299; which he urged as conclusive of the controversy. The constitution, legislation, and adjudication of a sovereign state all unite in declaring that even its own citizens shall not deal in banking, but agreeably to its peculiar laws. The plaintiff bank had not in any respect conformed to those laws. Consequently it cannot bank in Alabama, nor recover there on a banking transaction there. The second reason of the Circuit Court that corporations have no extra-territorial power may be erroneous, and yet the plaintiff bank must fail for the first reason; not because it is a corporation, but because it is a bank, no matter where or whether incorporated, or partnership, or individual, or even inhabitant and citizen of Alabama. It is enough that it attempted banking contrary to the local and peculiar law of Alabama. That settles the question, without involving it with corporation law. The Bank of the United States *vs.* Deveaux, 5 Cranch, 61, falls under this principle too, because no citizens, including those of Alabama, can bank there contrary to its laws.

No comity interferes with this unquestionable principle. It is the indisputable basis of universal law, that laws have no force beyond the territories of those who make them. This is one of the few principles of universal jurisprudence universally acknowledged. United States *vs.* Bevans, 3 Wheaton, 386. 3 Dallas, 370, note, Huberus. Laussat's Fonblanque, book 4, chap. 1. section 6, 658, (444.) 2 Kent's Commentaries, 3d edition, part 5, lecture 39, 457. Story's Conflict of Laws, sec. 23, p. 24. Henry on Foreign Law, p. 1. United States *vs.* Owens, 2 Peters, 540. Bank *vs.* Donelly, 8 Peters, 372. Rhode Island *vs.* Massachusetts, 1 Peters, 736.

It would be superfluous to multiply authorities for this indubitable position. In the case last cited, from 12 Peters, 740, this Court carries it so far as to declare, and with perfect propriety, that an act of Parliament during the colonial condition of this country

was not binding here. The only force allowed to laws extra-territorially is derived from international comity, which never intervenes to set aside either the written law or the common law, or even the state policy or state interest of another country. Henry, 2. Story's Conflict of Laws, page 33, sections 32, 33; page 37, section 38. Huberus, article 3. 3 Dallas, 370, in note. Bank of Marietta, 2 Randolph, 465. Pennington vs. Townshend, 7 Wendall, 276. The word in Huberus is "potestas," which Dallas translates rights, meaning as it does mean any species of right by written, common, or even usage law; for no such power or right of one state can by comity be supplanted by the law of another state. Comitas inter communitates is at most a frail and evanescent substitute for law. Dallas translates it courtesy, and it is really nothing more. It is a law of reciprocal necessity, of indispensable reciprocity, of absolute charity to do as you would be done by; without which the harmony of nations would be incessantly disturbed: but which, nevertheless, is no more than the highest obligation of charity, to love our neighbours as we do ourselves, but not better than ourselves. Its philosophy is well explained by Judge Story by a classical quotation in his learned judgment in the case of Harvey vs. Richards, 1 Mason, 412; damus petimusque vicissim sub obtentu mutuæ necessitatis. Unless, therefore, the state of Georgia needs such concession by comity from the state of Alabama, she is not bound to make it. One of the cases involving this question is brought here by the Carrollton Bank of Louisiana, the law of which state requires its judges to refer in their judgments to the written law of the state on which the judgments are founded, and prohibits the judges from ever leaving the state whose boundaries are established by the Constitution. How could the Courts of Alabama or any other state reciprocate with Louisiana such regulations as these? In another of the cases, the United States Bank of Pennsylvania is the plaintiff, which bank, by the law of that state conferring its charter, is closely connected with the canals, railroads, schools, and other improvements of Pennsylvania. Could any stretch of comity give such provisions force in Alabama? It is not judicial comity, but the comity of a state which its Co its of judicature award. Story's Conflict of Laws, p. 37, sec. 38. No Court therefore can allow it, but as the comity of the state, and not the Court. Comity, moreover, is international courtesy; never allowed between provinces, districts, counties, cities, or other parts of the same empire. The connexion between these United States is closer and more intimate than that of comity. Their union by federal compact expressly settles the relation of the states to each other, and leaves no room for tacit or constructive comity to operate. A national Constitution declares that no state shall enter into any treaty, alliance, or confederation, or, without the consent of Congress, into any agreement or compact with another state or foreign power. Such union, with much providence and some jealousy, has settled the powers and relations of the respective states. An article of the Constitution provides for the force and

3 B 2 72

proof of public acts of state, for the privileges and immunities of the citizens of each state in all the rest, for fugitives from justice and fugitives from labour; leaving little or nothing on this important subject to judicial construction. For certain purposes these United States are one and the same nation; for others, a quasi nation or close confederation, and a mere confederation, but still a national confederation for all powers not delegated to them by the people and the states. According to the language of this Court, in 12 Peters, 720, the states are sovereign within themselves as to all the powers not granted to the United States, and foreign to each other as to all others. The argument of the judge determining this case in the Circuit Court, denies the existence of any comity whatever between these several states whose union constitutes a nation. Whether that argument be unquestionable or not, it is certain that their union makes them a nation. In the opinion of Chancellor Kent, lately published on this subject, a doubt is intimated, whether, as the citizens of each state are entitled to all the privileges and immunities of citizens in the several states, it is competent to the state of Alabama to prevent citizens of Georgia or Pennsylvania from banking in the former state. But this Court adjudged, in the Bank of the United States *vs.* Devaux, 5 Cranch, 61, that no corporation is a citizen; and it cannot be doubted that citizens of Georgia and Pennsylvania are not entitled to more privileges and immunities in Alabama than that state vouchsafes to its own citizens. That full faith and credit shall be given to the acts and public proceedings of the states in each other, seems to be as yet confined to judicial acts. 3 Story's Commentaries, 174. Pennington *vs.* Townshend, 7 Wendall, 279. The laws of the different states are proved as foreign laws in Courts of justice: and that it would lead to intolerable confusion to make by comity the laws of any state, the laws of every other state, is demonstrated in Judge M'Kinley's argument with a force which Chancellor Kent's opinion attempts in vain to overthrow.

This is perhaps a question rather of politics than jurisprudence. It may be granted that states can re-enact each other's laws, and so adopt them, but it is submitted as clear that by no agreement whatever can this be constitutionally effected. If then no agreement of states can do it, it cannot be done by comity of Courts; otherwise construction would have more power than legislation. The question is not whether even one state, or the judicature of one state, can by comity adopt the law of another state; but it is whether this great addition to the law of a state can be made by the judiciary of the United States; not for the United States: but whether the federal judiciary can by comity incorporate the law of one of these United States with that of another. It may be questioned whether the judiciary of the United States can reciprocate comity with that of any foreign nation. All our federative law, political, civil, penal, fiscal, martial, and whatever else there is, is specific and written. There is no common law of the United States

but for principles and definitions. The admiralty law, though of large scope, is by constitutional grant, and the revenue law is settled by legislation. Could a Court of the United States reciprocate admiralty or revenue law with England, France, or Mexico?

Chancellor Kent alleges international law of merchants; but if merchants may make laws for nations, so may mariners, travellers, or borderers. If merchants by sea, why not traders ashore? Those of New York and Liverpool have no better right to supersede the treaty making authority by their own tacit understanding, than the traders who fetch peltries from the north or metals from the south. The borderers of the St. Lawrence, the Sabine, and the Arkansas may arrange rude international codes with Canada, Mexico, and Texas for the government of these United States, usurping the powers of constituted authorities, as ex parte professional opinions may usurp those of appointed judicature. There is no occasion for any such irregularities. Every state of the United States has its all-sufficient common law and frequent legislation; while the law-making power and the law-judging department of the Union are in constant being, rendering it wholly unnecessary for illegitimate usage, action, or habit, partial, personal, and selfish substitutes, to take the place of deliberate law-making. It is at least doubtful whether either the federal or even the state judiciary of these United States has the power to make laws by comity. At all events it is a perilous faculty by comity to make common law for one state from the written law of another; and granting that state Courts may exercise such jurisdiction by no means infers that the federal judiciary may do it for the states. For this Court to introduce a Georgia or Pennsylvania bank into Alabama, would be more than the legislature of that state can do for its own citizens, except as its peculiar constitutions allow.

Introducing or changing law is often a serious measure. It is the direst exercise of conquest, and the most difficult. Diversities of laws, language, and local sympathies are the ways of God to man, without which all nations would strive to have but one local habitation and one name. Droit d'aubaine, British allegiance, the land, exclusive law of the common law, all such seemingly severe and harsh provisions are pregnant with the philosophy of providence. A learned foreign lawyer, M. de Tocqueville, vol. i. 99, considers these United States so many foreign nations, whose whole form the Union, of which originally, even every township was a sort of independent sovereignty. Nothing like law can be more foreign than that of Massachusetts and Louisiana to each other. It may be politic, it may be wise to try to abolish or mitigate these estrangements of locality: but it is no more practicable to extirpate them than the barbarisms of war. This Court has strenuously adjudged that at any rate such is not the judicial function. It does not and will not anticipate or fabricate legislation.

Furthermore: the objection to Courts extending comity for states to banks is corroborated by the consideration that banking is a sovereign privilege. Making money, or a substitute for it, is of sove-

reign faculty., Wilson *vs.* Spence, 1 Randolph, 100. Pennington *vs.* Townsend, 7 Wend. 276.

Mr. Ogden cites The People *vs.* Utica, 15 Johnson, for Chief Justice Thomson's allegation that banking was not a franchise at common law. But of what banking is that allegation made? Banking by deposite, by discount, or by circulation? If the latter, it is expressly contradicted by Judge Roane and the Virginia Court, as it is believed to be by all the authors on political economy. In the case of Drew *vs.* Swift, in the Pennsylvania circuit, it was adjudged by Mr. Justice Baldwin that banking by circulation is money making, and part of the public authority. Be this as it may as a general principle, Alabama has settled it by her organic law. So adjudged in The State *vs.* Stebbins, 1 Stewart, 299. If it were res integra, it might well be questioned whether any state can devolve on individuals this sovereign authority. It was so questioned on demurrer, in Tennessee. Peck's Reports, 269. Without now attempting that perhaps foreclosed position, it is submitted that no state Court, much less a Court of the United States, can inflict on one state the banking sovereignty of another state. No comity can do that. It would be servitude. Otherwise the taxation, hostilities, and all other exigencies of one state or nation may be adjudicated upon another. Even if there were no law of Alabama to forbid it, the flagrant impolicy is patent. Story's Conflict, 33. The banks of Europe and Asia, the laws of Mexico and Texas, the abolition acts of Pennsylvania, the English common law, which in Massachusetts, ipso facto emancipates a slave, the church laws, laws of royal prerogative and of noblemen's privileges, might all be enforced in Alabama. There must be some stop to such endless and insufferable confusion—such chaos of government. The only question is, what branch of government shall interpose: and Judge Story's valuable work on the conflict of laws is explicit that in France, England, and this country, the judiciary is that branch, without awaiting written laws of direction. Story's Conflict, 24, 25. This Court has always asserted the necessity and duty of Courts to refuse their aid to acts contrary to the policy of law. Armstrong *vs.* Toler, 11 Wheat. 270. United States *vs.* Owen, 2 Peters, 527. Nor is there any inconsistency in Courts enforcing the exclusion, and yet not the comity, because the one is compliance with law, whereas the other is to make it. Finally, to doubt whether comity is due is to resolve that it is not, under such a government as ours, where the judicial power is so specific and defined.

Mr. Ogden finally denies the right of Alabama to meddle with bills of exchange, which are the means of commerce, and commerce with all its regulations have been surrendered by the states to the Union. But no bill of exchange is here in question as a commercial mean, more than a ferry boat, a horse, an ass, a slave, a man or woman, or any other commercial convenience; and it will not be pretended that these are not under state regulation. New York has regulated money by a small bill law, and money, more than bills of exchange, is the medium of commerce. All the states

have by law regulated the damages on bills of exchange. The argument proves too much, and therefore nothing. As to the ruinous consequences denounced, Mr. Ingersoll said that such had always been augured, and always would be, of measures offensive to certain political prejudices. They were abundantly disproved by the improvement and prosperity of the country. The Court, instead of being alarmed from its duty by such appeals, should feel encouraged to support the laws of state sovereignty; which, well understood, were the broad foundations of the general welfare. Neither man nor state can stand erect without these self-preserving rights; against which the pleas of comity and cries of politics are equally futile and unavailing in this Court as now constituted.

As it is impossible to foresee what may be the views of the Court, it is an advocate's duty to consider all the reasons given for the judgment below; and, therefore, the corporation question must next be examined. The Court will remark, that it is not a question of action, but of transaction. The record presents the case of an incorporated bank, by its stationary agent resident in Alabama, with the funds of the bank discounting there a bill of exchange; upon which transaction this action was instituted. It is thus no secondary contract; but a primary, actual dealing by the corporation in banking business out of the state which chartered the banking corporation. The right of suit is not to be confounded with the right of contract. They are obviously distinguishable. Perhaps American State Courts have sanctioned the right of action, which it is not intended either to concede or to draw in question. The cases of the Portsmouth Company, 10 Mass. Rep. 91; The Silver Lake Bank, 4 Johns. Chan. Reps. 370; of the New York Fireman's Insurance Company, 5 Con. Rep. 560; The Bank of Marietta, 2 Randolph, 465; The Gospel Society, 2 Gallison, 105, and 8 Wheaton, 454; Green vs. Minnis, 1 M'Cord, 80, and the various foreign authorities cited in the opposite argument; may perhaps establish the law that a corporation or sovereignty enjoys the right of suit in other Courts than those of its own state. I is nevertheless worthy of remark, that no case is to be found in the English books, of a corporation suing in England upon a contract there. All the volumes of English law may be challenged for such a case. The case of the Dutch West India Company, in Raymond and Strange, was suit upon a lawful contract, that is, a contract in the country where the company had a right to contract, so that the lex loci never came in question during the suit in England, and when an attempt was made to plead it into the suit, that attempt was frustrated by estoppel. The English chancery cases of suits by foreign sovereigns, are distinguishable from suits by foreign corporations; because the sovereign sued in them as an individual divested of the privileges of intangibility.

If suits have been brought by the Bank of England in this country, for the recovery of American debts, they must have been of rare occurrence, passing sub silentio. The case of Perkins

*vs.* The Washington Insurance Company, from 6 Johnson's Reports, cited to show that this question was not raised on that occasion, abounds with demonstration that it was against the interest of both parties to make it; and in the cases of the Silver Lake and Marietta Banks, the most eminent lawyers of New York and Virginia denied the right of action, which, a multo fortiori, argues contradiction of the right of transaction. Mr. Ogden's notion of the venue, at any rate, a very little technicality upon which to build so important a position, is annulled by a law of Alabama, which prohibits all special demurrers, so that no averment of venue is necessary in their declarations, and rarely occurs.

The question thus freed from mere fiction, and the right of action, is broadly whether corporations can contract and enforce their contracts by suit in foreign countries. To discriminate between right and remedy, is always matter of some difficulty, as this Court experienced in Ogden *vs.* Saunders, 12 Wheaton. Yet the distinction is well known and universally recognised; the right of remedy being regulated by the law of the forum; whereas, the legality of the contract is determined by the law of the place. In most of the Courts of civilized countries, there is little restriction upon the right of action. In Great Britain and this country, all Courts are open to all persons, upon principles of wise jurisprudence, well explained in the eighty-second number of the Federalist; that foreigners as well as citizens, the poor and the rich, the incorporated and the individual, have all an equal and unquestionable right to judicial redress for alleged wrong. The Courts of France will not take jurisdiction of a suit between two foreigners, but renvoy them to their own courts at home. But it is the privilege of every complainant to bring suit in any English or American Court upon all lawful contracts. The contract must be lawful, however, that is to say, must conform to the law of the place of contract. Place, therefore, settles the right, while Courts regulate the remedy.

Our question is, whether the incorporation of one state or country is such in all others? which is denied. What is a corporation? Mr. Ogden's definition is perfectly acceptable for the defendant's argument; he defines it, an artificial person created by the law of an independent state. The definition or description, accurately made, tends much to explain the reason of the thing and to elucidate the subject. It is an artificial body:—Ayliff calls it a mystical body, a mere creation of the law, with none but express powers ad hoc, or such implied powers as are strictly indispensable. Judge M'Kinley treats the matter with exemplary accuracy, when he says, that unless the act of incorporation by Georgia, Louisiana, or Pennsylvania, can operate as strict law in Alabama, it is of no force there whatever. Such is the true starting point of the whole discussion. All the authorities of all countries and ages concur in this fundamental doctrine of corporations. Brooke, Com'n, Bacon, Ayliff, Taylor, Brown, Coke, Blackstone, Kyd, Wilcock, and it may be affirmed, all American treatises and adjudications a ree in this

2 Kent's Com. 3 edit. 298. Ang. and Ames, 17. 59. Head vs. Amory, 2 Cranch, 167. Dartmouth College, 4 Wheat. 636. U. S. Bank vs. Daudridge, 12 Wheat. 638. Beatty vs. Knowles, 4 Peters, 167—168.

It is beyond question that corporation authority is a license to be strictly construed. Chancellor Kent, in his Commentaries, says, this is modern doctrine. Yet on the same page, he mentions Trajan's letter to Pliny, which strongly asserts it; and the fact is, that from Solon and Numa, whose laws on the subject he also refers to, down to Marshall, the late much honoured Chief Justice of this Court; who was a uniform and inflexible supporter of the strict construction of corporation powers; it has always been the same, and necessarily must be so, because charters take franchises or privileges from all to confer upon a few, which franchises or privileges must needs be restricted to their very capitulation. An individual power of attorney or substitution is never expanded by construction. All letters of license are taken strictly, though their interpretation is but matter of intention, whereas that of a charter presents a question of state power which Courts have no authority to enlarge constructively.

It may, indeed, be asked, what is meant by modern corporation law? What is the American law of charters? Who made it? When? Where? Is it English common law? or common civil law? from which code all the law of charters proceeds. Is the American law on this subject ante-revolution or post-revolution? Do we get it from Massachusetts or Louisiana, where the common English law and the common civil law respectively prevail? or is the modern law of Massachusetts enforced in Virginia as common law there, as was adjudged in Dandridge's case? Chancellor Kent says, 2 Com. 281, that corporations have multiplied with a flexibility and variety unknown to the common law. But what is the American common law of corporations? The United States having no common law, what is their standard? In all the states formed out of Louisiana, with the civil law as their birthright, corporators are personally answerable for corporate acts. In states inheriting the English common law, they are, perhaps, personally intangible; not by the terms of a charter or by any written law, but because it is understood that the English common law annexes such privilege of exemption. A state grants a charter, to which the common law tacitly annexes an inestimable privilege. Has this English common law been adopted in the American states? Is it consonant with their policy; or conformable to their constitutions? At the period of their independence, there were few if any corporations, and no banking corporations in America. Has that universal public sentiment, which gradually frames common law, since then engrafted this privilege upon the corporation stock, which till long after the American revolution had not begun to germinate, and only within a very few years last past has attained a growth which overshadows all our institutions? The source of this immense power it is hard to find; but, at all events, the stream has been uniform in the channel of the Supreme Court of the United States, coincident with those

principles of law; which, whether ancient or modern, are equally unquestionable in their authority and their reason. In some of the latter cases of this Court, The Columbia Bank, 7 Cranch, 299, the Bank of the United States, 8 Wheaton, 338, and the same bank, 12 Wheat. 68, in the absence of some of the judges, and Chief Justice Marshall earnestly dissentient in the last mentioned case, whose principles rule the whole doctrine, it was declared by the eminent judge who delivered the Court's opinions, that the common law of corporations has been broken in upon by modern adjudications; as it has been declared by another distinguished commentator, that the common law was found impolitic in this respect, and essentially discarded.

It is true, that in order to keep pace with the modern flood of these associations, the common law, with its characteristic adaptation to exigencies, has counteracted their intolerable privilege by holding them to personal liability. But no other change than this, it is apprehended, will be found in the modern common law of either this country or England. Power to pronounce it impolitic, to break in upon or discard it, if it exists in any Court, should be very sparingly exercised. All the English cases are in 2 Kent, 289. 292. and Angell and Ames, 128; and their uniform tendency is to keep down corporation privilege, not to exaggerate it. And the same is the result of any thorough examination of all the American cases. Corporations have not been allowed to escape suit by undue privilege; which is the substance of all that salutary change in the law, that is supposed to discard it as impolitic, or break in upon it as antiquated. It is adaptation, not alteration of the common law. No principle of corporation law is invoked for this defence, but such as the late Chief Justice of this Court always abided by. His anxious dissent in 12 Wheaton, sets forth those principles with a review of the accredited authorities from Brooke to Blackstone; while the learned judge who delivered the opinion of the majority of the Court, appeals to a recent dictum of Mr. Justice Bailey, and the still later doctrines of Chief Justice Parker, for a common law of corporations in Virginia, transported from Massachusetts.

Gradual and cautious conformity to circumstances is the merit of the common law, following the universal sense of propriety; for substantial law is eternal and identical, and what is frequently denounced as disorganization, is, in truth, restoration of first principles. The great duty of Courts is to maintain them, and it was no doubt the solemn determination of Chief Justice Marshall to uphold even those seeming formalities of corporation law, which experience had sanctioned as wise. His forecast in this is proved on this occasion. The seal, the regular vote, the record, the duly constituted agent, and other philosophical guards of this formidable imperium in imperio, cannot be dispensed with, without enabling a vast engine of factitious wealth to crush communities. And all the law is contrary to it. Formalities have been discarded, not to break in upon but to strengthen law, while the whole substance stands unimpaired in all its original

and indispensable propriety. Legislation and adjudication have never gainsaid it. Judge M'Kinley cites Chief Justice Parsons, for a solemn warning against constructive encroachment. Even granting the policy, where is the judicial power? No corporation is created, in contemplation of law, but for the public good. Charters are intended to benefit the unincorporated more than the incorporated. Legislatures and states organize them on no other principle; and Courts carry it into practice by restricting the grant to its letter, and, if indispensable, moulding common law to countervail privilege. Hence Coke's Institute, and the case in Cowper, declare corporations to be inhabitants that they may not evade taxation; while this Court denies that they are citizens, in order to prevent undue privilege of suit. 5 Cranch, 61. Hence numerous adjudications, individuating corporations for suit, not one of which designs to extend intangibility. U. States vs. Amedy, 11 Wheat. 392. Farmers' Bank of Delaware, 12 Peters, 135.

Any judicial extension of charter exemption by construction, would not be in harmony with common law, which is general assent; while every sound judicial limitation of such exemption effectuates the common will. A few may contend otherwise; but it is impossible that they can make law. All its established principles limit corporation power, and facilitate common right. Even the formalities of law are often its necessary solemnities. It might be sometimes convenient to suitors and judges for the latter to adjudicate at their meals, or in bed; but open Courts and formal proceedings are obviously essential. The great attempt of those who deny and would discard the settled laws of corporations is, first, to assimilate them to persons, and, secondly, to partners, or other associations of persons not incorporated. But they are neither for aggravation of exemption: they may resemble either for personal liability. This Court has adjudged that they are not persons. 12 Peters, 99, 100. And the very reverse is the reason of the law. Whenever impersonated it is to restrain, not to license them. A corporation cannot, like a person insolvent, make an assignment of its affairs. 12 Peters, 138. Even if so authorized by charter, it cannot assign them to foreign trustees. Williams vs. Maus, 6 Watts, 278. Can a corporation do any act of humanity? Certainly not, though the munificence of such acts daily stifles the sense of their illegality. It is as much a devastavit for the trustees or directors of a corporation to spend its means generously, as it would be for an executor or administrator. It is not the law that a corporation is a person capable like an individual of action and transaction. 2 Kent, 267. 299. 279. 1 Kyd, 225. Persons go anywhere. Corporations are localised and stationary. They cannot go abroad but by agents; and how they are to be constituted, or whether they can be at all, is the very question. 16 Johns. 6. Personal rights are original and unlimited. Corporate franchises are derivative and specific. A person, like a state may do whatever is not prohibited. A corporation like this confederation can do only what is expressly allowed by charter.

An American person is a sovereign, restrained by no fetters but of his own making. A corporation is his creature, bound by strict obligation. Persons may traffic everywhere: but why? Because they become subjects wherever they are. But corporations are amenable only to the state creating them. The European, Asiatic, or African, is an American, in America; whereas the perverse argument of corporation license is to be a citizen without being a subject; while all natural persons are subjects, even though not citizens. Personal identity, corporeal being, and powers of motion, are the attributes of persons, but not of corporations. They are personal for legal responsibility, but plural for the enjoyment of privilege.

Still less is the attempted resemblance of corporations to partners. In the Law Reporter, 59, this resemblance is strongly asserted. But the want of it is so palpable that a single reference to the distinction is enough. Ang. and Am. 23. Corporations are neither persons nor partners, but artificial bodies politic, created by act of state, always ad hoc, and their franchises are granted for public good, of which they are the supposed instruments. Charter elements are artificial creations, with none but express or severely indispensable power, indispensable to existence, without existence till allowed by the state, mostly assigned to a place, always confined to defined purposes. Whether, and how agencies for corporations can be constituted is questionable. 2 Kent, 291, 292, in note. But an inflexible and fundamental doctrine prevents their extra-territorial transactions, by requiring the permission of the state wherever such transaction is; in which doctrine the question of agency is merged and disappears.

In this plain principle all authorities agree. 2 Kent, 268, 269. 276. Ang. and Am. 27. 37, 38. The civil law, the common law, American law, all law coincides in it. Not a case or sentence can be cited against it. A corporation must be authorized by the sovereignty where it acts as such, otherwise it is what is called an adulterine corporation. Ang. and Am. 38. Mr. Ogden's definition acknowledges this; and he conceded that it cannot perform corporate acts beyond the state creating it. This is the explanation of Chief Baron Manwood's quaint notion, that corporations have no souls because they are created by the king. They are creations of law, and do not share in government or any political power. Per Marshall, Chief Justice, 4 Wheat. 636. No corporation is such, it has no creation or legal being, till authorized by the government of the state where it is to act as a corporate body. Greystock College case, Jenk. 205. Dyer, 3. 60. 6 Vin. Abr. 287. Ang. and Am. 38, note 5. This ancient judgment contains the germ of the whole self-protecting principle of sovereignties against corporations. The pope founded Greystock College, and it existed for a long time. But the English Courts, as soon as it appeared before them, annulled it for want of lawful beginning. Such is the universal law applicable to these bodies politic. Sutton's Hospital, Jenk. 270. Courts may have suffered them to sue abroad on contracts at home which are lawful; but never to contract and sue abroad without authority of state

there. Whenever this position against them is taken in a Court, it is insuperable. A charter, if required, must be proved before any corporate act can be even given in evidence. United States vs. Johns, 4 Dal. 415. Bul. N. P. 107. 10 Mass. 91. 8 Johns. 295. 1 Hal. 211. 1 Kyd, 292, 293. 10 Wend. 269. 3 Conn. 199. Ang. and Am. 377.

The universal common law of all sovereign states requires and uniformly asserts this self-protecting principle. It is a state right of indispensable recognition. None but the state can legitimate a corporation. In Pennsylvania, the legislature have authorized the Supreme Court to create charitable, religious, and literary corporate bodies, on certain terms, as in England the king deputes persons to grant charters. Ang. and Am. 44. But state agency, sovereignty permission, is sine qua non. But it is said that sovereigns may sue abroad. True, they do, but not as sovereigns. When the King of Spain sued in the Circuit Court of Pennsylvania, he was liable to costs, or to nonsuit; and when his minister, Don Onis waived his privilege as a foreign ambassador to become a witness on the trial, he might have been prosecuted for perjury, or committed for contempt. When a sovereign sues abroad, he becomes subject to the foreign jurisdiction, which corporations never do; and when sovereigns sue in equity, especially, the fullest reaction and reciprocity of responsibility necessarily ensue. It will not be pretended that a monarch of England brings his privilege of irresponsibility, or the Sultan of Turkey his despotic power, when condescending to sue in this country. As monarchs they have no power here whatever; and they sue, like all others subject to our Courts.

It has been made a question, too, whether upon the principles contended for, the American states, being, as was alleged, corporations, can, as they constantly do, borrow money, sell stocks, and otherwise transact business in foreign countries; to which the obvious answer is, that on all such occasions they deal as sovereign states, and not mere corporations. Chancellor Kent, in his published opinion, relies on the United States Bank having been permitted to sue in state Courts. But this right was denied in Virginia, and this Court has determined that that bank had no right to the federal forum but by express act of Congress. 5 Cranch, 61. Right of suit, at any rate, is not right of contract.

It being thus shown indisputably that no corporation can exist but by express permission of that state in which it acts as such, it follows, as a matter of course, that it is no corporation at all until allowed by the state in which it acts. Chancellor Kent perverts this principle, by asserting that a corporation may contract abroad until forbidden there; the true principle being, as asserted by Chief Justice Marshall in the case of the Providence Bank, that the act creating a corporation is an enabling act, by which alone it is enabled to contract. 2 Cranch, 167–169. This simple and incontestable position covers the whole ground. It is part of universal jurisprudence, and parcel of all politics. Corpora-

tions are creations of municipal law, having no existence or power
to contract whatever, until enabled so to do by a law, or other
legitimate permission of the sovereignty wherever acting.   Espe-
cially is this conservative principle indispensable as an undelegated
right of these United States.   Otherwise the smallest member of this
Union may legislate for, and govern all the rest.   In the case of the
Marietta Bank, 2 Rand. 465, the Court explained this principle
with great force of argument; much more, it is apprehended, than
is displayed by the contrary view, in Chancellor Kent's opinion, or
has been urged in this Court.

These United States, as such, can have no private corporation;
and if, upon false notions of commercial intimacy, they are to be
consolidated by traders, corporations, and professional dogmas, con-
trary to the true spirit of our political institutions, not only the rights
of all the states, but the federal Constitution itself will be at an end.
Upon the plea of international commercial law, a bank of the United
States might branch, not only in every state, but every county of
every state in the Union; and, indeed, so may every state bank.   It
is confidently submitted to this Court, that it will best fulfil its duties
by holding the states united by sovereign ties, by the states remain-
ing sovereign, and corporations remaining subject; not by sovereign
corporations and subject states.

The state of Alabama cannot apply the common law of Georgia
or of Pennsylvania to determine controversies such as this.   It
cannot ascertain, by any accredited rules of interpretation, what
may have been the intention of another state in creating a corpo-
ration; which is responsible for misconduct only to the state cre-
ating it, and cannot be reached in the foreign state where it con-
tracts.   Every charter involves questions of political advantage,
regarding which no state looks beyond itself, but simply to its own
good, of which no foreign Court can judge.   All a Court can do is
to ascertain the will of its own government; and if it finds that that
government has not sanctioned the corporation, by express authority
for that state, then such corporation cannot be acknowledged by the
Court.   It is no corporation before that Court.   Its charter may be
proved there, as it must be, before it is in evidence there.   But,
when proved, even though it may have a right of action there, it
has no right of contract in that state, till authorized by it to contract
there.   If Courts are bound by common law to restrict corporations
to the specific purposes of their creation, they are bound by the
same common law to prevent their wandering out of place, as much
as out of purpose.   2. Kent, 299, note E.

Charters are special and untransferible trusts, to be executed as
when and where prescribed, which trusts have no extra-territorial
existence.   If they act by agent beyond the chartering state, the trust
is defrauded and annulled, without responsibility of the agent to the
chartering state, or of the corporation to the foreign state.   No state
can, even by act of assembly, raise an executor, administrator, or
other trustee in another state.   The states of Georgia, Louisiana, and
Pennsylvania, could not intend by these bank charters to make laws

for the state of Alabama. It is impossible in legal contemplation so to consider it. Can then the interposition of a questionable agency supply a power, which not only never was intended to be given, but which could not be given even if intended? Otherwise, all corporations may by agencies act everywhere. The colleges of New England may make masters of arts in the southern states, and the southern states may introduce societies for establishing slavery in the north. Not only so, but Europe, Asia, Africa, even Australasia, Mexico, or Texas, may regulate the United States of America.

In Dandridge's case, 12 Wheat., Chief Justice Marshall, after explaining the supposed changes of the common law respecting corporations, denies that what he calls the talisman of construction has yet quite dissolved the whole fabric of deep-rooted and venerable jurisprudence. The old rule, for which on that occasion he fell into a minority of this Court, if preserved, as he insisted, would prevent all extra-territorial corporation power; and the confusion which if suffered it will be sure to inflict on the nationality of the country.

The legal analogies are abundant and unquestionable. Executors, administrators, and guardians have no authority beyond the states creating them. 1 Cranch, 92. 1 Dallas, 456. 2 Mass. 384. 3 Mass. 514. 11 Mass. 313. 3 Cranch, 319–323. 5 Mass. 7. 11 Mass. 256. 9 Cranch, 151. 1 Johns. Ch. Rep. 153. 7 Johns. Ch. Rep. 45. 6 Johns. Ch. Rep. 353. 1 Hayward's Rep. 354. 3 Day's Rep. 74. 305. 2 Root's Rep. 462. 7 Cow. Rep. 68. 9 Wend. 426. 1 Pick. Rep. 81. 2 Pick. Rep. 18. 8 Wheat. 671. 9 Wheat. Rep. 565– 569. 12 Wheat. 169. 3 Mason, 469. Coxe's Dig. p. 16, pl. 53. 5 Monroe's Rep. 49. 6 Monroe's Rep. 59. 4 Littel's Rep. 277. 1 Cameron and Norwood's (North Car.) Rep. 68. 1 Marsh. Rep. 88. Stephens *vs.* Swartz, 1 Carolina Law Rep. 471. It is in vain to say that executors, administrators, and guardians have charge of property, and are therefore obliged to give security for its safe management in each state where it may happen to be. So have corporations charge of property. Their franchises are property. Insolvent and bankrupt assignees have no power extra-territorially. Harrison *vs.* Sterry, 5 Cranch, 289. Dickson and Ramsey, 4 Wheat. 269.

When merchants draw bills of exchange over the boundaries of states, across the rivers Delaware, Ohio, Hudson, Connecticut, Potomac, and Savannah, or even the insignificant creeks, and sometimes mere ideal confines, which separate the various conterminous states of this Union, they are foreign bills of exchange. It is the law of this Court, that the states are foreign to each other for all but federal purposes. 12 Peters, 720. Even a state judgment, notwithstanding its constitutional protection, requires legal provision for its full faith and credit. And foreign judgments, even in rem— on questions of international law, are tested so far at least as to ascertain that they were pronounced with jurisdiction over both thing and person. Rose *vs.* Himely, 4 Cranch, 294. Persons, whether aliens or citizens, are not allowed right of suit in the federal Courts without some preliminary proof of it; and corporations,

though inhabitants, are not citizens with right of suit. 5 Cranch, 61. It has been adjudged that foreign property of non-residents is not attachable under state attachment laws, notwithstanding a practice of more than a hundred years in some of the states. Toland *vs.* Sprague, 12 Peters, 300.

Corporations are municipal creations of states and creatures of common law. But, a has already been questioned, what is that law? If English, it is adopted only as adapted here; and what is that in Alabama—a state not yet twenty years old? This is, probably, the first occasion when the elements of corporation law in that state have come to be ascertained. Is it Roman, English, or American? No instance has occurred, probably, before of a foreign corporation attempting by resident agency to deal in Alabama. We are brought then at last to the question, whether an incorporated bank can enjoy there privileges and immunities denied to the citizens of that state. The only adjudications in point are, Beattie *vs.* Knowler, 4 Peters, 167, 168; and The Marietta Bank, 2 Rand. 465; the argument of the Virginia Court in the latter; the judgment, as well as the argument of this Court in the former. The act of the state of Ohio is likewise full to the point, as a practical recognition of the law. The cases sustaining suits on contracts in the states creating the corporations are no contradictions of these two cases. The only pertinent English case, in Lord Raym. and Strange, has been explained. The case of the Propagation Society *vs.* Wheeler, in 8 Wheat. 464, was no more than a question of suit. The Greystock College case, that of The Bank of Marietta, and Beatty *vs.* Knowler, are coincident acknowledgments of the great principle, that a corporation has no corporate power beyond the state to which it owes being. In the earnest and sincere advocacy of that principle of universal, international, and municipal law, Mr. Ingersoll said he felt cheered by the assurance that his country is his client.

Mr. Vande Gruff, for J. B. Earle, one of the defendants in error; stated that the act of the legislature of Alabama, which declared the statutes of the state in force as they are contained in Aikin's Digest, provides that all statutes, laws, and parts of laws, not included in the Digest, are repealed. This repealed the act of 1827 relative to banking; and other laws on the same subject. This act was passed in 1832. Aikin's Digest, 301. There is another act of the legislature of Alabama, which makes bills of exchange and promissory notes negotiable, and declares them to be prima facie evidence of consideration. Aikin's Digest, 327.

Two questions have been agitated in these causes. One may not be necessary to their decision. The question of comity may be one which on general principles may embarrass. It is believed that comity between nations is as necessary to their intercourse, as our breath is to our existence; but it is not understood how it is to be limited. Is a law of Pennsylvania to be applied over the whole world? The rule that corporations have not an extra-

territorial existence is established: but the principles which are claimed on the part of the plaintiffs in error, would give a universal existence and unlimited privileges to such institutions.

The general rule is, that the laws of a particular state have authority only within the territory of the state; and the exception to the rule prevails only, when the laws have been adopted in a foreign, or another state or country. I this principle is correct, it will be the duty of the counsel for the plaintiff in error, to show that the law of Pennsylvania incorporating the United States Bank is a law which has been adopted in the state of Alabama.

A railroad company may buy iron abroad, for the purpose of constructing their railroad at home. This appears to be a contract which will be sustained by the comity of nations. It presents a different question from this; which is, whether the United States Bank of Pennsylvania can go abroad to do acts which are only authorized in the state.

It would be disastrous to say a corporation cannot go out of Alabama to buy paper to be used in its operations at home. But this is a different case from authorizing a corporation to carry on the business for which it was incorporated in Pennsylvania, out of that state. Could a bank of the state of Pennsylvania go to Mobile, and carry on the business of banking there, to the injury of the domestic banks? The rule of comity has never been applied so as to allow it to interfere with all the laws of a state: its application has ever and only been to particular cases.

If a Court has declared that the rule of comity does not apply in a particular case, there is a final adjustment of the question as to the force of the foreign law in that case; and the question is settled by the decision of the Court. No cases which have been cited for the plaintiffs in error, show that by the laws or the decisions of the Courts of Alabama, corporations have extra-territorial powers or privileges. The case of the Marietta Bank, decided in Virginia, and reported in 2 Rand. Rep., shows that comity in favour of corporations does not exist. This is evidence that there is no general law which allows the existence of corporations, out of the state in which they are chartered.

All the questions of the rights of corporations to go abroad to borrow money, do not apply to the case before the Court. Those corporations borrow money to enable them to transact and carry on the business for which they were incorporated at home.

The inquiry is, whether the United States Bank of the state of Pennsylvania could go into Alabama, and there carry on the business of banking. The legislature of Alabama would, in positive terms, have refused this privilege, if it had been applied for. A judge in Alabama, knowing this, should have felt himself bound by his judicial duties to apply a principle which would have been applied by the legislature.

Is it reasonable, that if large profits are to be made in Alabama, that a part of these profits should not be paid to the state of Alabama, for the privilege of carrying on banking? This is just, and it has

been the course of legislation in all the states to receive a bonus from banking corporations, or to claim a portion of the profits of their operations on granting charters of incorporation.

In England corporations can only exist by prescription, or be established by grants from the king, or legislative enactment. Could a foreign corporation go to England, and carry on its business there, until it should be expressly excluded by the decision of a Court, or by an act of Parliament?

Another point in this case is to be regarded. The act of the legislature of Pennsylvania establishes the United States Bank at Philadelphia, and authorizes branches in the state. The law gives it no powers to be exercised out of the state. This is a sufficient evidence of the restriction of its existence to the state of Pennsylvania.

As to that feature in the case before the Court, which depends on the existing constitution and laws of Alabama, prohibiting banking, the Court will be obliged to decide what banking is. The agreed case shows that a part of the capital of the bank was transferred to Alabama to buy bills of exchange; and the question is, whether buying bills of exchange is banking.

Discounting bills and notes, and receiving money on deposit, are not exclusively banking. Every bank, at the time of the incorporation of the State Bank of Alabama, dealt in bills of exchange. The object of the charter of the bank was to include the discounting and purchase of bills of exchange, as a part of the operations of the bank. The bank was to have every opportunity of making profits which any other bank possessed.

It is not necessary to go into the question of the rights of individuals to purchase bills of exchange. The question before the Court is, whether foreign corporations have such rights. Speculations on the rights of individuals only embarrass the case. To show that the dealing in bills of exchange is banking, Mr. Vande Gruff cited Postlethwait's Universal Dictionary of Trade and Commerce, titles Discount, Banking. 15 Johns. Rep. 390. Tomlin's Law Dictionary, title Bank.

How can the plaintiff say the purchase of bills of exchange is not banking, when the law of their existence gives them no other powers but those of a bank. They are here found remitting their funds of the bank to Alabama to buy bills. Can they say this is not a banking operation? It was the object of the act incorporating the bank to give it the advantages of buying bills of exchange, which composes a large part of the profits of banking operations; and this is precisely what they have done in the case before the Court. The constitution of Alabama on this subject should receive a liberal construction, as the whole support of the government of Alabama is derived from the banking operations of the state banks.

Mr. Chief Justice TANEY delivered the opinion of the Court.
These three cases involve the same principles, and have been

[Bank of Augusta vs. Earle.]

brought before us by writs of error directed to the Circuit Court and southern district of Alabama. The two first have been fully argued by counsel; and the last submitted to the Court upon the arguments offered in the other two. There are some shades of difference in the facts as stated in the different records, but none that can affect the decision. We proceed therefore to express our opinion on the first case argued, which was the Bank of Augusta vs. Joseph B. Earle. The judgment in this case must decide the others.

The questions presented to the Court arise upon a case stated in the Circuit Court in the following words:—

"The defendant defends this action upon the following facts, that are admitted by the plaintiffs: that plaintiffs are a corporation, incorporated by an act of the legislature of the state of Georgia, and have power usually conferred upon banking institutions, such as to purchase bills of exchange, &c. That the bill sued on was made and endorsed, for the purpose of being discounted by Thomas M'Gran, the agent of said bank, who had funds of the plaintiffs in his hands for the purpose of purchasing bills, which funds were derived from bills and notes discounted in Georgia by said plaintiffs, and payable in Mobile; and the said M'Gran, agent as aforesaid, did so discount and purchase the said bill sued on, in the city of Mobile, state aforesaid, for the benefit of said bank, and with their funds, and to remit said funds to the said plaintiffs.

If the Court shall say that the facts constitute a defence to this action, judgment will be given for the defendant, otherwise for plaintiffs, for the amount of the bill, damages, interest, and cost; either party to have the right of appeal or writ of error to the Supreme Court upon this statement of facts, and the judgment thereon."

Upon this statement of facts the Court gave judgment for the defendant; being of opinion that a bank incorporated by the laws of Georgia, with a power among other things to purchase bills of exchange, could not lawfully exercise that power in the state of Alabama; and that the contract for this bill was therefore void, and did not bind the parties to the payment of the money.

It will at once be seen that the questions brought here for decision are of a very grave character, and they have received from the Court an attentive examination. A multitude of corporations for various purposes have been chartered by the several states; a large portion of certain branches of business has been transacted by incorporated companies, or through their agency; and contracts to a very great amount have undoubtedly been made by different corporations out of the jurisdiction of the particular state by which they were created. In deciding the case before us, we in effect determine whether these numerous contracts are valid, or not. And if, as has been argued at the bar, a corporation, from its nature and character, is incapable of making such contracts; or if they are inconsistent with the rights and sovereignty of the states in which they are made, they cannot be enforced in the Courts of justice.

74

Much of the argument has turned on the nature and extent of the powers which belong to the artificial being called a corporation; and the rules of law by which they are to be measured. On the part of the plaintiff in error, it has been contended that a corporation composed of citizens of other states are entitled to the benefit of that provision in the Constitution of the United States which declares that "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states;" that the Court should look behind the act of incorporation, and see who are the members of it; and, if in this case it should appear that the corporation of the Bank of Augusta consists altogether of citizens of the state of Georgia, that such citizens are entitled to the privileges and immunities of citizens in the state of Alabama: and as the citizens of Alabama may unquestionably purchase bills of exchange in that state, it is insisted that the members of this corporation are entitled to the same privilege, and cannot be deprived of it even by express provisions in the Constitution or laws of the state. The case of the Bank of the United States vs. Deveaux, 5 Cranch, 61, is relied on to support this position.

It is true, that in the case referred to, this Court decided that in a question of jurisdiction they might look to the character of the persons composing a corporation; and if it appeared that they were citizens of another state, and the fact was set forth by proper averments, the corporation might sue in its corporate name in the Courts of the United States. But in that case the Court confined its decision, in express terms, to a question of jurisdiction; to a right to sue; and evidently went even so far with some hesitation. We fully assent to the propriety of that decision; and it has ever since been recognised as authority in this Court. But the principle has never been extended any farther than it was carried in that case; and has never been supposed to extend to contracts made by a corporation; especially in another sovereignty. If it were held to embrace contracts, and that the members of a corporation were to be regarded as individuals carrying on business in their corporate name, and therefore entitled to the privileges of citizens in matters of contract, it is very clear that they must at the same time take upon themselves the liabilities of citizens, and be bound by their contracts in like manner. The result of this would be to make a corporation a mere partnership in business, in which each stockholder would be liable to the whole extent of his property for the debts of the corporation; and he might be sued for them, in any state in which he might happen to be found. The clause of the Constitution referred to certainly never intended to give to the citizens of each state the privileges of citizens in the several states, and at the same time to exempt them from the liabilities which the exercise of such privileges would bring upon individuals who were citizens of the state. This would be to give the citizens of other states far higher and greater privileges than are enjoyed by the citizens of the state itself. Besides, it would deprive every state of all control over the extent

of corporate franchises proper to be granted in the state; and corporations would be chartered in one, to carry on their operations in another. It is impossible upon any sound principle to give such a construction to the article in question. Whenever a corporation makes a contract, it is the contract of the legal entity; of the artificial being created by the charter; and not the contract of the individual members. The only rights it can claim are the rights which are given to it in that character, and not the rights which belong to its members as citizens of a state: and we now proceed to inquire what rights the plaintiffs in error, a corporation created by Georgia, could lawfully exercise in another state; and whether the purchase of the bill of exchange on which this suit is brought was a valid contract, and obligatory on the parties.

The nature and character of a corporation created by a statute, and the extent of the powers which it may lawfully exercise, have upon several occasions been under consideration in this Court.

In the case of Head and Amory *vs.* the Providence Insurance Company, 2 Cranch, 127, Chief Justice Marshall, in delivering the opinion of the Court, said, " without ascribing to this body, which in its corporate capacity is the mere creature of the act to which it owes its existence, all the qualities and disabilities annexed by the common law to ancient institutions of this sort, it may correctly be said to be precisely what the incorporating act has made it; to derive all its powers from that act, and to be capable of exerting its faculties only in the manner which that act authorizes.

To this source of its being, then, we must recur to ascertain its powers; and to determine whether it can complete a contract by such communications as are in this record."

In the case of Dartmouth College *vs.* Woodward, 4 Wheat. 636, the same principle was again decided by the Court. " A corporation," said the Court, " is an artificial being, invisible, intangible, and existing only in contemplation of law. Being a mere creature of the law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence."

And in the case of the Bank of the United States *vs.* Dandridge, 12 Wheat. 64, where the questions in relation to the powers of corporations and their mode of action, were very carefully considered; the Court said, "But whatever may be the implied powers of aggregate corporations by the common law, and the modes by which those powers are to be carried into operation; corporations created by statute, must depend both for their powers and the mode of exercising them, upon the true construction of the statute itself."

It cannot be necessary to add to these authorities. And it may be safely assumed that a corporation can make no contracts, and do no acts either within or without the state which creates it, except such as are authorized by its charter; and those acts must also be done, by such officers or agents, and in such manner as the charter authorizes. And if the law creating a corporation, does not, by

the true construction of the words used in the charter, give it the right to exercise its powers beyond the limits of the state, all contracts made by it in other states would be void.

The charter of the Bank of Augusta authorizes it, in general terms, to deal in bills of exchange; and, consequently, gives it the power to purchase foreign bills as well as inland; in other words, to purchase bills payable in another state. The power thus given, clothed the corporation with the right to make contracts out of the state, in so far as Georgia could confer it. For whenever it purchased a foreign bill, and forwarded it to an agent to present for acceptance, if it was honoured by the drawee, the contract of acceptance was necessarily made in another state; and the general power to purchase bills without any restriction as to place, by its fair and natural import, authorized the bank to make such purchases, wherever it was found most convenient and profitable to the institution; and also to employ suitable agents for that purpose. The purchase of the bill in question was, therefore, the exercise of one of the powers which the bank possessed under its charter; and was sanctioned by the law of Georgia creating the corporation, so far as that state could authorize a corporation to exercise its powers beyond the limits of its own jurisdiction.

But it has been urged in the argument, that notwithstanding the powers thus conferred by the terms of the charter, a corporation, from the very nature of its being, can have no authority to contract out of the limits of the state; that the laws of a state can have no extra-territorial operation; and that as a corporation is the mere creature of a law of the state, it can have no existence beyond the limits in which that law operates; and that it must necessarily be incapable of making a contract in another place.

It is very true that a corporation can have no legal existence out of the boundaries of the sovereignty by which it is created. It exists only in contemplation of law, and by force of the law; and where that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty. But although it must live and have its being in that state only, yet it does not by any means follow that its existence there will not be recognised in other places; and its residence in one state creates no insuperable objection to its power of contracting in another. It is indeed a mere artificial being, invisible and intangible; yet it is a person, for certain purposes in contemplation of law, and has been recognised as such by the decisions of this Court. It was so held in the case of The United States vs. Amedy, 11 Wheat. 412, and in Beaston vs. The Farmer's Bank of Delaware, 12 Peters, 135. Now, natural persons through the intervention of agents, are continually making contracts in countries in which they do not reside; and where they are not personally present when the contract is made; and nobody has ever doubted the validity of these agreements. And what greater objection can there be to the capacity of an artificial person,

by its agents, to make a contract within the scope of its limited powers, in a sovereignty in which it does not reside; provided such contracts are permitted to be made by them by the laws of the place?

. The corporation must no doubt show, that the law of its creation gave it authority to make such contracts, through such agents. Yet, as in the case of a natural person, it is not necessary that it should actually exist in the sovereignty in which the contract is made. It is sufficient that its existence as an artificial person, in the state of its creation, is acknowledged and recognised by the law of the nation where the dealing takes place; and that it is permitted by the laws of that place to exercise there the powers with which it is endowed.

Every power, however, of the description of which we are speaking, which a corporation exercises in another state, depends for its validity upon the laws of the sovereignty in which it is exercised; and a corporation can make no valid contract without their sanction, express or implied. And this brings us to the question which has been so elaborately discussed; whether, by the comity of nati ns and between these states, the corporations of one state are permitted to make contracts in another. It is needless to enumerate here the instances in which, by the general practice of civilized countries, the laws of the one, will, by the comity of nations, be recognised and executed in another, where the right of individuals are concerned. The cases of contracts made in a foreign country are familiar examples; and Courts of justice have always expounded and executed them, according to the laws of the place in which they were made; provided that law was not repugnant to the laws or policy of their own country. The comity thus extended to other nations is no impeachment of sovereignty. It is the voluntary act of the nation by which it is offered; and is inadmissible when contrary to its policy, or prejudicial to its interests. But it contributes so largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong; that Courts of justice have continually acted upon it, as a part of the voluntary law of nations. It is truly said, in Story's Conflict of Laws, 37, that "In the silence of any positive rule, affirming, or denying, r restraining the operation of foreign laws, Courts of justice presu me the tacit adoption of them by their own government; unless they are repugnant to its policy, or prejudicial to its interests. It is not the comity of the Courts, but the comity of the nation which is administered, and ascertained in the same way, and guided by the same reasoning by which all other principles of municipal law are ascertained and guided."

Adopting, as we do, the principle here stated, we proceed to inquire whether, by the comity of nations, foreign corporations are permitted o make contracts within their jurisdiction; and we can perceive no sufficient reason for excluding them, when they are not contrary to the known policy of the state, or injurious to its inte-

rests. It is nothing more than the admission of the existence of an artificial person created by the law of another state, and clothed with the power of making certain contracts. It is but the usual comity of recognising the law of another state. In England, from which we have received our general principles of jurisprudence, no doubt appears to have been entertained of the right of a foreign corporation to sue in its Courts; since the case Henriquez *vs.* The Dutch West India Company, decided in 1729, 2 L. Raymond, 1532. And it is a matter of history, which this Court are bound to notice, that corporations, created in this country, have been in the open practice for many years past, of making contracts in England of various kinds, and to very large amounts; and we have never seen a doubt suggested there of the validity of these contracts, by any Court or any jurist. It is impossible to imagine that any Court in the United States would refuse to execute a contract, by which an American corporation had borrowed money in England; yet if the contracts of corporations made out of the state by which they were created, are void, even contracts of that description could not be enforced.

It has, however, been supposed that the rules of comity between foreign nations do not apply to the states of this Union; that they extend to one another no other rights than those which are given by the Constitution of the United States; and that the Courts of the general government are not at liberty to presume, in the absence of all legislation on the subject, that a state has adopted the comity of nations towards the other states, as a part of its jurisprudence; or that it acknowledges any rights but those which are secured by the Constitution of the United States. The Court think otherwise. The intimate union of these states, as members of the same great political family; the deep and vital interests which bind them so closely together; should lead us, in the absence of proof to the contrary, to presume a greater degree of comity, and friendship, and kindness towards one another, than we should be authorized to presume between foreign nations. And when (as without doubt must occasionally happen) the interest or policy of any state requires it to restrict the rule, it has but to declare its will, and the legal presumption is at once at an end. But until this is done, upon what grounds could this Court refuse to administer the law of international comity between these states? They are sovereign states; and the history of the past, and the events which are daily occurring, furnish the strongest evidence that they have adopted towards each other the laws of comity in their fullest extent. Money is frequently borrowed in one state, by a corporation created in another. The numerous banks established by different states are in the constant habit of contracting and dealing with one another. Agencies for corporations engaged in the business of insurance and of banking have been established in other states, and suffered to make contracts without any objection on the part of the state authorities. These usages of commerce and trade have been so general and public, and have been practised for so long a period of time, and so generally acqui-

esced in by the states, that the Court cannot overlook them when a question like the one before us is under consideration. The silence of the state authorities, while these events are passing before them, show their assent to the ordinary laws of comity which permit a corporation to make contracts in another state. But we are not left to infer it merely from the general usages of trade, and the silent acquiescence of the states. It appears from the cases cited in the argument, which it is unnecessary to recapitulate in this opinion; that it has been decided in many of the state Courts, we believe in all of them where the question has arisen, that a corporation of one state may sue in the Courts of another. If it may sue, why may it not make a contract? The right to sue is one of the powers which it derives from its charter. - If the Courts of another country take notice of its existence as a corporation, so far as to allow it to maintain a suit, and permit it to exercise that power; why should not its existence be recognised for other purposes, and the corporation permitted to exercise another power which is given to it by the same law and the same sovereignty—where the last mentioned power does not come in conflict with the interest or policy of the state? There is certainly nothing in the nature and character of a corporation which could justly lead to such a distinction; and which should extend to it the comity of suit, and refuse to it the comity of contract. If it is allowed to sue, it would of course be permitted to compromise, if it thought proper, with its debtor; to give him time; to accept something else in satisfaction; to give him a release; and to employ an attorney for itself to conduct its suit. These are all matters of contract, and yet are so intimately connected with the right to sue, that the latter could not be effectually exercised if the former were denied.

We turn in the next place to the legislation of the states. So far as any of them have acted on this subject, it is evident that they have regarded the comity of contract, as well as the comity of suit, to be a part of the law of the state, unless restricted by statute. Thus a law was passed by the state of Pennsylvania, March 10, 1810, which prohibited foreigners and foreign corporations from making contracts of insurance against fire, and other losses mentioned in the law. In New York, also, a law was passed, March 18, 1814, which prohibited foreigners and foreign corporations from making in that state insurances against fire; and by another law, passed April 21, 1818, corporations chartered by other states are prohibited from keeping any office of deposit for the purpose of discounting promissory notes, or carrying on any kind of business which incorporated banks are authorized by law to carry on. The prohibition of certain specified contracts by corporations in these laws, is by necessary implication an admission that other contracts may be made by foreign corporations in Pennsylvania, and New York; and that no legislative permission is necessary to give them validity. And the language of these prohibitory acts most

clearly indicates that the contracts forbidden by them might lawfully have been made before these laws were passed.

Maryland has gone still farther in recognising this right. By a law passed in 1834, that state has prescribed the manner in which corporations not chartered by the state, " which shall transact or shall have transacted business" in the state, may be sued in its Courts upon contracts made in the state. The law assumes in the clearest manner, that such contracts were valid, and provides a remedy by which to enforce them.

In the legislation of Congress, also, where the states and the people of the several states are all represented, we shall find proof of the general understanding in the United States, that by the law of comity among the states, the corporations chartered by one were permitted to make contracts in the others. By the act of Congress of June 23, 1836, (4 Story's Laws, 2445,) regulating the deposites of public money, the Secretary of the Treasury was authorized to make arrangements with some bank or banks, to establish an agency in the states and territories where there was no bank, or none that could be employed as a public depository, to receive and disburse the public money which might be directed to be there deposited. Now if the proposition be true that a corporation created by one state cannot make a valid contract in another, the contracts made through this agency in behalf of the bank, out of the state where the bank itself was chartered, would all be void, both as respected the contracts with the government and the individuals who dealt with it. How could such an agency, upon the principles now contended for, have performed any of the duties for which it was established?

But it cannot be necessary to pursue the argument further. We think it is well settled, that by the law of comity among nations, a corporation created by one sovereignty is permitted to make contracts in another, and to sue in its Courts; and that the same law of comity prevails among the several sovereignties of this Union. The public and well known, and long continued usages of trade; the general acquiescence of the states; the particular legislation of some of them, as well as the legislation of Congress; all concur in proving the truth of this proposition.

But we have already said that this comity is presumed from the silent acquiescence of the state. Whenever a state sufficiently indicates that contracts which derive their validity from its comity are repugnant to its policy, or are considered as injurious to its interests; the presumption in favour of its adoption can no longer be made. And it remains to inquire, whether there is any thing in the constitution or laws of Alabama, from which this Court would be justified in concluding that the purchase of the bill in question was contrary to its policy.

The constitution of Alabama contains the following provisions in relation to banks

" One state bank may be established, with such number of

branches as the General Assembly may from time to time deem expedient, provided that no branch bank shall be established, not bank charter renewed, under the authority of this state, without the concurrence of two-thirds of both houses of the General Assembly; and provided also that not more than one bank or branch bank shall be established, nor bank charter renewed, but in conformity to the following rules:

"1. At least two-fifths of the capital stock shall be reserved for the state.

"2. A proportion of power, in the direction of the bank, shall be reserved to the state, equal at least to its proportion of stock therein.

"3. The state and individual stockholders shall be liable respectively for the debts of the bank, in proportion to their stock holden therein.

"4. The remedy for collecting debts shall be reciprocal, for and against the bank.

"5. No bank shall commence operations until half of the capital stock subscribed for be actually paid in gold and silver; which amount shall, in no case, be less than one hundred thousand dollars."

Now from these provisions in the constitution, it is evidently the policy of Alabama to restrict the power of the legislature in relation to bank charters, and to secure to the state a large portion of the profits of banking, in order to provide a public revenue; and also to make safe the debts which should be contracted by the banks. The meaning too in which that state used the word bank, in her constitution, is sufficiently plain from its subsequent legislation. All of the banks chartered by it, are authorized to receive deposits of money, to discount notes, to purchase bills of exchange, and to issue their own notes payable on demand to bearer. These are the usual powers conferred on the banking corporations in the different states of the Union; and when we are dealing with the business of banking in Alabama, we must undoubtedly attach to it the meaning in which it is used in the constitution and laws of the state. Upon so much of the policy of Alabama, therefore, in relation to banks as is disclosed by its constitution, and upon the meaning which that state attaches to the word bank, we can have no reasonable doubt. But before this Court can undertake to say that the discount of the bill in question was illegal, many other inquiries must be made, and many other difficulties must be solved. Was it the policy of Alabama to exclude all competition with its own banks by the corporations of other states? Did the state intend, by these provisions in its constitution, and these charters to its banks, to inhibit the circulation of the notes of other banks, the discount of notes, the loan of money, and the purchase of bills of exchange? Or did it design to go still further, and forbid the banking corporations of other states from making a contract of any kind within its territory? Did it mean to prohibit its own banks from keeping mutual accounts with the banks of other states, and from entering into any contract with

.them, express or implied? Or did she mean to give to 'her banks the power of contracting within the limits of the state with foreign corporations, and deny it to individual citizens? She may believe it to be the interest of her citizens to permit the competition of other banks in the circulation of notes, in the purchase and sale of bills of exchange, and in the loan of money. Or she may think it to be her interest to prevent the circulation of the notes of other banks; and to prohibit them from sending money there to be employed in the purchase of exchange, or making contracts of any other description.

The state has not made known its policy upon any of these points. And how can this Court, with no other lights before it, undertake to mark out by a definite and distinct line the policy which Alabama has adopted in relation to this complex and intricate question of political economy? It is true that the state is the principal stockholder in her own banks. She has created seven; and in five of them the state owns the whole stock; and in the others two-fifths. This proves that the state is deeply interested in the successful operation of her banks, and it may be her policy to sh it out all interference with them. In another view of the subject, however, she may believe it to be her policy to extend the utmost liberality to the banks of other states; in the expectation that it would produce a corresponding comity in other states towards the banks in which she is so much interested. In this respect it is a question chiefly of revenue, and of fiscal policy. How can this Court, with no other aid than the general principles asserted in her constitution, and her investments in the stocks of her own banks, undertake to carry out the policy of the state upon such a subject in all of its details, and decide how far it extends, and what qualifications and limitations are imposed upon it? These questions must be determined by the state itself, and not by the Courts of the United States. Every sovereignty would without doubt choose to designate its own line of policy; and would never consent to leave it as a problem to be worked out by the Courts of the United States, from a few general principles, which might very naturally be misunderstood or misapplied by the Court. It would hardly be respectful to a state for this Court to forestall its decision, and to say, in advance of her legislation, what her interest or policy demands. Such a course would savour more of legislation than of judicial interpretation.

If we proceed from the constitution and bank charters to other acts of legislation by the state, we find nothing that should lead us to a contrary conclusion. By an act of Assembly of the state, passed January 12th, 1827, it was declared unlawful for any person, body corporate, company, or association, to issue any note for circulation as a bank note, without the authority of law; and a fine was imposed upon any one offending against this statute. Now this act protected the privileges of her own banks; in relation to bank notes only; and contains no prohibition against the purchase of bills of exchange, or against any other business by foreign banks, which

might interfere with her own banking corporations. And if we were to form our opinion of the policy of Alabama from the provisions of this law, we should be bound to say that the legislature deemed it to be the interest and policy of the state not to protect its own banks from competition in the purchase of exchange, or in any thing but the issuing of notes for circulation. But this law was repealed by a subsequent law, passed in 1833, repealing all acts of Assembly not comprised in a digest then prepared and adopted by the legislature. The law of 1827 above mentioned was not contained in this digest, and was consequently repealed. It has been said at the bar, in the argument, that it was omitted from the digest by mistake, and was not intended to be repealed. But this Court cannot act judicially upon such an assumption. We must take their laws and policy to be such as we find them in their statutes. And the only inference that we can draw from these two laws, is, that after having prohibited under a penalty any competition with their banks by the issue of notes for circulation, they changed their policy, and determined to leave the whole business of banking open to the rivalry of others. The other laws of the state, therefore, in addition to the constitution and charters, certainly would not authorize this Court to say, that the purchase of bills by the corporations of another state was a violation of its policy.

The decisions of its judicial tribunals lead to the same result. It is true that in the case of The State vs. Stebbins, 1 Stewart's Alabama Reports, 312, the Court said that since the adoption of their constitution, banking in that state was to be regarded as a franchise. And this case has been much relied on by the defendant in error.

Now we are satisfied, from a careful examination of the case, that the word franchise was not used, and could not have been used by the Court in the broad sense imputed to it in the argument. For if banking includes the purchase of bills of exchange, and all banking is to be regarded as the exercise of a franchise, the decision of the Court would amount to this—that no individual citizen of Alabama could purchase such a bill. For franchises are special privileges conferred by government upon individuals, and which do not belong to the citizens of the country, generally, of common right. It is essential to the character of a franchise that it should be a grant from the sovereign authority, and in this country no franchise can be held which is not derived from a law of the state.

But it cannot be supposed that the constitution of Alabama intended to prohibit its merchants and traders from purchasing or selling bills of exchange; and to make it a monopoly in the hands of their banks. And it is evident that the Court of Alabama, in the case of The State vs. Stebbins, did not mean to assert such a principle. In the passage relied on they are speaking of a paper circulating currency, and asserting the right of the state to regulate and to limit it.

The institutions of Alabama, like those of the other states, are founded upon the great principles of the common law; and it is

very clear that at common law, the right of banking in all of its ramifications, belonged to individual citizens; and might be exercised by them at their pleasure. And the correctness of this principle is not questioned in the case of The State vs. Stebbins. Undoubtedly, the sovereign authority may regulate and restrain this right: but the constitution of Alabama purports to be nothing more than a restriction upon the power of the legislature, in relation to banking corporations; and does not appear to have been intended as a restriction upon the rights of individuals. That part of the subject appears to have been left, as is usually done, for the action of the legislature, to be modified according to circumstances; and the prosecution against Stebbins was not founded on the provisions contained in the constitution, but was under the law of 1827 above mentioned, prohibiting the issuing of bank notes. We are fully satisfied that the state never intended by its constitution to interfere with the right of purchasing or selling bills of exchange; and that the opinion of the Court does not refer to transactions of that description, when it speaks of banking as a franchise.

The question then recurs—Does the policy of Alabama deny to the corporations of other states the ordinary comity between nations? or does it permit such a corporation to make those contracts which from their nature and subject matter, are consistent with its policy, and are allowed to individuals? In making such contracts a corporation no doubt exercises its corporate franchise. But it must do this whenever it acts as a corporation, for its existence is a franchise. Now it has been held in the Court of Alabama itself, in 2 Stewart's Alabama Reports, 147, that the corporation of another state may sue in its Courts; and the decision is put directly on the ground of national comity. The state therefore has not merely acquiesced by silence, but her judicial tribunals have declared the adoption of the law of international comity in the case of a suit. We have already shown that the comity of suit brings with it the comity of contract; and where the one is expressly adopted by its Courts, the other must also be presumed according to the usages of nations, unless the contrary can be shown.

The cases cited from 7 Wend. 276, and from 2 Rand. 465, cannot influence the decision in the case before us. The decisions of these two state Courts were founded upon the legislation of their respective states, which was sufficiently explicit to enable their judicial tribunals to pronounce judgment on their line of policy. But because two states have adopted a particular policy in relation to the banking corporations of other states, we cannot infer that the same rule prevails in all of the other states.

Each state must decide for itself. And it will be remembered, that it is not the state of Alabama which appears here to complain of an infraction of its policy. Neither the state, nor any of its constituted authorities, have interfered in this controversy. The objection is taken by persons who were parties to those contracts; and

[Bank of Augusta vs. Earle.]

who participated in the transactions which are now alleged to have been in violation of the laws of the state.

It is but justice to all the parties concerned to suppose that these contracts were made in good faith, and that no suspicion was entertained by either of them that these engagements could not be enforced. Money was paid on them by one party, and received by the other. And when we see men dealing with one another openly in this manner, and making contracts to a large amount, we can hardly doubt as to what was the generally received opinion in Alabama at that time, in relation to the right of the plaintiffs to make such contracts. Every thing now urged as proof of her policy, was equally public and well known when these bills were negotiated. And when a Court is called on to declare contracts thus made to be void upon the ground that they conflict with the policy of the state; the line of that policy should be very clear and distinct to justify the Court in sustaining the defence. Nothing can be more vague and indefinite than that now insisted on as the policy of Alabama. It rests altogether on speculative reasoning as to her supposed interests; and is not supported by any positive legislation. There is no law of the state which attempts to define the rights of foreign corporations.

We, however, do not mean to say that there are not many subjects upon which the policy of the several states is abundantly evident, from the nature of their institutions, and the general scope of their legislation; and which do not need the aid of a positive and special law to guide the decisions of the Courts. When the policy of a state is thus manifest, the Courts of the United States would be bound to notice it as a part of its code of laws; and to declare all contracts in the state repugnant to it, to be illegal and void. Nor do we mean to say whether there may not be some rights under the Constitution of the United States, which a corporation might claim under peculiar circumstances, in a state other than that in which it was chartered. The reasoning, as well as the judgment of the Court, is applied to the matter before us; and we think the contracts in question were valid, and that the defence relied on by the defendants cannot be sustained.

The judgment of the Circuit Court in these cases, must therefore be reversed with costs.

Mr. Justice BALDWIN delivered an opinion assenting to the judgment of the Court, on principles which were stated at large in the opinion. This opinion was not delivered to the reporter.

Mr. Justice M'KINLEY delivered an opinion, dissenting from the judgment of the Court.

I dissent from so much of the opinion of the majority of the Court as decides that the law of nations furnishes a rule by which validity can be given to the contracts in these cases; and from so much as

decides that the contracts, which were the subjects of the suits, were not against the policy of the laws of Alabama.

This is the first time since the adoption of the Constitution of the United States, that any federal Court has, directly or indirectly, imputed national power to any of the states of the Union; and it is the first time that validity has been given to such contracts, which, it is acknowledged, would otherwise have been void, by the application of a principle of the necessary law of nations. This principle has been adopted and administered by the Court as part of the municipal law of the state of Alabama, although no such principle has been adopted or admitted by that state. And whether the law of nations still prevails among the states, notwithstanding the Constitution of the United States; or the right and authority to administer it in these cases are derived from that instrument; are questions not distinctly decided by the majority of the Court. But whether attempted to be derived from one source or the other, I deny the existence of it anywhere, for any such purpose.

Because the municipal laws of nations cannot operate beyond their respective territorial limits, and because one natio 1 has no right to legislate for another; certain rules founded in the law of nature and the immutable principles of justice have, for the promotion of harmony and commercial intercourse, been adopted by the consent of civilized nations. But no necessity exists for such a law among the several states. In their character of states they are governed by written constitutions and municipal laws. It has been admitted by the counsel, and decided by the majority of the Court, that without the authority of the statutes of the states chartering these banks, they would have no power whatever to purchase a bill of exchange, even in the state where they are established. If it requires the exertion of the legislative power of Pennsylvania, for instance, to enable the United States Bank to purchase a bill of exchange in that state; why should it not require the same legislative authority to enable it to do the same act in Alabama? It has been contended in argument, that the power granted to the bank to purchase a bill of exchange at Philadelphia, in Pennsylvania, payable at Mobile, in Alabama, would be nugatory, unless the power existed also to make contracts at both ends of the line of exchange. The authority to deal in exchange may very well be exercised by having command of one end of the line of exchange only. To buy and sell the same bill at the bank is dealing in exchange, and may be exercised with profit to the bank; but not perhaps as conveniently as if it could make contracts in Alabama as well as at the bank.

But if it has obtained authority to command but one end of the line of exchange, it certainly has no right to complain that it cannot control the other; when that other is within the jurisdiction of another state, whose authority or consent it has not even asked for. The bill of exchange which is the subject of controversy between the Bank of Augusta and Earle, and that which is the subject of controversy between the United States Bank and Primrose,

were both drawn at Mobile, and made payable at New York. Neither of the banks had authority from any state, to make a contract at either end of the line of exchange here established. Here, then, they claim, and have exercised, all the rights and privileges of natural persons, independent of their charters; and claim the right, by the comity of nations, to make original contracts everywhere, because they have a right, by their charters, to make like contracts in the states where they were created, and have "a local habitation and a name.".

It is difficult to conceive of the exercise of national comity, by a state having no national power. Whatever national power the old thirteen states possessed previous to the adoption of the Constitution of the United States, they conferred, by that instrument, upon the federal government. And to remove all doubt upon the question, whether the power thus conferred was exclusive or concurrent, the states are, by the tenth section of the first article of the Constitution, expressly prohibited from entering into any treaty, alliance, or confederation; and, without the consent of Congress, from entering into any agreement or compact with another state, or with a foreign power. By these provisions, the states have, by their own voluntary act, and for wise purposes, deprived themselves of all national power, and of all the means of international communication; and cannot even enter into an agreement or compact with a sister state, for any purpose whatever, without the consent of Congress. The comity of nations is defined by Judge Story, in his Conflict of Laws, to be the obligations of the laws of one nation in the territories of another, derived, altogether from the voluntary consent of the latter. And in the absence of any positive rule, affirming, or denying, or restraining the operation of foreign laws, Courts of justice presume the tacit adoption of them by their own government, unless they are repugnant to its policy or prejudicial to its interests. Conflict of Laws, 37.

Now, I ask again, what is the necessity for such a rule of law as this? Have not the states full power to adopt or reject what laws of their sister states they please? And why should the Courts interfere in this case, when the states have full power to legislate for themselves, and to adopt or reject such laws of their sister states as they think proper? If Alabama had adopted these laws, no difficulty could have arisen in deciding between these parties. This Court would not then have been under the necessity of resorting to a doubtful presumption for a rule to guide its decision. But when the Court have determined that they have the power to presume that Alabama has adopted the laws of the states chartering these banks, other difficult questions arise. How much of the charter of each bank has been adopted? This is a question of legislative discretion, which, if submitted to the legislature of the state, would be decided upon reasons of policy, and public convenience. And the question of power, to pass such a law under the Constitution of Alabama, would have to be considered and decided. These are

very inconvenient questions for a judicial tribunal to determine. As the majority of the Court have not expressly stated whether Alabama has adopted the whole charters of the banks, or what parts they have adopted, there is now no certainty what the law of Alabama is on the subject of these charters.

But these are not all the difficulties that arise in the exercise of this power by the judiciary. Many questions very naturally present themselves in the investigation of this subject, and the first is, To what government does this power belong? · Secondly, Has it been conferred upon the United States? or has it been reserved to the states by the tenth amendment of the Constitution? If it be determined that the power belongs to the United States, in what provision of the Constitution is it to be found? And how is it to be exercised? By the judiciary, or by Congress? The counsel for the banks contended, that the power of Congress to regulate commerce among the several states, deprives Alabama of the power to pass any law restraining the sale and purchase of a bill of exchange; and, by consequence, the whole power belongs to Congress. The Court, by the opinion of the majority, does not recognise this doctrine, in terms. But if the power which the Court exercised, is not derived from that provision of the Constitution, in my opinion it does not exist.

If ever Congress shall exercise this power to the broad extent contended for, the power of the states over commerce, and contracts relating to commerce, will be reduced to very narrow limits. The creation of banks, the making and endorsing of bills of exchange and promissory notes, and the damages on bills of exchange, all relate, more or less, to the commerce among the several states. Whether the exercise of these powers amounts to regulating the commerce among the several states, is not a question for my determination on this occasion. The majority of the Court have decided that the comity of nations gives validity to these contracts.

And what are the reasons upon which this doctrine is now established? Why, the counsel for the banks say: We are obliged to concede that these banks had no authority to make these contracts in the state of Alabama, in virtue of the laws of the states creating them, or by the laws of Alabama. · Therefore, unless this Court will extend to them the benefit of the comity of nations; they must lose all the money now in controversy, they will be deprived hereafter of the benefit of a very profitable branch of their business as bankers, and great public inconvenience will result to the commerce of the country. And besides all this, there are many corporations in the north, which were created for the purpose of carrying on various branches of manufactures, and particularly that of cotton  Those engaged in the manufacture of cotton will be unable to send their agents to the south to sell their manufactured articles, and to purchase cotton to carry on their business: and may lose debts already created. · This is the whole amount of the argument, upon which the benefit of this doctrine is claimed. Because banks cannot make money in places and by means not authorized by their charters;

because they may lose by contracts made in unauthorized places; because the commerce of the country may be subjected to temporary inconvenience; and because corporations in the north, created for manufacturing purposes only, cannot, by the authority of their charters, engage in commerce also; this doctrine, which has not heretofore found a place in our civil code, is to be established. Notwithstanding, it is conceded that the states hold ample legislative power over the same subject, it is deemed necessary, on this occasion, to settle this doctrine by the supreme tribunal. The majority of the Court having, in their opinion, conceded that Alabama might make laws to prohibit foreign banks to make contracts, thereby admitted, by implication, that she could make laws to permit such contracts. I think it would have been proper to have left the power there, to be exercised or not, as Alabama, in her sovereign discretion, might judge best for her interest or her comity. The majority of the Court thought and decided otherwise. And here arises the radical and essential difference between them and me.

They maintain a power in the federal government, and in the judicial department of it, to do that which in my judgment belongs, exclusively, to the state governments; and to be exercised by the legislative and not the judicial departments thereof. A difference so radical and important, growing out of the fundamental law of the land, has imposed on me the unpleasant necessity of maintaining, single handed, my opinion, against the opinion of all the other members of the Court. However unequal the conflict, duty impels me to maintain it firmly; and, although I stand alone here, I have the good fortune to be sustained, to the whole extent of my opinion, by the very able opinion of the Court of Appeals of Virginia, in the case of the Marietta Bank vs. Pendell and others, 2 Ran. Rep. 465. If Congress have the power to pass laws on this subject, it is an exclusive power; and the states would then have no power to prohibit contracts of any kind within their jurisdictions. If the government of the United States have power to restrain the states, under the power to regulate commerce, whether it be exerted by the legislative or the judicial department of the government is not material; it being the paramount law, it paralyses all state power on the same subject. And this brings me to the consideration of the second ground on which I dissent.

It was contended by the counsel for the banks, that all the restraints imposed by the constitution of Alabama, in relation to banking, were designed to operate upon the legislature of the state, and not upon the citizens of that or any other state. To comprehend the whole scope and intention of that instrument, it will be necessary to ascertain from the language used, what was within the contemplation and design of the convention. The provision in the constitution on the subject of banking is this: "One state bank may be established, with such number of branches as the General Assembly may, from time to time, deem expedient; provided, that no branch bank shall be established, nor bank charter renewed, under

the authority of this state, without the concurrence of two-thirds of both houses of the General Assembly; and provided, also, that not more than one bank nor branch bank shall be established, nor bank charter renewed, at any one session of the General Assembly, nor shall any bank or branch bank be established, or bank charter renewed, but in conformity with the following rules:

1. At least two-fiths of the capital stock shall be reserved for the state.

2. A proportion of power in the direction of the bank shall be reserved to the state, equal at least to its proportion of stock therein.

3. The state, and the individual stockholders, shall be liable, respectively, for the debts of the bank, in proportion to their stock holden therein.

4. The remedy for collecting debts shall be reciprocal for and against the bank.

5. No bank shall commence operations until half of the capital stock subscribed for shall be actually paid in gold or silver, which amount shall in no case be less than one hundred thousand dollars."

There are a few other unimportant rules laid down, but they are not material to the present inquiry. The inquiry naturally suggests itself to the mind, Why did Alabama introduce into her constitution these very unusual and specific rules? If they had not been deemed of great importance, they would not have been found there. Can any one say, therefore, that this regularly organized system, to which all banks within the state of Alabama were to conform, did not establish for the state, her legislature, or other authorities a clear and unequivocal policy on the subject of banking? It has been conceded in the argument, and by the opinion of the majority of the Court, that these constitutional provisions do restrict and limit the power of the legislature of the state. Then the legislature cannot establish a bank in Alabama, but in conformity with the rules here laid down. They have established seven banks; five of them belonging exclusively to the state, and two-fifths of the stock of the other two, with a proportionate power in the direction, reserved to the state. Each of these banks is authorized to deal in exchange.

It is proper to stop here, and inquire whether the subject of exchange is proper to enter into the policy of the legislation of a state; and whether it is a part of the customary and legitimate business of banking. All the authorities on the subject show that in modern times it is a part of the business of banking. See Postlethwaite's Commercial Dictionary, title Bank; Tomlin's Law Dictionary, title Bank; Rees' Cyclopædia, title Bank; Vatt. 105. This last author quoted, after showing that it is the duty of the sovereign of a nation to furnish for his subjects a sufficiency of money for the purposes of commerce, to preserve it from adulteration, and to punish those who counterfeit it, proceeds to say, "There is another custom more modern, and of no less use to commerce, than the establishment of money, namely, exchange, or the business of the bankers; by means of whom a merchant remits immense sums from

[Bank of Augusta *vs.* Earle.]

one end of the world to the other with very little expense, and, if he pleases, without danger.  For the same reasons that, sovereigns are obliged to protect commerce, they are obliged to protect this custom by good laws, in which every merchant foreigner, or citizen may find security."  From these authorities it appears that exchange is a part of modern banking, or at least so intimately connected with it that all modern banks have authority to deal in it.  And it also appears that it is as much the duty of a state to provide for exchange, as for money or, a circulating medium, for its subjects or citizens.

When the state of Alabama reserved to herself, by her fundamental law, at least two-fifths of the capital and control of all banks to be created in the state, and, by her laws, has actually appropriated to herself the whole of the capital, management, and profits of five out of seven banks, and two-fifths of the other two; had she not the same right to appropriate the banking right, to deal in exchange, to herself, to the same extent?  While performing her duty, under the constitution, by providing a circulating medium for the citizens, she was not unmindful of her duty in relation to exchange, and that is also provided for.  Has she not provided increased security and safety to the merchant by making herself liable for the payment of every bill of exchange sold by the five banks belonging to her, and for two-fifths of all sold by the other two?  And has she not also provided by law, that all the profits derived from thus dealing in bills of exchange shall go into the public treasury, for the common benefit of the people of the state?  And has she not, by the profits arising from her banking, including the profits on exchange, been enabled to pay the whole expenses of the government, and thereby to abolish all direct or other taxation?  See Aikin's Digest, 651.

It was not the intention of the legislature, by conferring the power upon these banks to purchase and sell bills of exchange, to deprive the citizens of the state, or any other natural person, of the right to do the same thing.  But it was the intention to exclude all accumulated bank capital which did not belong to the state, in whole or in part, according to the constitution, from dealing in exchange; and such is the inevitable and legal effect of those laws.  Let us test this principle.  It is admitted by the majority of the Court, in their opinion, that these constitutional provisions were intended as a restraint upon the legislature of the state.  If so intended, the legislature can pass no law contrary to the spirit and intention of the constitution; or contrary to the spirit and intention of the charters of the banks, created in pursuance of its provisions.  Now were the laws chartering the banks which are parties to this suit, contrary to the spirit and intention of the constitution and laws of Alabama?  That is the precise question.

It must be borne in mind that these were banks, and nothing but banks that made the contracts in Alabama; and in that character, and that only, have they been considered in the opinion of the majority of the Court.  Were those banks chartered by the legislature of Alabama, two-thirds of both houses concurring?  Was, at least, two-fifths of the capital stock, and of the management of these

banks reserved to the state? Did the profits arising from the purchase of these bills of exchange go into the treasury of Alabama? All these questions must be answered in the negative. Then these are not constitutional banks in Alabama, and cannot contract there? The majority of the Court have decided these causes upon the presumption that Alabama had adopted the laws of Georgia, Louisiana, and Pennsylvania chartering these banks. And this presumption rests for its support upon the fact that there is nothing in the laws or the policy of the laws of Alabama to resist this presumption. I suppose it will not be contended that the power of this Court, to presume that Alabama had adopted these laws, is greater than the power of Alabama to adopt the laws for herself. Suppose these banks had made a direct application to the legislature of Alabama to pass a law to authorize them to deal in bills of exchange in that state, could the legislature have passed such a law without violating the constitution of the state?

An incorporated bank in Alabama is not only the mere creature of the law creating it, as banks are in other states; but it is the creature of a peculiar fundamental law; and if its charter is not in conformity to the provisions of the fundamental law, it is void. It must be recollected that the banks, which are the plaintiffs in these suits, when they present themselves to the legislature, asking permission to use their corporate privileges there, are not demanding a right, but asking a favour, which the legislature may grant or refuse as it pleases. If it should refuse, it would violate no duty, incur no responsibility. If, however, the Court exercise the power, it is upon the positive obligation of Alabama, that the presumption must arise, or the right does not exist. A positive rule of law cannot arise out of an imperfect obligation, by presumption or implication. But to put it on the foot of bare repugnance of the law, presumed to be adopted, to the laws of the country adopting, if there be any repugnance the Court ought not to presume the adoption. Story's Conflict of Laws, 37. The charter of every bank not created in conformity with the constitution of Alabama, must, at least, be repugnant to it. The presumption is, that the charters of all these banks were repugnant, there being no reason or inducement to make them conform in the states where they were created. The power of the Court to adopt the laws creating these banks, as they actually existed, and the power of the legislature of Alabama to adopt them in a modified form, or to grant the banks a mere permission to do a specified act, present very different questions, and involve very different powers. If, therefore, the legislature could not adopt the charters in the least objectionable form, nor authorize the banks to deal in exchange, without violating the constitution of Alabama, how can it be said that the contracts in controversy are not against the policy of the laws of Alabama? And by what authority does the majority of this Court presume that Alabama has adopted those laws? The general rule is, that slight evidence and circumstances shall defeat a mere legal presumption of law. This case will be a signal exception to that rule.

In the case of Pennington vs. Townsend, 7 Wend. Rep. 278, the Protection and Lombard Bank, chartered by New Jersey, by agents, undertook to do banking business in New York, and there discounted the check which was the subject of the suit, in violation of the restraining acts of 1813 and 1818; the first of which enacts that no person unauthorized by law shall become a member of any association for the purpose of issuing notes or transacting any other business which incorporated banks may or do transact. The act of 1818 enacts that it shall not be lawful for any person, association, or body corporate to keep any office of deposit for discounting, or for carrying on any kind of banking business, and affixes a penalty of $1000, to be recovered, &c. Under these laws the contract between the parties was held to be void; and the Court says, "The protection against the evil intended to be remedied, to wit, preventing banking without the authority of the legislature of the state, is universal in its application within the state, and without exception; unless qualified by the same power which enacted it, or by some other paramount law. Such is not the law incorporating this bank."

Is there any thing in these laws which more positively prohibits banking in New York, without the authority of the legislature of that state, than there is in the constitution of Alabama, prohibiting all banking except in the manner prescribed by the constitution? Can it be believed that she intended to protect herself against the encroachments of her own legislature only, and to leave herself exposed to the encroachments of all her sister states? Does the language employed in these provisions of the constitution justify any such construction? It is general, comprehensive, and not only restrictive, but expressly prohibitory. Whatever is forbidden by the constitution of Alabama, can be done by no one within her jurisdiction; and it was sufficient for her to know that no bank could do any valid banking act there without violating her constitution. It was contended, by the counsel for the banks, that no law could be regarded as declaring the policy of the state, unless it was penal; and inflicted some punishment for its violation. This doctrine is as novel as it is unfounded in principle. I know of no such exclusive rule by which to reach the mind and intention of the legislature. If the language used shows clearly that particular acts were intended to be prohibited, and the act is afterwards done, it is against the policy of the law and void. Suppose the legislature of Alabama were to establish a bank, disregarding all the conditions and restrictions imposed by the constitution: would it not violate that instrument, and therefore the act be void? And can Georgia, Louisiana, or Pennsylvania, by their respective legislatures, do in Alabama what her own legislature cannot do? The relations which these states hold towards each other, in their individual capacity of states, under the Constitution of the United States, is that of perfect independence. In the case of Buckner vs. Finley and Van Lear, 2 Peters' Rep. 590, Chief Justice Marshall said, "For all national purposes embraced by the federal Constitution, the states and the citizens thereof are one

3 E 2

united under the same sovereign authority, and governed by the same laws. In all other respects the states are necessarily foreign to, and independent of each other." It is in this foreign and independent relation that these four states stand before this Court in these cases. The condition of Alabama, taken with a view to this relation, cannot be worse than that of an independent nation, in like circumstances. What that would be we will see from authority.

"Nations being free and independent of each other in the same manner as men are naturally free and independent, the second general law of their society is that each nation ought to be left in the peaceable enjoyment of that liberty it has derived from nature. The natural society of nations cannot subsist, if the rights which each has received from nature are not respected. None would willingly renounce its liberty: it would rather break off all commerce with those that should attempt to violate it. From this liberty and independence it follows that every nation is to judge of what its conscience demands, of what it can or cannot do, of what is proper or improper to be done; and consequently to examine and determine whether it can perform any office for another without being wanting in what it owes to itself. In all cases, then, where a nation has the liberty of judging what its duty requires, another cannot oblige it to act in such or such a manner. For the attempting this would be doing an injury to the liberty of nations. A right to offer constraint to a free person can only be invested in us in such cases where that person is bound to perform some particular thing for us, or from a particular reason that does not depend on his judgment; or, in a word, where we have a complete authority over him." Vatt. 53, 54.

Now apply these just and reasonable principles to Alabama, in her relation of a foreign and independent state, reposing upon the rights reserved to her by the tenth amendment of the Constitution of the United States; and then show the power that can compel her to pass penal laws to guard and protect those perfect, ascertained, constitutional rights from the illegal invasion of a bank created by any other state. If this power exists at all, it can be shown, and the authority by which it acts. But not even a reasonable pretence for any such power or authority has been shown. The conclusion must therefore be, that Alabama, as an independent foreign state; owing no duty, nor being under any obligation to either of the states, by whose corporations she was invaded; was the sole and exclusive judge of what was proper or improper to be done; and consequently had a right to examine and determine whether she could grant a favour to either of those states without injury to herself; unless indeed there be a controlling power in this Court, derived from some provision of the Constitution of the United States. As none such has been set up, or relied upon in the opinion of the majority of the Court; for the present I have a right to conclude that none such exists. And without considering any of the minor points discussed in the argument, or noticed in the opinion, I dismiss the subject.